# **Memphis Seismic/Modernization Phase I**

**Veterans Administration Hospital**

**Memphis, Tennessee**

Caddell Construction Co., Inc.

v.

United States of America

Expert Report

November 29, 2005

Prepared by:

Marshall T. Ferrell
Tennessee PE No. 8590
Ferrell Engineering, Inc.
2 Office Park Circle
Suite 103
Birmingham, Al 35223
Tel. (205) 879-2036
Fax (205) 879-5642

IN THE UNITED STATES COURT OF Federal Claims

| | | |
|---|---|---|
| CADDELL CONSTRUCTION CO., INC, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | No. 04-461C |
| | ) | (Judge Bohdan A. Futey) |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**EXPERT REPORT of**

**MARSHALL T. FERRELL, PE** Marshall T. Ferrell, P.E. 11/29/05

I have been retained by Steel Service Corporation (SSC) to evaluate and render my opinion concerning certain issues associated with SSC's performance on the Memphis Seismic/Modernization Phase I Veterans' Administration Hospital project (Project) in Memphis, Tennessee. My opinions on issues including the shop drawing approval process, the adequacy of the Contract Documents for purposes of pricing and bidding, the adequacy of the Contract Documents for the purposes of detailing, fabrication and erection of structural steel, the impact of precast connections to structural steel, the qualifications of EEE Detailing, Inc. (EEE) and planned man-hours in a shop fabrication facility are discussed in the following sections. I have also provided the typical sequence of

pre-erection activities after award of the sub-contract for fabrication and erection.

**Executive Summary**

I have reached the following conclusions regarding the Contract Documents and SSC's performance on the VA Project in Memphis, Tennessee:

1. The Contract Documents met the requirements of the "AISC Code of Standard Practice for Buildings and Bridges, June 10, 1992" for purposes of pricing and bidding.
2. The Contract Drawings dated June 23, 1995 and Released for Construction to SSC did not meet the "AISC Code of Standard Practice for Buildings and Bridges, June 10, 1992" and were not adequate for the purposes of detailing, fabrication and erection. The Contract drawings were incomplete and inadequate for the purposes of detailing, fabrication and erection. Discrepancies, errors and omissions on the Contract Drawings disrupted the detailing, fabrication and erection activities on the Project resulting in increased costs and delays to these activities. The errors and

omissions on the Contract Drawings affected all trades and prevented any meaningful coordination by the Construction Team because of the lack of coordination by the VAMC and its design team in the plans and specifications and in correcting errors and in providing omitted information.

3. For example, the connection requirements and locations for the precast connections were continually revised on responses to precast RFI's by the VAMC and on precast drawings submitted to the VAMC for approval. Sometimes the responses to precast RFI's were in conflict. Responses to RFI's submitted by SSC differed from responses received by the precast manufacturer for the same issue. The precast manufacturer had virtually no opportunity to coordinate the connection requirements with the steel fabricator until receipt of the final approved precast drawings by the precaster. As a result, the Construction Team cannot be held responsible for conflicts created by the VAMC's failure to complete and/or coordinate its design.

4. EEE Detailing, Inc. (EEE) has provided detailing services on numerous projects of equal or greater

complexity than the VA Project. EEE was a reputable detailing firm that has furnished shop drawing preparation on many projects on which my firm, Ferrell Engineering, Inc. (FE), has furnished connection design engineering services.

5. When planned shop fabrication man-hours on a project are unused, it is virtually impossible to replace those man-hours with hours from other projects. The hours are lost forever.

## Typical Sequence of Pre-Erection Activities

**Connection Design**—If the Structural Engineer of Record (SER) does not design the steel connections, and if these services are required by the Contract Documents, then the steel fabricator will design the structural steel connections or retain a connection design engineering firm to provide the connection design services. On the VA Project, the SER provided most of the connection design for the major connections on the Contract Drawings. SSC retained FE to provide the connection design services required by the Structural Steel Specification 05100, Part 2.2B for those connections not shown on the Contract Drawings. FE is a specialty structural engineering firm

specializing in structural steel connection design along with stair/handrail design. FE was established in August 1991 and has provided connection design services on major projects, including hospitals, stadiums, arenas, ballparks, high-rise buildings and industrial buildings throughout the United States, Canada and Puerto Rico. The connection design activity, whether provided by FE or by the SER, is not an issue in this claim.

**Connection Design Review and Approval**—Completed connection designs are forwarded to the SER for review and approval. Connection designs that have been reviewed and approved by the SER are then sent from the steel fabricator to the detailer for the detailer's use in preparing shop drawings. Since the SER is the only individual who has all the information necessary to evaluate the impact of the connection details on the structural design, this review and approval is essential to the structural stability of the structure. Allen and Hoshall (A&H) was the SER for this Project.

**Detailing of the Shop Drawings**—SSC sub-contracted with EEE to prepare the erection drawings and shop drawings for the VA Project. The steel detailer, in order to produce shop drawings, relies on the accuracy and completeness of the Contract Drawings for preparation of the erection

drawings and shop drawings. EEE is a reputable steel detailer headquartered in Birmingham, Alabama. FE has furnished connection design services on numerous projects detailed by EEE since EEE was established in January 1992.

**Shop Drawing Review and Approval**—Completed shop drawings are submitted to the SER for review and approval.

**Finalize Shop Drawings**—The detailer incorporates any approval comments or revisions from the SER into its shop drawings before issuing the shop drawings for fabrication.

**Fabrication**—The fabricator fabricates the steel members using the approved shop drawings and ships the steel to the field.

**Erection**—The erector places the steel members in the locations as designated on the erection drawings.

## Shop Drawing Approval Process

Structural Steel Specification 05100, Part 1.2B2, states that Paragraph 4 in the AISC Code of Standard Practice for Buildings and Bridges, 1992 is superseded by requirements of the General Conditions, Special Conditions and Contract Documents. Paragraph 4 is titled "Shop and Erection Drawings." However, there were no requirements in

the General Conditions, Special Conditions and Contract Documents to replace Paragraph 4.

There are parts of Paragraph 4 that are essential to the performance of a steel fabricator that were not superseded by information in the General Conditions, Special Conditions or Contract Documents. These parts are as follows:

1. Part 4.2—"When shop drawings are made by the fabricator, prints thereof are submitted to the owner for his examination and approval. The fabricator includes a maximum allowance of fourteen (14) calendar days in his schedule for the return of shop drawings."

To my knowledge the approval time of fourteen (14) calendar days was not superseded by alternate requirements in the General Conditions, Special Conditions, or Contract Documents. Stipulating approval time for shop drawings is essential for the fabricator to plan and schedule fabrication and erection. When a part of the Code is superseded but not replaced by alternate criterion, then the standard practice in the steel fabrication industry provides the standard and that standard is as stated in the Code and, therefore, the Code requirements must govern. The VA's Senior Resident Engineer, Mr. William Totolo, took

the position throughout the Project that the "contractual approval time" was 30 calendar days but I have found nothing in the Contract Documents to support his position. This position was also taken in letter dated December 9, 2003 from the Department of Veterans Affairs to Caddell Construction. See Exhibit A.

2. Part 4.2.1–"Approval by the owner's authorized representative of shop drawings prepared by the fabricator indicates that the fabricator has correctly interpreted the contract requirements, and may rely upon these drawings in the fabrication process."

To my knowledge there are no requirements in the General Conditions, Special Conditions or Contract Documents that replace this Code requirement. Therefore, as stated above, the Code codified the standard practice in the steel fabrication industry and, therefore, governs since this Code requirement was not superseded by replacement "language." While it is recognized by AISC that some additions, deletions or revisions may be noted on the shop and erection drawings, it is not the intent of AISC that the shop and erection drawings approval process be used as a tool as the owner for the completion and

coordination of the design on the Contract Drawings by the incremental release of design drawings for construction.

Drawings that are not complete and ready for construction should not be issued for construction. The purpose of shop drawing approval by the architect/engineer (A/E) is simply as stated in the Code "that the fabricator has correctly interpreted the Contract Documents and may rely on these drawings in the fabrication process."

## Adequacy of the Contract Drawings for The Purposes of Pricing and Bidding

The AISC "Code of Standard Practice for Steel Buildings and Bridges", June 10, 1992 provides a common understanding of the acceptable standards when contracting for structural steel. The 1992 Code was the latest edition of this document when this project was awarded in 1996; therefore, the 1992 Code has been used for purposes of this report. The First Edition of this Code was published in 1924 and AISC has continuously surveyed the structural steel design community and construction industry to determine standard trade practices since that time. As a result, the Code has been periodically updated to reflect new and changing technology and industry practices. An

AISC committee composed of representatives from fabricators, erectors, structural engineers, architects, inspectors and detailers developed the 1992 Code.

The Project Structural Steel Specification Section 5100 Part 1.2B2 references the American Institute of Steel Construction Code of Standard Practice for Steel Buildings and Bridges, 1992 Edition. As discussed above, Specification Section 5100 states that Articles 3.2 and 3.3 and Paragraphs 4 and 9 of the Code are superseded by requirements of the General Conditions, Special Conditions and Contract Documents.

In my opinion, the Contract Documents provided adequate information to the steel fabricators for the purpose of pricing and bidding this Project. The Contract Documents provided information necessary to determine quantities and approximate lengths for member takeoff. Typical details were provided in the Contract Documents that allowed the fabricators to understand the nature of the structural steel framing even though many of the details shown were not actually used on this Project.

Neither SSC nor EEE could anticipate the discrepancies and errors on the design drawings during the estimating and bidding of the Project. For bidding purposes, the detailer reviews the contract drawings for possible duplication of

shop details, the quantity of members to be detailed and the nature (degree of complexity) of the Project as indicated by the typical details shown on the design drawings. Using the detailer's experience on projects of similar complexity, the detailer estimates the man-hours needed to perform the various types of work that he will encounter. There is simply not enough time while bidding the project to review every condition to determine if the design drawings are complete for detailing. The bidder, to be competitive, can only assume that the drawings that will be "Released for Construction" will be complete and base the detailing cost and schedule commitments upon that fact.

As the first step in preparing a competitive bid to furnish structural steel for a given project at a lump sum, the fabricator's estimator prepares a detailed list, or "takeoff", of all pertinent material shown in the structural design drawings and determines the associated costs and labor. The estimator, from past experience and with the aid of cost data from previous similar jobs, determines the cost of preparing shop drawings and fabricating the structural steel. The pricing may be determined by either applying cost factors or by making a complete and detailed analysis of shop costs. Dimensional

information in the Contract Documents does not have to be "exact" to determine a realistic price.

**Adequacy of Contract Drawings for the Purposes of Detailing, Fabrication and Erection of Structural Steel**

The most important Contract Documents for the steel detailer are the Contract Drawings and Specifications. The accuracy of the Contract Drawings is the responsibility of the Owner's Designated Representative for Design (Architect/Structural Engineer of Record). While it is apparent from the Contract Documents that coordination by the Contractor for location of secondary members is a Project requirement, this coordination by the Contractor does not release the Owner's Designated Representatives for Design from their responsibility to furnish complete and accurate Contract Documents that allow the detailer to proceed with preparation of the erection drawings and shop drawings in an efficient manner. The requirement for the owner to provide "complete structural steel design plans clearly showing the work to be performed..." is stated in Part 3.1 of the Code along with appropriate Commentary for Part 3.1. Part 3.1 was not deleted or superseded in the Structural Steel Specification 5100, Part 1.2B2.

In my opinion, the quality of the Contract Drawings, dated June 23, 1995 and issued for detailing, fabrication and erection of structural steel for this Project did not meet the Standard of Care of a reasonably prudent SER. The discrepancies and errors in these Contract Drawings disrupted SSC's planned activity schedules for the detailing, fabrication and erection of the Project.

The design and construction of structural steel buildings is a complex and challenging process. No set of construction documents is perfect. Good communication between members of the design and construction teams is essential for a successful project. The standard form of communication between the Design Team and the Construction Team used to resolve these questions is the "Request for Information" (RFI). The RFI process is intended to provide a written record of inquiries and associated responses. There is a need for clarity in both questions and answers. A successful RFI process is truly a team effort. The A/E should incorporate RFI responses into their design drawings concurrent with processing the RFI. The A/E then has the benefit of having complete, up-to-date information on their drawings for reviewing submittals. The RFI process is not intended to be a tool for the correction and/or completion of the project design through the incremental release of

design drawings for construction. Drawings that are not complete and ready for construction, should not be issued for construction.

The AISC Code of Standard Practice for Steel Buildings and Bridges, March 18, 2005, is the first Code to cover RFI practices even though the RFI process has been used throughout the industry for many years. The RFI Process is a new section that defines the RFI process and how it is intended to be used by all parties and is a codification of the standard practice in the steel fabrication industry when the VAMC project was designed and constructed... Responses to RFI's must be received in a timely fashion so as not to delay the detailing, fabrication and erection of the project. It has been my experience that the typical response time to RFI's in the steel industry is one to three working days, depending upon the urgency and complexity of the issue and the amount of work required to develop a full and complete response. There may be circumstances in which more than 3 days is required to prepare the response. On this Project, SSC reserved RFI numbers one through 355. Under my direction, qualified and experienced personnel at FE have analyzed all of these RFI's. See Exhibit B. Most of these RFI's were answered

by the VA Senior Resident Engineer, Mr. Bill Totolo. The result of the FE analysis is as follows:

1. 52 RFI's were not required because of discrepancies in the Contract Documents. Some of these RFI's were not required due to the fact that the Design Drawing information was correct (34). Some were SSC requests for alternate proposals (3). Some were in effect duplicates of previously submitted RFI's (2). Some addressed issues between SSC and its subcontractors (5). Some addressed issues that had no impact on detailing, fabrication or erection of structural steel (8).
2. 303 RFI's were required because of errors, omissions or discrepancies in the Contract Drawings for SSC to prepare shop drawings, fabricate and erect the steel. Primary reasons that these RFI's were required are as follows:
   a. Incorrect section references (Example RFI 0010, 0012, 0013, 0014, 0015, 0025, 0041, 0043, 0047, 0048, etc)
   b. Incorrect or missing member location dimensions or member elevations (Example RFI 0021, 0027, 0042, 0052, 0053, 0055, 0056, 0058, 0246, etc)

c. Incorrect column grid notations, column grid to column grid dimensions or column orientations (Example RFI 0019, 0020, 0030, 0038, etc)

d. Design Drawing sections shown but not used on this Project (Example RFI 0280, 0281, 0282, 0283, 0284, etc)

e. Design Drawing plans and sections in disagreement (Example RFI 0022, 0023, 0024, 0224, 0241, 0242, 0247, 0308, etc)

f. Incorrect member sizes or incorrect member material grade (Example RFI 0031, 0035, 0036, 0039, etc)

The content and response time to RFI's on this Project disrupted EEE's plan to staff this Project as required to meet SSC's fabrication requirements. In an e-mail from SSC to EEE on March 8, 1996, SSC informed EEE of the out for approval dates for shop drawings as required by SSC. The quantity of RFI's on a project should not be used to measure the completeness of the Contract Documents. When the number and/or content of RFI's reach a point where productivity is hindered to the point that schedules and/or costs are affected, then the number of RFI's has become excessive.

Meetings held at the Department of Veterans Affairs in Washington, DC on April 25 through April 28, 1995 were for the purpose of reviewing the 100% Construction Documents Submittal by the Design Team. The minutes of that meeting are included in this report and identified as Exhibit C. Some direct quotes from those minutes are as follows:

1. "Due to the incomplete nature of many of the drawings, there is a serious concern for coordination between the disciplines. Is there enough time to not only finish the drawings, but to do adequate coordination in three weeks? Could an adequate coordination review by JMGR engineers be done in the time remaining? Could this be done on a "fast track" basis, with review being done concurrently with the work? This is a question that will be given serious consideration and should be resolved by the end of the review."

2. Structural Reviewer—"Structural drawings need a great deal of work; drawings brought to Washington by Allen & Hoshall still have many mistakes. Estimate 50% completion. Will need resubmittal."

3. Exit Meeting on April 28, 1995—"It was pointed out that a post submittal will be necessary by

June 6, 1995. By that time, one plot or sepia of each of the corrected drawings is to be re-submitted (along with Final Specifications). Not only are these drawings to be completely capable of being bid, but are to be properly coordinated so that they are as "tight" as possible (meaning that they keep errors and omissions to a minimum)."

4. Exit meeting on April 28, 1995—Structural

a. "There is much work to do on these drawings to reach 100%. Resubmit all drawings, calculations and final specifications by June 6."

b. "The following elements must be coordinated with the architectural drawings, pre-cast panels, stairs, storefront elements, catwalks, depressed slabs, dimensions, especially the slab edge. Coordination elements with other disciplines include mechanical equipment seismic anchorage and pipe and shaft openings."

c. "It was decided that the A/E designs the special moment connections since the local fabricators do not have this expertise. The fabricators can, however, design and detail the typical

connections if the A/E shows the proper calculations and examples."

In a transmittal dated June 9, 1995 Allen & Hoshall submitted "completed" structural drawings for the superstructure to VAMC.

In a VA Price Negotiation Memorandum dated June 14, 1995 (Exhibit D), the VA initiates a credit ($43,060) for reduced quality control stating the reason for the change to be that "Allen & Hoshall, the engineering Joint Venture partner, has not provided the quality control and coordination per the contract, especially with respect to the structural design."

In a letter dated July 31, 1995 from Allen & Hoshall to JMGR, A&H disagrees with the reduction in fee due to VA Negotiation Memorandum dated June 14, 1995. JMGR sent A&H's letter dated July 31 to VAMC on August 3, 1995 requesting more specific information regarding the basis for the VAMC's position.

While I have not been able to determine the results of the negotiation for reduction in fee, there is no doubt that VAMC recognized that there were serious inadequacies in the structural design drawings and the coordination of these drawings with other trades.

Despite the VAMC's actual knowledge of such inadequacies, many of the responses from the VA Senior Resident Engineer, Mr. William Totolo, appear to be an attempt to posture in defense of the accuracy of the Design Documents in dealing with the Construction Team. Mr. Totolo uses words in his responses to the RFI's such as "you may change" or "to clarify" in an effort to disguise the fact that the information given in the Design Documents was either an error or omission or revised design information was being transmitted in the RFI responses to the Construction Team. The definition of "clarification" given in the AISC 2005 Code is "An interpretation of the design drawings or specifications that have been released for construction, made in response to an RFI or a note on an approval drawing, and providing an explanation that neither revises the information that has been released for construction nor alters the cost or schedule of performance of the work." The AISC 2005 Code definition for "revision" is "An instruction or directive providing information that differs from information that has been released for construction. A revision may, but does not always, impact the cost or schedule of performance of the work." Most responses to RFI's by the Owner's Representatives for Design and Construction on this Project were clearly

revisions to the Contract Documents, not simply clarifications or requests for changes to the Contract Documents by SSC as the wording in the responses attempted to imply. The RFI process is not intended for posturing by either the Owner's Representatives for Design and Construction or the Construction Team.

The RFI's and the responses clearly show that the Design Drawings, dated June 23, 1995 that were Released for Construction and received by SSC on March 16, 1996 on this Project were incomplete and uncoordinated for detailing and fabrication purposes and disrupted the preparation of shop drawings, fabrication and erection on the Project. These deficiencies did not allow EEE to efficiently prepare the shop drawings. The design of the Project was completed through the RFI process. To my knowledge, the revisions transmitted to the Construction Team through the RFI process were never incorporated into the Contract Drawings. Using this approach, the errors and deficiencies on the Contract Drawings are discovered when a production detailer finds that he does not have sufficient information to complete the shop drawing on which he is working. He then notifies his supervisor of the deficiency and is assigned to another task while an RFI is submitted to request the missing or conflicting information. When the response to

response to the RFI is received, the production detailer is given the response and returns to complete the detailing of the members affected by the deficient Contract Drawings. Distribution of the response to the RFI must be made to all production detailers on the project as the response may also affect the members being detailed by other detailers and checkers. Each production detailer and checker must then take the time to record the response to the RFI on their set of Contract Drawings to assure that responses to all RFI's are considered in the detailing process rather than relying on a "stack" of RFI's that must be referenced throughout the project as they proceed with preparing the shop drawings. This process is very inefficient and time-consuming and inevitably results in increased errors on the shop drawings which cannot be attributed to the detailer.

Clouding missing information on the shop drawings and submitting them for review or proceeding to partially detail members can only be used if both the quantities of members affected and the content of the missing information is of such a nature that the procedure is advantageous. In my opinion, both the quantities of RFI's and the content of the RFI's render this procedure worthless on this Project except in a few isolated cases. The time to complete the shop drawings of the members affected after receipt of the

information on approval of the shop drawings would have far exceeded the time required to complete the shop drawings prior to submittal for approval if the responses to the RFI's had been received in a timely manner.

**Impact of Precast Connections on Structural Steel**

Architectural Precast Concrete Panels Specification Section 03450 is a performance specification which transfers a portion of the design responsibility to the precast panel fabricator, Arkansas Precast Corporation (APC), and its specialty engineer, Rupprecht Engineering, Inc. for design associated with the Architectural Precast. Specification Section 03450 included the following criteria:

1. Part 1.6E Submittals—Structural calculations for panel embedded connections
2. Part 1.8A Quality Assurance—Requirements of Regulatory Agencies—Panel Design: The contractor shall engage a Civil Engineer, registered in the State of Tennessee, for design of all precast concrete panels and connection hardware embedded within the panels. All panels shall be designed to resist loads due to gravity, wind, and seismic

in accordance with the draft version of the Department of Veteran Affairs, "Earthquake Resistant Design Requirement for VA Hospital Facilities, H-08-8, dated March 1995. By reference this requires full compliance with the California Building Code, Title 24 as modified by H-08-8.

3. Part 1.9 Coordination—Coordinate the manufacture and erection of precast concrete panels with related work of other sections of the Specifications. Provide templates for inserts and other devices for anchoring precast concrete elements to the work of other trades, in sufficient time to be built into adjoining construction. Perform cutting, fitting and other related work in connection with erection of precast concrete work.

4. Part 3.1A1 Execution—Handling and Installation: Accurately place and securely anchor precast concrete panels to adjoining construction in accordance with approved shop and erection drawings.

This Specification requires design of the precast concrete panels and the connection material embedded within

the panels to be designed by the precast panel manufacturer's engineer. The responsibility for the design of the connections to the structural steel and the impact of the design of these connections on the structural steel frame remain the responsibility of the SER.

This Specification also requires coordination of the manufacture and erection of precast concrete panels with related work. In Section 03450, Part 1.2, Related Work, there is no reference to Structural Steel Section 05100. The sections referenced as "Related Work" in Section 03450 are Section 03300 Concrete, Section 09050 Color Design and Section 07920 Sealants and Caulking. Similarly, in Structural Steel Section 05100, Part 1.1C, Related Sections, there is no reference to Architectural Precast Concrete Panels, Section 03450. The sections referenced as "Related Sections" in Section 05100 are Section 03300 Cast-in-Place Concrete and Section 05311 Steel Decking.

General Notes on Drawing 1-S1, Scope, states "The S drawings and the SE drawings are mutually independent of one another. Contractor shall coordinate the S drawings with the SE drawings at the interface of the new construction and seismic strengthening construction." The S drawings are new tower construction and the SE drawings are "existing" building construction.

With regard to the existing building, Drawing 1-SE6.1, Precast Concrete Panel Note 4 states that "The precast panel drawings have been developed for bidding purposes. The contractor shall review these drawings for adequate erection tolerances, erection sequence and coordination with new tower construction. Connection details or their proposed locations may be modified as required to minimize disruption to the existing hospital building and its occupants. Such changes shall be supported by calculations based on criteria described in Notes 1 and 3. Proposed details or other changes shall be submitted to the resident engineer for review." This drawing refers to precast connections in the existing building and only pertains to the existing building (SE drawings) as the S drawings (new tower) and the SE drawings (existing building) are mutually independent of each other. For this report all of my comments concerning precast panel connections will be limited to the S-drawings for the new tower which do not contain the statement in Note 4, drawing 1-SE6.1.

As shown below, the information shown on the Contract Documents pertaining to precast locations and connections was simply in error and uncoordinated. The VAMC used the RFI process and shop drawing approval process to complete the precast design.

The following precast panel sections that were shown on the Contract Drawings were shown but not used due to the VAMC's responses to SSC RFI's:

| Drawing | Sections Shown But Not Used |
|---|---|
| 1-S25 | 16 and 18 |
| 1-S26 | 5 |
| 1-S30 | 1 and 8 |

In addition, numerous design revisions were made by the VAMC on the precast erection drawings submitted to VAMC for approval by APC. For example, VAMC responses to precast RFI's changed information furnished on VAMC markups on precast drawing submittals. See RFI VA 371, Exhibit E.

Plans and sections for precast connections on the Contract Drawings differ throughout the Project. For example SSC RFI 65, 190, 224 240, 241, 242, 308, 341, 247, 293, 318 and 319, pertain to discrepancies between plans and sections for precast connections.

The response to SSC RFI 65 was received in a letter from the Department of Veterans Affairs (Senior Resident Engineer, William Totolo) dated May 9, 1996. The response states that "The sections are correct. Coordinate with precast manufacturer and architectural drawings." The handwritten response to this RFI and signed by the Owner Representative differs from the May 9, 1996 letter response

from the Senior Resident Engineer, Mr. William Totolo. The handwritten response was not returned to SSC. See Exhibit F.

The Contract Documents were erroneous, incomplete and uncoordinated for the purpose of connecting the precast panels to the structural steel and prevented SSC from being able to coordinate its steel with the precast. These discrepancies delayed the completion of the precast drawings and disrupted the detailing, fabrication and erection of the structural steel due to the revisions required to the steel shop drawings after approved precast drawings were received.

## Qualification of EEE Detailing, Inc.

FE has provided connection design services on numerous complex projects where EEE has provided the detailing services. Some of the projects are as follows:

| PROJECT | LOCATION | FABRICATOR |
|---|---|---|
| Nippondenso Plant | Oak Ridge, TN | Fischer Steel |
| SPSA Power Plant | Norfolk, VI | Shelby Steel |
| MD Anderson Cancer Ctr | Houston, TX | Trinity Ind. |
| SE Alabama Medical Ctr | Dothan, AL | E&H Steel |

**Planned Man-hours in a Shop Fabrication Facility**

It is common practice in the steel fabrication industry for the material and approved shop drawings to be available for fabrication only a short time before fabrication is to begin on the projects. It is uncommon for the material to be available and shop drawings completed and approved for a significant period of time prior to the planned fabrication of the projects. Therefore, when shop hours allocated to a project are not used as planned for steel fabrication, it is virtually impossible to fill those "available" hours with hours from other projects. The availability of hours from other projects is dependent upon both shop drawing availability and material availability for each of the other projects. When hours from other projects cannot be used to fill allocated but unused hours, the fabricator has "lost" those hours.

**Exhibits**

See attached list for Exhibits A, B, C, D, E and F

## Contract Documents and Project Files Reviewed in Preparation of This Report

1. Structural Steel Design drawings dated June 23, 1995 and received by SSC on March 16, 1996, Released for Construction
2. Architectural Design Drawings dated June 23, 1995
3. Structural Steel Specification Section 05100
4. Architectural Pre-Cast Concrete Specification Section 03450
5. General Conditions Specification Section 01001
6. General Requirements 01010
7. Samples and Shop Drawings Specification Section 01340
8. SSC subcontract with Caddell Construction dated February 16, 1996
9. SSC RFI's one through 355
10. Addendums One through 5
11. SSC correspondence folders one through 6
12. VAMC files obtained by SSC in discovery
    a. Minutes of Meeting at VAMC in Washington, DC on April 25 through April 28, 1995 for purposes of reviewing the 100% Construction Documents Submittal

b. Allen & Hoshall transmittal dated June 9, 1995 to VAMC—Submittal of completed structural drawings for the superstructure

c. VA price negotiation memorandum dated June 14, 1995 referencing credit for reduced quality control due from Allen & Hoshall

d. Letter from A&H to JMGR (architect) dated July 31, 1995 referencing Amendment Modification No. Change No. A disagreeing with the reduction in fee ($43,060) due to the VA negotiation memorandum dated June 14, 1995

e. Letter dated August 3, 1995 from JMGR to VAMC attaching the A&H letter dated July 31, 1995 to JMGR and requesting more specific information regarding the basis for the VA's position

f. Minutes of various job meetings from June 12, 1996 to January 29, 1997

g. Letter dated July 25, 1996 from Caddell Construction to VAMC concerning unanswered pre-cast questions

h. Letter dated April 28, 1997 from VAMC to JMGR concerning checking of contract drawings for errors and omissions in order to minimize additional costs

i. Letter dated December 9, 2003 from Department of Veterans Affairs to Caddell Construction Company, Inc. concerning Contracting Officer's Final Decision on SSC Request for Equitable Adjustment

j. Handwritten note on "sign-in sheet" for structural meeting on 04/18/95

13. Some Precast RFI's sent from Arkansas Pre-cast

14. Precast erection drawing approval comments for Submittals 03450-1 and 03450-2

15. AISC Code for Standard Practice for Buildings and Bridges, 1992

16. AISC Code of Standard Practice for Buildings and Bridges, 2005

17. Steel and precast shop and erection drawings

18. SSC's Claim for Equitable Adjustment dated October 31, 1997

**Rates for Preparation and Testimony**

Marshall Thomas Ferrell--$225 per hour

Other Ferrell Engineering, Inc. Technical Employees--$95 per hour

Ferrell Engineering, Inc. Clerical--$55 per hour

Expenses–At cost

**Index of Exhibits for Ferrell Expert Report**

| Exhibit | Description |
|---|---|
| A | Dept of VA letter to Caddell dated December 9, 2003 |
| B | FE analysis of RFI's |
| C | Minutes of meetings at Dept of VA on April 26 through 28, 1995 |
| D | VAMC Price Negotiation Memorandum dated June 14, 1995 |
| E | VA RFI 371 |
| F | SSC RFI 65 with responses from VAMC and Owner's Representative |

**MARSHALL T. FERRELL**
**1788 DEO DARA DRIVE**
**BIRMINGHAM, ALABAMA 35226**

**(205) 979-4685**

## EDUCATION

1965 to 1968 — University of Tennessee
Knoxville, Tennessee
Bachelor of Science in Civil Engineering - March 1968

1963 to 1965 — U.S.A.F. Academy
Colorado Springs, Colorado
Major: Chemistry

## EXPERIENCE

**August 1991 to Date**
**Ferrell Engineering, Birmingham, Alabama**

Title: President
. Structural steel connection design and stair/handrail design.

**September 1985 to August 1991**
**Trinity Industries, Inc., Structural Division, Birmingham, Alabama**

**June 1988 to August 1991**

Title: Director of Engineering, Building and Bridges

Supervise the engineering managers for all of Trinity's structural facilities to assure quality shop drawings and maximize fabrication efficiencies. Keep abreast of industry and code changes and advise appropriate Trinity personnel. Monitor engineering cost and schedules for all structural facilities.

**September 1985 to June 1988**

Title: Engineering Manager, Eastern Region

Reviewed new contracts and directed preparation of job standards and connection designs. Submitted requests to design engineers for changes to improve shop operations. Maintained schedules and cost reports for all projects. Assisted estimating on work being quoted.

**November 1978 to September 1985**
**John W. Parrish Structural Detailers/North Alabama Fabricators, (same ownership), Birmingham, Alabama**

Title: Chief Engineer and Quality Control Manager

Managed all drafting personnel. Prepared job standards and connection designs. Established quality control manual and welding procedures.

**January 1971 to November 1978**
**Mississippi Valley Structural Steel, Chattanooga, Tennessee**

Title: Project Engineer/Estimator

Made material take-offs and estimated shop labor hours, painting costs, shipping costs, and detail costs for a major structural steel fabricator. Designed structural steel for design/build projects. Checked estimates and design calculations made by other employees.

**April 1968 to January 1971**
**Chicago Bridge & Iron Company, Birmingham, Alabama**

Title: Field Engineer/Design Engineer

Made field layouts and surveys required for steel erection. Made design calculations and design drawings for elevated tanks, flat bottom storage tanks, and paper mill digester.

## ENGINEER REGISTRATION

Alabama, Tennessee, North Carolina, Maryland, Florida, Texas, New York, New Jersey, Pennsylvania, Illinois, Mississippi, Georgia, Kentucky, South Carolina, Virginia, Missouri, Puerto Rico, Louisiana, Nevada, New Mexico, Ohio, Arkansas, Massachusetts, Colorado, Michigan, West Virginia, Nebraska, Rhode Island, Minnesota, Oklahoma, Connecticut, District of Columbia and Province of Alberta, Canada.

## PROFESSIONAL COMMITTEES

AISC Committee on Specifications, 1991; AISC Committee on Manuals, present member; AISC Specification Task Committee for Connections, present member; T.R. Higgins Jury member, 2000 and 2001; ASCE Committee on Structural Connections, 2002 through 2005; ASCE Committee on Design of Structural Steel Buildings, present member.

## PROFESSIONAL ORGANIZATION

Structural Engineers Association of Alabama
Professional Member of AISC
ASCE Member

**PUBLICATIONS**

Moment Connections to Column Webs
1998 North American Steel Construction Conference Proceedings Manual

Moment Connections to Column Webs
Reprinted in AISC Design Guide 13

**RETAINED AS EXPERT**

Puerto Rico Convention Center, San Juan, Puerto Rico
Hardin/QB Construction
2003 & 2005

Georgia World Congress, Atlanta, GA
Kilpatrick Stockton LLP
2003

Universal Studios' Islands of Adventure Seuss Landing, Orlando, FL
Moye, O'Brian, O'Rourke, Pickert & Martin
2003/2004

PNC Park, Pittsburg, PA
Watt, Tieder, Hoffar & Fitzgerald
2003/Current

Ford Field, Detroit, MI
Sullivan, Ward, Asher & Patton
2004/2005

New Cincinnati Reds' Ballpark, Cincinnati, Oh
Steel Service Corporation
Mockbee, Hall and Drake, PC
2005

Cooper River Bridge Claim, Charleston, SC
Nexsen Pruet Adams Kleemeier, LLC
2005

Memphis Seismic/Modernization Phase I Veterans Administration Hospital, Memphis, TN
Steel Service Corporation
Mockbee, Hall and Drake, PC
2005