ORIGINAL

DEFENSE CONTRACT AUDIT AGENCY
EASTERN REGION
GULF COAST BRANCH OFFICE
P. O. BOX 1244
PASCAGOULA, MISSISSIPPI 39568-1244

E-mail Address: *fao1751@rea.dcaa.mil

IN REPLY REFER TO

1751
(Assignment No. 98J17200002)

19 May 1999

Steel Services Corporation
P.O. Box 1144
Jackson, MS 39215-1144

Dear Mr. Cox:

We are enclosing a draft copy of our Audit Report No. 1751-98J17200002 on your request for equitable adjustment proposal related to Contract V101BC0133. Our audit results reflect the incorporation of the data provided by Mr. Ray Vinson during November and December 1998 in response to the 22 September 1998 exit conference. Please review this draft report and provide your comments. We would appreciate a written response to the draft report by 18 June 1999, so that they may be included in our audit report. If you do not wish to provide a written response, please advise so that we can proceed with issuing our report.

If you desire another exit conference to discuss our draft audit report, the conference may be scheduled with Mr. David Hampshire, Technical Specialist at (504) 257 -3359 or Mr. Gary Rosetti, Supervisory Auditor at (228) 938-1741.

Sincerely,

BARBARA J. IRVIN
Branch Manager

Enclosure:
Draft Audit Results – 98J17200002

ORIGINAL

EXHIBIT
E

DRAFT

# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 1751-98J17200002

**PREPARED FOR:** Contracting Officer (186A)
ATTN: Milan Srskic
Office of Facilities Management
Department of Veterans Affairs
810 Vermont Avenue N. W.
Washington, DC 20420

**PREPARED BY:** Gulf Coast Branch Office
P.O. Box 1244
Pascagoula, Mississippi 39568-1244
Telephone No. (228) 938-1720
FAX No. (228) 769-9166
E-mail Address *fao1751@rea.dcaa.mil

**SUBJECT:** Report on Audit of Subcontractor Equitable Adjustment Proposal Related to Steel Fabrication of Phase 1 VAMC, Memphis, TN

**REFERENCES:** VA Audit Control Number 8PE-N02-007
Prime Contract No. V101BC0133, Project Number 614-011

**SUBCONTRACTOR:** Steel Service Corporation
2260 Flowood Drive
Jackson, MS 39208

**REPORT RELEASE RESTRICTIONS:** See Page 27

**CONTENTS:**

| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 4 |
| Subcontractor Organization and Systems | 27 |
| DCAA Personnel and Report Authorization | 28 |
| Audit Report Distribution and Restrictions | 29 |
| Appendixes | 30 |

FOR OFFICIAL USE ONLY

DRAFT

## SUBJECT OF AUDIT

As requested by the Department of Veterans Affairs, we audited Steel Service Corporation's (SSC's) firm-fixed-price equitable adjustment proposal in the amount of $3,497,100 to determine if the proposed costs are acceptable as a basis to negotiate a fair and reasonable contract price. SSC originally submitted an equitable adjustment proposal dated 31 October 1997 in the amount of $2,907,121. During the course of this audit, SSC modified their equitable adjustment proposal as shown in the Results of Audit on page 4. SSC proposed costs include unabsorbed overhead, second tier subcontractor cost, increased subletting cost, efficiency losses, increased overhead rates and other related costs the subcontractor contends were the result of deficient contract drawings. The subcontractor advised the equitable adjustment proposal was submitted under the changes clause. The original proposed performance period was from February 1996 through November 1996.

The request for equitable adjustment proposal and related cost or pricing data are the responsibility of the subcontractor. Our responsibility is to express an opinion on the request for equitable adjustment proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $3,497,100 request for equitable adjustment proposal disclosed $1,912,868 of questioned costs, including the following significant items:

| | |
|---|---|
| Unabsorbed Overhead | $678,385 |
| EEE Detailing | 189,417 |
| American Metal Works | 141,763 |
| Increased Overhead Rates | 122,500 |
| Subletting | 207,528 |
| Efficiency Losses | 444,480 |
| Disputes Act Interest | 100,000 |

As identified in the notes of this report, the cost or pricing data are considered inadequate in part. The significant issues described below should be considered in the negotiation process.

SIGNIFCANT ISSUES

1. The results are qualified because (i) we have not received a technical report or assistance concerning contractor claimed delays and inefficiencies and (ii) we have not audited to determine entitlement. Additionally, we have not received technical input as to the adequacy of the SSC's

original bid or assignment of subcontractor modification amounts. This information is required since SSC premised their request for an equitable adjustment based on delays that are the fault of the government and in some instances (as discussed in the notes of this report) is proposing cost on a total cost basis that subtracts bid cost from cost incurred.

2. Unabsorbed overhead costs are significantly overstated in comparison to overhead costs calculated using the Eichleay formula. Cost not questioned represents a ceiling on allowable unabsorbed overhead. As such, questioned unabsorbed overhead should be adjusted for the results of a technical evaluation of the reasonableness of the subcontractor's proposed delay periods.

3. Cost questioned should be adjusted for the results of the technical review and entitlement determinations.

## SCOPE OF AUDIT

Except for the qualifications discussed below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the equitable adjustment proposal is free of material misstatement. An audit includes:

- reviewing the subcontractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the equitable adjustment proposal;
- assessing the accounting principles used and significant estimates made by the subcontractor;
- evaluating the overall equitable adjustment proposal presentation; and
- determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

- Federal Acquisition Regulation (FAR)

Subcontract No. 90521-05-SC is not covered by the Cost Accounting Standards Board (CASB) rules and regulations since the prime contract was awarded as a sealed bid contract and was, therefore, exempt from all CAS requirements under 48 CFR 9903.201-1(b)(1).

The subcontractor is a small business with limited resources to be applied to compliance procedures and testing. Our audit scope reflects this assessment of control risk and includes those tests of compliance with applicable laws and regulations that we believe provide a reasonable basis for our opinion. Our evaluation included examining, on a test basis, evidence submitted in support of the amounts claimed. The data submitted was traced to the source documentation when possible. We believe that our audit provides a reasonable basis for our opinion.

QUALIFICATIONS:

1. An equitable adjustment proposal has two basic elements, entitlement and quantum (amount). Our primary responsibility is to review quantum. Entitlement is a legal issue resulting from specific contract clauses. We did not determine the issue of entitlement; therefore, the results of our audit are qualified accordingly.

2. A technical evaluation is being performed by the Department of Veterans Affairs. However, we have not received a copy of that technical evaluation and were advised by the Department of Veterans Affairs that the technical evaluation would not be available for incorporation into our audit report. We believe that the technical evaluation at a minimum should address the following areas:

   - Determine if contract drawings were deficient and caused subcontractor delays.

   - Determine if it was reasonable for the subcontractor to schedule and fabricate steel for the subcontract starting in May 1996.

   - Determine if the subcontractor's original bid was reasonable for those areas, which the subcontractor is claiming total cost less bid cost (i.e., travel, program management, printing, etc).

   - Determine whether the various elements of costs, which the subcontractor proposed on a total cost basis, should be reduced for any of the amounts received in contract modifications.

   - Evaluate subcontractor inefficiency estimates.

   - Determine if a subcontract existed prior to the October 1996 signing of the subcontract (the subcontractor proposes the majority of unabsorbed overhead for the time period prior to October 1996).

DRAFT

Audit Report No. 1751-98J17200002

## RESULTS OF AUDIT

AUDITOR'S OPINION:

In our opinion, except for the qualifications discussed above, the cost or pricing data submitted by the offeror are inadequate in part (see the comments in the notes to the exhibits). The equitable adjustment proposal was prepared in accordance with appropriate provisions of the FAR. Nevertheless, in our opinion, technical review of delay days, contract modifications, fabrication schedules, efficiency estimates, and evaluation of the original bid as discussed in the Qualifications section of the report are significant enough to materially impact the results of the audit. Therefore, as discussed with Mr. Milan Srskic, title, by David Hampshire of our office on xx June 1999, we recommend that contract price negotiations not be concluded until the results of those evaluations are considered by the contracting officer.

An exit conference was held with Mr. Lawrence Cox and representatives of Steel Service on 22 September 1998. Additional support was provided, reviewed and incorporated into the current audit results. Steel Services provided the written response, dated xxxxxxxx, which is included as an APPENDIX to this report.

Since there are significant findings as discussed in the Results of Audit which are contested by the subcontractor; we are available to provide you with assistance in resolving the reported findings.

The results of audit are as follows:

| | | | Notes 1 & 2 | | | |
|---|---|---|---|---|---|---|
| Elements of proposal | SSC Original Proposal | SSC Revised Proposal | Questioned Costs | Unresolved Costs | Note | Page |
| Added Travel | $ 20,000 | $ 25,703 | | | 3 | 5 |
| Added Project Management | 30,000 | 89,654 | | | 4 | 6 |
| Printing | 3,500 | 6,412 | | | 5 | 6 |
| | | | | | | |
| EEE Detailing | | | | | | |
| Direct Payment to EEE | 37,000 | 268,007 | $119,612 | | 6 | 7 |
| Electronic Data | 15,000 | 15,000 | | | 6 | 7 |
| EEE Detailing Contract | 310,249 | 146,854 | 69,805 | | 6 | 7 |
| **Subtotal EEE** | $362,249 | $429,861 | $189,417 | | 6 | 7 |



FOR OFFICIAL USE ONLY

DRAFT

| | | | | | | |
|---|---|---|---|---|---|---|
| Unabsorbed Overhead | | | | | | |
| Period 1 (May to Nov. 96) | 845,384 | 800,199 | | | 7 | 9 |
| Period 2 (Jan to Aug 97) | 547,166 | 427,966 | | | 7 | 9 |
| **Subtotal Unabsorbed O/H** | $1,392,550 | $1,228,165 | $678,385 | | 7 | 9 |
| | | | | | | |
| 2nd Tier Subcontractors | | | | | | |
| Williams-Beasely | 95,007 | 208,323 | | $208,323 | 8 | 12 |
| American Metal Works | 141,763 | 141,763 | 141,763 | | 9 | 12 |
| | | | | | | |
| Increased Overhead Rates | 122,500 | 122,500 | 122,500 | | 10 | 15 |
| Subletting | 190,440 | 207,528 | 207,528 | | 11 | 17 |
| Efficiency Losses | 93,465 | 444,480 | 444,480 | | 12 | 18 |
| Preparation Cost | 75,000 | 153,884 | | | 13 | 22 |
| **Subtotal** | $2,526,474 | $3,058,273 | $1,784,073 | | | |
| Profit | 252,647 | 305,827 | | | 14 | 23 |
| Bond | 28,000 | 33,000 | 28,795 | | 15 | 23 |
| Disputes Act Interest | 100,000 | 100,000 | 100,000 | | 16 | 24 |
| **Total** | $2,907,121 | $3,497,100 | $1,912,868 | $208,323 | | |

1. The results of audit are qualified as shown in the Qualifications section on page 3 of this report. Accordingly, audit results should be adjusted for any entitlement issues and technical evaluation results.

2. SSC proposed added travel, added project management, and printing cost on a total cost basis. Under this approach, the subcontractor is proposing costs as the difference between cost shown in their accounting records and the costs listed on their bid sheets. Use of the total cost method generally should only occur when the nature of the equitable adjustment proposal makes it impossible or impracticable to directly determine actual related increased costs with a reasonable degree of accuracy. Additionally this method is premised on the following assumptions:

- the subcontractor's initial bid was realistic;
- the actual incurred costs were reasonable and required for subcontract performance;
- the government was responsible for the total difference between bid and incurred cost and;
- any related amounts obtained through contract modifications (change orders) were added to original bid amounts.

3. Added Travel

a. Summary of Conclusions:

We take no exception to SSC's calculation of proposed travel cost in the amount of $25,703. However, as stated in the Qualifications section on page 3, a technical review should be performed to: (i) determine the adequacy of the SSC's original bid; (ii) determine if all costs were incurred due to government fault; and (iii) whether any amounts received through contract modifications relate to this element of proposed cost.

b. Basis of Subcontractor's Cost:

SSC proposed added travel costs as the mathematical difference between travel costs charged to this subcontract and travel costs initially bid for this subcontract.

c. Audit Evaluation:

We verified travel costs bid to SSC bid sheets and verified total travel costs recorded to this subcontract. We then verified judgmentally sampled travel costs to source documents. We then verified the mathematical accuracy of SSC's calculation.

We noted SSC is effectively proposing this element of cost on a total cost basis. See Note 2 above concerning the implied assumptions of cost proposed on a total cost basis.

4. Added Project Management

a. Summary of Conclusions:

We take no exception to SSC's calculation of proposed project management cost in the amount of $89,654. However, as stated in the Qualifications section on page 3, a technical review should be performed to: (i) determine the adequacy of the SSC's original bid; (ii) determine if all costs were incurred due to government fault; and (iii) whether any amounts received through contract modifications relate to this element of proposed cost.

b. Basis of Subcontractor's Cost:

The costs proposed for project management represent all SSC site representative costs recorded on this subcontract and all SSC engineering labor and engineering overhead costs recorded to this subcontract. SSC maintains they bid this effort to be accomplished by a second tier subcontractor and did not bid any SSC project management cost for site management or SSC engineering labor.

c. Audit Evaluation:

We verified that project management effort was bid solely as second tier subcontract effort on SSC's bid sheets. We verified SSC engineering labor for project management and for a site representative to SSC job cost records for this subcontract. We then judgmentally selected and reviewed costs to source documents. The mathematical accuracy of SSC's calculations was also verified. Finally, we noted that SSC is effectively proposing this element of cost on a total cost basis. See Note 2 above concerning the implied assumptions of cost proposed on a total cost basis.

In our review of change order support, we noted that as of Change Order Number 4, SSC received and identified compensation for $60,000 of site representative costs and an additional $120,835 of engineering costs. Further we noted SSC did not reduce claimed engineering subcontract costs for this additional $120,835 of engineering costs. In discussions with SSC, the subcontractor stated their assignment of these costs did not actually represent what the change order amounts were received for. Our review of change order documents disclosed that change orders did not identify an allocation of cost. Due to this, we believe a technical review is needed to determine if any equitable adjustment proposal amounts should be reduced by any amounts that were received through change orders.

5. Printing

a. Summary of Conclusions:

We take no exception to SSC's calculation of proposed printing cost in the amount of $6,412. However, as stated in the Qualifications section on page 3, a technical review should be performed to: (i) determine the adequacy of the SSC's original bid; (ii) determine if all costs were incurred due to government fault; and (iii) whether any amounts received through contract modifications relate to this element of proposed cost.

b. Basis of Subcontractor's Cost:

The costs proposed for printing are all the printing costs that were charged to this subcontract. SSC maintains they intended this effort to be accomplished by a second tier subcontractor and did not bid any SSC printing costs.

c. Audit Evaluation:

We verified printing effort was not bid on SSC's bid sheets and verified printing costs to the applicable VA job accounts. We judgmentally selected costs to verify to source documents. We also verified the mathematical accuracy of SSC's calculation.

Additionally, we noted SSC is effectively proposing this element of cost on a total cost basis. See Note 2 above concerning the various assumptions implied with cost proposed on a total cost basis.

6. Direct Payment to EEE, Electronic Data, and EEE Detailing

a. Summary of Conclusions:

We question $189,417of the $429,861 proposed related to the EEE detailing subcontract. SSC proposed costs related to the EEE subcontract as follows:

| | |
|---|---|
| Direct Payments to EEE | $268,007 |
| Electronic Data | 15,000 |
| EEE Detailing Subcontract Proposal | 146,854 |
| **Total Related to EEE** | $429,861 |

Questioned cost of $189,417 is calculated as the difference between the $429,861 of total cost proposed related to EEE and the $240,444 of cost not questioned in the 2nd tier assist subcontract audit. See Appendix 4 for a copy of this second tier subcontract audit.

We believe that a technical review should evaluate if amounts proposed for these engineering services should be reduced for any amounts that were received in subcontract change order modifications. During our review of subcontract change order modifications, we noted that as of subcontract Change Order Number 4, SSC received and identified compensation for $60,000 of site representative costs and an additional $120,835 of engineering costs. Further we noted SSC did not reduce claimed added project management or other engineering costs for these change order amounts. SSC stated their assignment of these costs did not actually represent what the change order amounts were obtained for. Since subcontractor change orders do not specifically identify what they are for, we believe a technical review should determine if proposed amounts should be reduced by any amounts obtained through subcontractor change orders.

b. Basis of Subcontractor's Cost:

The basis of the $429,861 of claimed EEE 2nd tier subcontractor cost is as follows:

The $268,007 of direct payments by SSC represents advance payments made above the original subcontract value made to EEE on their 2nd tier subcontractor equitable adjustment proposal.

The $15,000 represents the amount SSC increased the EEE subcontract value for the VA not providing files electronically.

The $146,854 of proposed costs represents EEE subcontract cost as follows:

| | |
|---|---|
| Revisions | $112,002 |
| Delay Damages | 171,222 |
| Profit on Delay | 25,683 |
| Efficiency Losses | 59,960 |
| Profit | 8,994 |
| **Sub-total** | $377,861 |
| Less Advanced Direct Payments | (268,007) |
| **Subtotal** | $109,854 |
| Subcontractor Identified as Not Included Above | 37,000 |
| **Total Claimed** | $146,854 |

c. Audit Evaluation:

We determined that total payments paid to EEE to date equal $525,607. Additionally, we noted that as part of the final payment an agreement was entered into in which further payments are only to be made contingent upon recovery from the government. [As such, we believe that costs should be limited to the lower of additional payments made to date $283,007 ($525,607 less the $242,600 original subcontract amount) or allowable cost determined in the EEE detailing 2nd tier subcontract.]

We verified SSC increased the EEE second tier subcontract by $15,000 for not providing the data electronically. We then requested support for SSC's contention that the VA was required to provide this data electronically. However, SSC maintained that the VA verbally committed to this.

The audit of the EEE 2nd tier subcontractor was performed as an assist audit by the Huntsville Branch Office. As shown in Appendix 4 proposed and questioned costs are as follows:

| Cost Element | Proposed Amount | Questioned Amount |
|---|---|---|
| Revisions | $112,230 | $35,646 |
| Delay Damages | 140,547 | ( 2,231) |
| Profit | 21,082 | |
| Efficiency Loss | 36,390 | 36,390 |
| Total | $310,249 | $69,805 |

At the time of that audit, proposed costs were $310,249 and questioned costs were $69,805, leaving potentially allowable cost of $240,444. SSC currently shows 2nd tier subcontract cost of $377,861 (an increase of $67,612). The increase amounts have not been submitted for audit and are related to increased delay cost of $30,674 ($171,221 - $140,547) and increased efficiency loss of $23,570 ($59,960 - $36,390) plus additional profit associated with these elements. As shown in the assist audit report in Appendix 4, total delay cost was calculated as being $142,778 and the efficiency loss was questioned in total. Accordingly, increasing these elements of proposed cost would not increase potentially allowable cost.

7. Unabsorbed Overhead

a. Summary of Conclusions:

We question $678;385 of the $1,228,165 proposed unabsorbed overhead costs. This represents the difference between Eichleay calculated unabsorbed overhead and unabsorbed overhead claimed for periods 1 and 2 as shown below.

| | |
|---|---|
| Proposed Unabsorbed Overhead Period #1 | $ 800,199 |
| Proposed Unabsorbed Overhead Period #2 | 427,966 |
| Total Proposed Unabsorbed Overhead | 1,228,165 |
| Less Eichleay Calculated Recoverable Overhead | 549,780 |
| Questioned Unabsorbed overhead | $ 678,385 |

We calculated an extended home office overhead daily rate using the Eichleay formula. We used the Eichleay formula because the Federal Circuit has mandated the use of the Eichleay formula in all disputes arising out of contracts involving the federal government. The Court of Appeals for the Federal Circuit, *Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574 (1994), ruled that the Eichleay formula is the exclusive means for calculating unabsorbed overhead in cases arising under construction contracts. Additionally, the ASBCA has supported the application of the Eichleay formula for the recovery of unabsorbed overhead on manufacturing and supply contracts.

In our analysis of the subcontractor's calculation of unabsorbed overhead, we noted the following inadequacies:

- SSC's estimated production hours and months were not substantiated by their master shop schedules.
- SSC included overhead cost from other operations but did not include the labor hours associated with those operations in determining the percentage of lost hours.

- SSC did not adjust proposed unabsorbed overhead for any unabsorbed overhead related to other contracts.

- SSC did not adjust proposed unabsorbed overhead for any replacement work obtained.

b. Basis of Subcontractor's Cost:

SSC calculated unabsorbed overhead for period number one as the amount of hours they contend were planned but not performed during the period of May through November 1996 (lost hours) divided by the sum of actual and lost hours for that same period for the fabrication operations. SSC then multiplied that percentage by their calculation of the monthly average of fixed overhead for all operations (fabrication, steel sales, and engineering). As such, SSC is calculating the percentage of overhead over a different base than they are calculating overhead.

SSC calculated unabsorbed overhead for period number two as the amount of hours they contend were planned but not performed during the period of January to August 1997 (lost hours) divided by the sum of actual and lost hours for that same period for the fabrications operation. SSC then multiplied that percentage by their calculation of the monthly average of fixed overhead for all operations (fabrication, steel sales and engineering). As such, SSC is calculating the percentage of overhead over a different base than they are calculating overhead.

c. Audit Evaluation:

We attempted to verify SSC's planned performance of 5,000 hours per month from May to November 1996 and from January to August 1997 to master shop schedules but were unable to do so. Our review indicated that as late as 7 March 1996, SSC did not have the VA job scheduled on Master Shop Schedules, and as of 18 March 1996, had 0 hours scheduled for May 1996. In fact, no Master Shop Schedules were noted that indicated more than 50 hours for the VA job for May 1996. This is significant since SSC had little work scheduled or actually performed during May and June of 1996. As such, SSC's calculation of unabsorbed overhead causes more costs to be allocated to this subcontract than if they would have used hours from more normal production level months.

We noted the contractor calculated lost hours over only the fabrication operation while applying the lost hours percentage to overhead from fabrication, steel sales, and engineering. This resulted in proposed cost being overstated since the lost hour percentage is computed over a smaller base, which increases that percentage. Additionally, the pool, which the percentage is applied to, includes cost form operations not included in the base. This results in a larger number to which the labor percentage is applied.

We noted that average monthly hours worked during unabsorbed overhead two substantially exceeded average hours worked during the period of January 19 1998. In fact, average hours worked during unabsorbed period number two excee hours worked during each of the following: Calendar Year (CY) 1994, CY 1995, CY 1997, and CY to date April 1998.

We attempted to verify contractor proposed fixed overhead amounts back to SSC's official books and records. We noted SSC included overhead cost related to unaffected groups (Engineering and Steel Sales); included variable cost accounts such as utilities and maintenance; failed to reduce overhead costs for applicable credits for scrap sales and discounts earned; and failed to reduce fixed overhead for amounts recovered in settlements on other jobs during this period. Additionally, we noted that SSC made no adjustment for replacement work obtained or for the unabsorbed overhead applicable to the underbid labor hours on this subcontract.

We requested the reason why SSC did not calculate unabsorbed overhead using the Eichleay method, since this method is currently widely accepted by the federal courts and contract appeal boards. SSC advised they used their method since they felt it specifically identified unabsorbed overhead costs. However, it should be noted that their calculation involves estimated average hours per month and average monthly overhead amounts. Accordingly, we do not feel that SSC's calculation specifically identifies unabsorbed overhead as claimed.

We also noted that SSC did not sign their subcontract with Caddell until 14 October 1996 and that the subcontract amount was increased in a settlement of disagreements with the prime contractor. SSC contends that legally a subcontract existed prior to this date and as such does not affect their claim for unabsorbed overhead prior to that date. We recommend that a technical review address this issue and determine if amounts received provided compensation for any equitable adjustment costs proposed by SSC.

Finally, we calculated recoverable unabsorbed overhead using the Eichleay formula as follows:

$$\frac{\text{Contract Billings}}{\text{Total Billings for Contract Period}} \times \text{Allowable Home Office Overhead for Contract Period} = \text{Home Office Overhead Allocable to the Contract}$$

$$\frac{\$\ 5{,}809{,}879}{\$\ 79{,}284{,}236} \times \$9{,}552{,}668 = \$700{,}011$$

$$\frac{\text{Allocable Home Office Overhead}}{\text{Days of Performance}} = \text{Daily Home Office Overhead Rate}$$

$$\frac{\$700{,}011}{840} = \$833$$

| Home Office Overhead Rate | X | Days Delay | = | Amount Recoverable |
|---|---|---|---|---|
| $833 | X | 660 | = | $549,780 |

Note the Eichleay daily rate was calculated over the period of May 1996 to August 1998 (28 months at 30 days a month for a total of 840 days). Delay days were calculated as total days of 840 less SSC's stated planned performance period of six months (180 days) for a total of 660 delay days. The August data was used as the cut off since it was the latest actual cost data provided during our audit fieldwork. Since overhead cost appeared to be generally level to declining in the out years, inclusion of actual data for months past August 1998 would not appear to materially alter the above calculation since increases in total contract billings, total overhead, total contract days, and total delay days would offset each other.

Finally, questioned unabsorbed overhead should be increased for any delay days that are not ultimately found to be the government's fault. Questioned cost should be increased by $833 for each such day.

8. Williams-Beasely

We were advised by the VA not to perform or request an assist audit on this second tier subcontractor. Accordingly, we have classified these costs in the amount of $208,323 as unresolved.

9. American Metal Works

a. Summary of Conclusions:

We question proposed costs for this second tier wholly owned subsidiary subcontractor in the amount of $141,763 in its entirety due to a lack of auditable support. However, in the event that it is later determined this portion of Steel Services equitable adjustment proposal is with merit and a government caused delay affecting this second tier subcontractor did occur, we calculated a daily overhead rate of $105 to be applied to any government caused delayed days.

b. Basis of Subcontractor's Cost:

The subcontractor proposed costs for this related second tier subcontractor are as follows:

| | |
|---|---|
| Unabsorbed Overhead for 1996 | $ 83,755 |
| Unabsorbed Overhead for 1997 | 40,000 |
| Increased Wage Rates | 4,188 |
| Increased Overhead Rate | 13,820 |
| **Total** | $141,763 |

SSC calculated 1996 unabsorbed overhead as the total amount of overhead that was bid since the project was not performed and did not absorb overhead for 1996. Steel Services states that actual unabsorbed overhead for 1996 was $262,610.

SSC estimated 1997 unabsorbed overhead as 2,000 hours multiplied by $20.00 to estimate unabsorbed overhead.

SSC estimated increased wage rates as 4,188 proposed hours times a $1.00 hour increase.

SSC estimated increased overhead rates as proposed hours of 4,188 multiplied $11.00 an hour multiplied by an estimated 30% increased overhead.

c. Audit Evaluation:

We noted the following concerning Steel Services proposed $83,755 of 1996 unabsorbed overhead:

- SSC disclosed that a man-hour cost reporting system was not in place at American Metal Works during this period and consequently could not provide scheduling details.
- The $83,755 of claimed 1996 unabsorbed overhead represents total overhead (both variable and fixed) the contractor contends was estimated for this job.
- SSC states there was $262,610 of actual unabsorbed overhead for 1996 and that this supports their proposed 1996 unabsorbed overhead. It is noted however, that the $262,610 the contractor refers to as actual unabsorbed overhead for 1996 is total overhead costs less overhead costs allocated to jobs through the 200% allocation rate. That $262,610 difference should be reduced for the $147,221 of unallowable cost and also for variable overhead cost included in this total.

We noted the following concerning Steel Services proposed $40,000 of 1997 unabsorbed overhead:

- SSC disclosed that a man-hour cost reporting system was not in place at American Metal Works during this period and consequently could not provide scheduling details.
- The $40,000 of claimed 1997 unabsorbed overhead represents total overhead for 2,000 hours at $20.00 per hour (200% overhead rate proposed on $10.00 labor). No auditable support was provided for the 2,000 hour estimate.

- SSC's accounting records disclosed $54,651 of unallocated overhead for 1997. However, this amount includes $45,329 of unallowable cost and also variable overhead cost.

We noted the following concerning $4,188 of Increased Wage Rates:

- SSC proposed a $1.00 hour wage increase form 1996 to 1997. However, a comparison of 1996 and 1997 labor rates did not show increased labor rates.

We noted the following concerning the $13,830 of increased overhead rates:

- SSC calculated this amount as proposed hours multiplied by the increased labor amount multiplied by a 30% increased overhead rate. It is noted that the labor rate did not increase.

Since SSC advised that American Metal Works did not have a man-hour cost reporting system, we compared the proposed judgmental estimates to the total cost shown for this job and noted that as of 17 November 1998 American Metal Works accounting reports showed the following:

| | |
|---|---|
| American Metal Works Subcontract Value | $363,325 |
| Subcontract Costs Per Accounting Records | $297,076 |
| **Cost Underrun As of 17 November 1998** | $ 66,249 |
| | |
| Proposed American Metal Works Equitable Adjustment Cost | $141,763 |

Accordingly, since this subcontract was not in an overrun position and SSC did not provide adequate auditable support for their proposed judgmentally estimated amounts, these amounts will be questioned in total. However, in the event that it is later determined that the subcontractor's equitable adjustment proposal has merit, we calculated a daily unabsorbed overhead rate based on the Eichleay calculation. The Eichleay method is currently widely accepted and used by the courts and contract boards in determining unabsorbed overhead costs. This calculation is as follows:

$$\frac{\text{Contract Billings}}{\text{Total Billings for Contract Period}} \times \text{Allowable Home Office Overhead for Contract Period} = \text{Home Office Overhead Allocable to the Contract}$$

$$\frac{\$\ 363{,}325}{\$9{,}562{,}196} \times \$2{,}312{,}274 = \$87{,}857$$

$$\frac{\text{Allocable Home Office Overhead}}{\text{Days of Performance}} = \text{Daily Home Office Overhead Rate}$$

| | | | | |
|---|---|---|---|---|
| $87,857 / 840 | = | $105 | | |
| Home Office Overhead Rate | X | Days Delay | = | Amount Recoverable |
| $105 | X | 660 | = | $69,300 |

The $105 unabsorbed overhead daily rate should be applied to any delay days accepted. Unabsorbed overhead using 660 days of delay would be as follows:

| | |
|---|---|
| Eichleay Daily Rate | $ 105 |
| Delay Days | 660 |
| Questioned Due Daily Rate | $69,300 |

10. Increased Overhead Rates

a. Summary of Conclusions:

We question proposed increased overhead costs in the amount of $122,500 in total. A comparison of actual overhead rates using the SSC stated rate structure resulted in determining the bid rate would not have been obtained even if the entire amount of proposed VA fabrication labor was added to the overhead base. Additionally, a comparison of 1996 and 1997 overhead rates using only the fabrication identified overhead adjusted to include VA proposed labor would have resulted in the 1997 rate being less than 10 percentage points higher than the 1996 rate. Finally, we noted SSC did not adjust proposed costs for overhead proposed elsewhere, or for unabsorbed overhead relating to other contracts or relating to underbid items.

b. Basis of Subcontractor's Cost:

SSC proposed increased overhead costs of $122,500 due an increase in their bid overhead rate from 200% in 1996 to 235% in 1997. SSC stated that they bid the recovery of all of their overheads through a single rate applied to fabrication labor only. SSC calculated the proposed amount as 35,000 hours multiplied by $10.00 an hour multiplied by 35%.

c. Audit Evaluation:

Using SSC's assertion that their bid overhead structure consisted of a single overhead rate of 200% using steel fabrication labor as a base and overhead pool cost form steel fabrication, steel sales and engineering, we calculated the following actual rates for 1996 and 1997:

| Description | 1996 | 1997 |
|---|---|---|
| Total Overhead Per SSC | $5,206,223 | $5,180,548 |
| Fabrication Labor | $1,324,652 | $1,519,243 |
| Rate | 393% | 341% |

We then added bid VA fabrication labor to the actual 1996 based and recalculated the overhead percentage. Although this rate is understated since variable pool cost related to the bid labor were not added to the pool, it still shows SSC would not have obtained their bid rate under this overhead structure.

| Description | 1996 | 1997 |
|---|---|---|
| Total Overhead Per SSC | $5,206,223 | $5,180,548 |
| | | |
| Bid VA Fabrication Labor | $ 335,260 | |
| 1996 Fabrication Labor | $1,324,652 | $1,519,243 |
| Adjusted 1996 Labor Base | $1,659,912 | |
| | | |
| Adjusted Overhead rate | 314% | 341% |

We then calculated an overhead rate consisting of fabrication pool overhead only. In their bid, engineering was proposed as subcontract effort and Steel Sales recovers all or part of their overhead through markups on sales to their related second tier subcontractor and outside customers. Consequently, the associated pool costs for these operations do not appear to be allocable to the VA job.

| Description | 1996 | 1997 |
|---|---|---|
| Total Fabrication Overhead Per SSC | $3,422,876 | $3,286,452 |
| Fabrication Labor | $1,324,652 | $1,519,243 |
| Rate | 258% | 216% |
| 1996 Rate to Include Proposed VA Labor of $335,260 ** | 206% | |

** This calculation was performed to see if SSC could have obtained their bid overhead rate under this rate structure. Note, the obtained rate would actually be higher than the 206% since variable overhead related to the $335,260 of VA labor would need to be added to overhead cost. This would result in the rates being even less than 10 percentage points (1996 rate of 206% versus 1997 rate of 216%) difference shown above. Additionally, pool costs for both years should be reduced for overhead amounts proposed elsewhere in this equitable adjustment proposal to prevent duplicate recovery of overhead cost.

Accordingly, we will question these costs in total since our comparisons of actual rates adjusted for the VA labor base did not reflect the increased rate amounts proposed by the contractor. In the first comparison, SSC would not have obtained the rate bid in either year. In the comparison of fabrication overhead only, the 1996 and 1997 rate difference was only 10 percentage points. This difference could have been further offset for adjustments for the related variable cost associated with VA bid labor base added.

We also noted the subcontractor did not adjust proposed increased overhead costs for overhead costs proposed elsewhere in this equitable adjustment proposal. Additionally, adjustments were not made for unabsorbed overhead associated with other contracts or from underbid cost on this subcontract. Without consideration of those amounts, duplicate overhead recovery could occur.

11. <u>Subletting</u>

a. Summary of Conclusions:

We question proposed sublet cost in the amount of $207,528 in total since SSC failed to reduce proposed sublet costs for fixed overhead costs and the VA will be reviewing related costs for a Section 9 proposal separately from this equitable adjustment proposal.

b. Basis of Subcontractor's Cost:

SSC contends that increased costs were incurred as a result of having to sublet work due to being held to Section 9 requirements and due to delays caused by defective contract drawings. Proposed costs were calculated as the sum of:

| | |
|---|---|
| Subcontractor Cost | $657,857 |
| Related Shipping Cost | 48,589 |
| Added Sales Tax | 53,659 |
| Total | $760,105 |

SSC then judgmentally adjusted these costs by costs they estimated they would have incurred to produce these sublet items. SSC estimated this adjustment as follows:

| | |
|---|---|
| Estimated Hours to Produce | 15,113 |
| Estimated Labor & Overhead Rate | $32.70 |
| Estimated Total Labor & Overhead | $494,195 |
| Less Estimated Fixed Cost Not Recovered | 251,178 |
| Total Adjustment | $243,017 |

SSC then calculated total proposed costs as the difference between total sublet cost less adjustments for the variable cost that would have been incurred and for costs proposed in the Section 9 proposal. Proposed costs were calculated as follows:

| | |
|---|---|
| Total Sublet Cost | $760,105 |
| Adjustment for Variable Cost to Produce | (243,017) |
| Subtotal | 517,088 |
| Adjustment for Section 9 Proposal | (309,560) |
| Total Proposed | $207,528 |

c. Audit Evaluation:

We selected a judgmental sample of SSC's proposed sublet cost of $760,105 and verified those costs to source documents without exception.

We noted that SSC is only adjusting proposed increased sublet cost for their judgmental estimate of variable cost to have produced the sublet items. In conversations, SSC advised that the fixed costs would be incurred regardless of whether the work was performed in house or not. However, it is noted that SSC does not take this approach in other proposal elements and proposes other equitable adjustment costs on a full cost basis (i.e., overhead rates including both variable and fixed amounts). Since overhead rates are calculated over the entire base and pool (both variable and fixed cost) for the period, we disagree with this adjustment of only variable cost.

Finally, we noted that the elimination of the fixed cost adjustment of $251,178 reduces proposed cost below the amount that SSC identified as being related to the Section 9 proposal. Accordingly, we will question these costs in this equitable adjustment proposal, as it is our understanding these costs are being addressed in the Section 9 proposal.

12. Efficiency Losses

a. Summary of Conclusions:

We question efficiency loss costs in the amount of $444,480 in total since these costs are based on judgmental estimates, and are not supported by SSC's official books and records. Additionally, significant discrepancies were noted in SSC's calculation of efficiency losses related to other projects, which account for $279,732 of the total $444,480 efficiency loss proposed.

b. Basis of Subcontractor's Cost:

SSC estimated efficiency losses of $164,748 on this subcontract plus $279,732 of efficiency losses on other projects.

The $164,748 of inefficiencies related to this project was based on judgmental estimates of the portion of overrun man-hours per ton related to the SSC underbid and to the added work through request for information process. SSC then claimed the remaining difference to be the efficiency loss for this project. These judgmental estimates were:

| | |
|---|---|
| Man-hours Per Reported Tonnage of 1,774 Tons | 19.84 |
| Less Bid Man-hours Per Ton | 13.10 |
| SSC Stated Efficiency Hour Loss Per Ton | 6.74 |
| Less: | |
| SSC Estimate of Hours Due to Added Work Through RFI Process | (1.90) |
| SSC Estimate of Underbid Hours Due To Being More Difficult Than Bid | (2.00) |
| Estimated Efficiency Hour Loss Due to Defective Plans | 2.84 |
| Multiplied by Estimated Tonnage Affected | 1,774 |
| Estimated Increased Hours Due to Defective Plans | 5,038.16 |
| Multiplied by estimated rate Per Hour ($10.00* 235% OH) | $33.50 |
| Estimated Efficiency Loss (MATH ERROR) | $168,778 |

SSC then calculated an efficiency loss of other projects based on the performance of other projects during 1996. SSC identified projects they stated were substantially performed in 1996. SSC then scheduled purported actual hours and budget hours and calculated an efficiency rate, which they applied to total hours they identified for 1996. SSC then judgmentally estimated that half this loss was due to the VA job. This calculation is as follows:

| Job # | Actual Final | Budget | Remaining | Net Budget |
|---|---|---|---|---|
| 200 | 8,047 | 6,105 | | |
| 201 | 2,814 | 2,892 | | |
| 205 | 6,047 | 6,245 | | |
| 206 | 1,547 | 2,693 | 1,147 | |
| 207 | 6,224 | 3,692 | | |
| 208 | 19,104 | 14,550 | | |
| 209 | 7,050 | 7,545 | 495 | |
| 210 | 828 | 889 | | |
| 212 | 1,584 | 1,347 | | |
| 213 | 6,515 | 6,334 | | |

| | | | | |
|---|---|---|---|---|
| 217 | 8,683 | 6,496 | | |
| 968 | 13,091 | 10,322 | | |
| 969 | 5,200 | 4,666 | | |
| 970 | 16,083 | 17,022 | | |
| 975 | 554 | 505 | | |
| 976 | 9,306 | 8,631 | | |
| 981 | 5,912 | 2,954 | | |
| 991 | 3,727 | 3,941 | | |
| 993 | 6,003 | 6,000 | | |
| 994 | 33,076 | 62,622 | 29,523 | |
| Total | 161,395 | 175,451 | 31,165 | 144,286 |

The contractor then estimated the loss as:

| | |
|---|---|
| Actual Hours | 161,395 |
| Less Net Budget | 144,286 |
| Loss Hours | 17,109 |
| Estimated 50% Due To Memphis Job | X 50% |
| Memphis Caused Inefficiency Loss | 8,554.5 |
| Estimated Labor & Overhead | X 32.70 |
| Total Estimated Inefficiency Loss | $279,732 |

c. Audit Evaluation:

We advised SSC that their calculation of inefficiency hours on this subcontract appeared to be based upon judgmental estimates and requested that SSC tie proposed amounts to their official books and records. SSC then provided support for total hours per ton and for bid hours per ton. However, SSC advised the breakout attributable to underbid hours, RFI hours, and defective plan hours were judgmental and not identifiable in their records.

We advised SSC that in our judgmental review of inefficiency hours related to other projects, we noted the following inaccuracies:

- Identified total affected hours of 161,395 for 1996 when only 139,638 total hours were incurred on jobs in 1996.
- Identified Job 200 as being in an overrun position of 1,942 hours when only 140 hours were incurred in 1996.

- Identified Job 968 as being in an overrun position of 2,769 hours when overrun hours were incurred, mainly in 1995 but incurred in total prior to the May 1996 claim period.

- Identified Job 969 as being in an overrun position of 534 hours when the overrun occurred in 1995.

- Identified job 981 as being in an overrun position of 2,954 hours when the overrun occurred in 1995.

These four jobs represent a significant portion (8,199 of 17,109) of the overrun hours shown in SSC's calculation. Additionally, as shown in the jobs above, SSC was experiencing labor hour overruns on jobs prior to this VA job. SSC then provided the following revised data:

| Job # | Actual Final | Budget |
|---|---|---|
| 968 | 13,091 | 10,345 |
| 989 | 4,295 | 3,777 |
| 952 | 18,483 | 12,400 |
| 942 | 4,839 | 4,522 |
| 925 | 2,565 | 2,570 |
| 856 | 1,771 | 1,317 |
| 233 | 1,179 | 1,141 |
| 229 | 2,191 | 1,573 |
| 228 | 1,228 | 1,044 |
| 200 | 8,047 | 6,105 |
| 201 | 2,814 | 2,892 |
| 205 | 6,047 | 6,245 |
| 206 | 1,547 | 2,693 |
| 207 | 6,224 | 3,692 |
| 208 | 19,104 | 14,550 |
| 209 | 7,050 | 7,545 |
| 210 | 828 | 889 |
| 212 | 1,584 | 1,347 |
| 213 | 6,515 | 6,334 |
| 217 | 8,683 | 6,496 |
| Total | 118,085 | 97,477 |

The contractor then estimated the loss as follows:

| | |
|---|---|
| Actual Hours | 118,085 |
| Less Net Budget | 97,477 |
| Loss Hours | 20,608 |
| Estimated 50% Due To Memphis Job | X 50% |
| Memphis Caused Inefficiency Loss | 10,304 |
| Estimated Labor & Overhead | X 32.70 |
| Total Estimated Inefficiency Loss | $336,941 |

During our review of this revised data, we noted the contractor was including overrun hours for the following jobs even though they were showing significant hour overruns prior to the start of the VA job. As of 3 May 1996, SSC man-hour reports showed losses as follows:

| | |
|---|---|
| Job 968 | 2,770 |
| Job 989 | 540 |
| Job 952 | 6,106 |
| Job 942 | 340 |
| Job 856 | 477 |
| Total | 10,233 |

It was also noted that Job Number 217, which shows 2,487 of loss hours is shown as a replacement job for the Austin Airport Project. SSC has already claimed unabsorbed overhead cost related to that job in a separate unabsorbed overhead claim and has not reduced proposed unabsorbed overhead in this proposal for any unabsorbed overhead related to the Austin Airport.

Based on our review, we will question the judgmentally estimated efficiency losses in total. In our review we noted:

- Over 50% of loss hours proposed for other jobs are related to losses incurred either prior to this job or for jobs which SSC is already claiming unabsorbed overhead from other contracting parties.

- The list of jobs used by SSC to support their judgmental estimates shows that SSC was incurring labor hour overruns even prior to the May 1996 job start date.

- Judgmentally proposed hours related to the VA job and to other jobs appear to demonstrate only that hour overruns occurred and not that a loss necessarily occurred as a result of this subcontract. As shown above losses were occurring even prior to this job.

13. Preparation Cost

a. Summary of Conclusions:

We take no exception to SSC's calculation of proposed preparation costs in the amount of $153,884. However, SSC is also proposing disputes act interest. As such, if SSC is asserting this equitable adjustment proposal is an actual claim, SSC should separately identify all preparation costs that have been incurred since that assertion since any such costs would be unallowable under FAR 31.205-47(f)(1).

b. Basis of Subcontractor's Cost:

Proposed preparation costs consists of the following:

| | |
|---|---|
| Construction Mediation Services, Inc. | $108,848 |
| Construction Mediation Services, Inc. – Estimate to Complete | 15,000 |
| Mockbee Hall & Drake Cost | 6,855 |
| L.N. Ross Cost | 14,706 |
| L.N. Ross Cost - Estimate to Complete | 5,000 |
| Alabama Graphics | 2,399 |
| Kinko's | 1,076 |
| Total | $153,884 |

c. Audit Evaluation:

We requested that SSC provide supporting source documents and outside consultant agreements. SSC advised that no outside consultant agreements existed but provided billings and invoices for proposed costs. Selected billings were traced back to job cost records without exception.

14. Profit

DCAA does not audit profit, as the determination of an appropriate profit rate is the responsibility of the contracting officer. However, we noted that the subcontractor proposed a profit rate of ten percent applied to all proposed costs except for bond and disputes act interest. This rate should be applied to all costs not ultimately accepted by the contracting officer.

15. Bond Cost

a. Summary of Conclusions:

We question proposed bond costs in the amount of $28,795. Questioned costs represent the difference between proposed bond costs and the actual bond rate incurred multiplied by proposed cost not questioned.

b. Basis of Subcontractor's Cost:

SSC estimated bond costs of $33,000 but advised that the bond rate decreases as contract cost increases. SSC also advised that per section 1.18, of the subcontract bond costs are settled with the government during the final settlement at actual costs.

c. Audit Evaluation:

We calculated questioned bond cost as the difference between bond cost proposed and proposed cost not questioned multiplied by the effective bond rate recorded on this job as of 17 November 1998. These calculations are as follows:

| | |
|---|---|
| Total Actual Bond Cost as of 17 November 1998 | $ 22,640 |
| Total Actual Job Cost as of 17 November 1998 | $6,929,698 |
| Effective Bond Rate | .33% |
| | |
| Total Cost Not Questioned ($3,058,273 -$1,784,073) | $1,274,200 |
| Effective bond rate | .33% |
| Bond Cost Calculated Using Actual Rate | $ 4,205 |
| | |
| Bond cost Proposed | $ 33,000 |
| Bond Cost Calculated Above | $ 4,205 |
| Questioned bond Cost | $ 28,795 |

16. Disputes Act Interest

a. Summary of Conclusions:

We question proposed disputes act interest in the amount of $100,000 in total since this element of cost would only apply to an equitable adjustment claim and not to an equitable adjustment proposal. Additionally, if SSC is actually asserting this to be an equitable adjustment claim they should identify any preparation costs incurred after the date SSC determined this proposal to be a claim.

b. Basis of Subcontractor's Cost:

SSC stated that the $100,000 was a judgmental estimate.

c. Audit Evaluation:

Confirmed with the VA and SSC that this proposal was being submitted as an equitable adjustment proposal and not an equitable adjustment claim. Advised SSC that disputes act interest was not applicable to an equitable adjustment proposal. SSC disputed that interest was not applicable.

# SUBCONTRACTOR ORGANIZATION AND SYSTEMS

I. Organization

Steel Services Corporation conducts business as an S Corporation. The company engages in the fabrication and sale of steel and other metals, primarily in the southern United States. In addition, the company engages in the erection of steel and metal buildings primarily for commercial use. Sales for calendar year 1997 were approximately $31,413,192. Government sales were less than twenty percent of total sales for 1997. The sole stockholder of Steel Services owns 100% of American Metal Works, Inc; 50% of Steel Solutions Inc; 100% of Cougar Inc. and 100% of SSC Freightways. Steel Services Corporation conducts business with all these companies.

II. Accounting System

Steel Services Corporation's fiscal accounting period is from 1 January to 31 December. Steel Services recognizes revenues from construction contracts on the percentage of completion method. Fabrication contract costs include all direct material and labor costs and indirect cost related to contract performance, including indirect labor, supplies, tools, repairs, depreciation costs, and general and administrative costs. Indirect costs are charged to fabrication jobs based on a predetermined rate applied to direct fabrication labor. The contractor accumulates indirect cost related to engineering, steel sales, and production. Steel Services Corporation Financial Statements are audited annually by Davenport, Holliday and Spring, a professional association of certified public accountants.

III. Assessment of Control Risk

Steel Services Corporation is a small business with limited resources to be applied to compliance procedures and testing. Our audit scope reflects this assessment of control risk and includes those tests of compliance with applicable laws and regulations that we believe provide a reasonable basis for our opinion.

## DCAA PERSONNEL

| | Telephone No. |
|---|---|
| Primary contacts regarding this audit | |
| David Hampshire, Technical Specialist | (504) 257-3353 |
| Gary Rosetti, Supervisory Auditor | (228) 938-1741 |
| Other contact regarding this audit report: | |
| Barbara J. Irvin, Branch Manager | (228) 938-1720 |
| | FAX No. |
| | (228) 769-9166 |
| | E-mail Address |
| | *fao1751@rea.dcaa.mil |

RELEVANT DATES

Request for Audit: Nashville Branch Office Memorandum--dated 19 May 1998; received 22 May 1998

**AUDIT REPORT AUTHORIZED BY:**

Barbara J. Irvin
Branch Manager
DCAA Gulf Coast Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

### DISTRIBUTION

Contracting Officer (186A)
ATTN: Milan Srskic
Office of Facilities Management
Department of Veterans Affairs
810 Vermont Avenue N. W.
Washington, DC 20420

Contract Review and Evaluation Division (53C)
Inspector General
Department of Veterans Affairs
810 Vermont Avenue
Washington, DC 20420

### RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Make proprietary determinations in the event of an external request for access. Consider the restrictions of 18 U.S.C. 1905 before releasing this information to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), DCAA will refer any Freedom of Information Act requests for audit reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The Defense Contract Audit Agency has no objection to release of this report, at the discretion of the contracting agency, to authorized representatives of Steel Services Corporation. Nor does this Agency or Steel Services Corporation object to release of this report to authorized representatives of Caddell Construction Company. See the Appendix for a copy of the subcontractor's release statement.

4. Do not use the information contained in this audit report for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

DRAFT

Audit Report No. 1751-98J17200002

APPENDIX 1
Page 1 of 1

## EVALUATION OF PROPOSAL FOR EQUITABLE ADJUSTMENT

Filed Under Changes Clause (X) or Dispute Clause ( )
Contract No. V101BC0133 Subcontract No. 90521-05-SC
Board of Appeals Case No. N/A

Subcontractor Name: Steel Service Corporation — Telephone (601) 939-9222
Outside Proposal or Claim Preparer: L. Ray Vinson — Telephone (706) 327-7274
Trial Attorney Name: Mary Elizabeth Hall — Telephone (601) 353-0035
Date of Initial Price Proposal: 16 February 1996 — Amount: $5,381,500
Date of Basic Subcontract: 14 October 1996 — Amount: $5,355,000
Contract type: Firm-fixed-price
Total Amount of All Modifications: $454,879
Date(s) of Alleged Abnormal Condition(s): Throughout contract period of 1996 through 1998
Description: Steel Services Corporation maintains that defective contract drawings resulted in SSC not being able to perform subcontract work as planned and resulted in unabsorbed overhead as well as other increased subcontract costs.
Subcontract Specified Performance Dates: None Noted
Actual Performance Dates: Subcontractor contends February 1996 until present

## CHRONOLOGY OF SIGNIFCANT EVENTS

| Event | Date |
|---|---|
| Veterans Administration Awards Prime Contract to Caddell | 31 January 1996 |
| Subcontractor Contends Subcontract Awarded from Prime | 4 March 1996 |
| Subcontractor Contends First Request for Information Issued to Prime | 19 March 1996 |
| Subcontractor Contends Over 250 Requests for Information Issued to Prime | 13 May 1996 |
| Subcontractor Claims Unabsorbed Overhead Experienced | May-November 1996 |
| Subcontractor Contends that Prime Contractor Increased Subcontract Amount to $5,801,701 to Accommodate Erection Not Starting During the Summer of 1996 | August 1996 |
| Subcontractor Signs Subcontract | 14 October 1996 |
| Subcontractor Claims Second Unabsorbed Overhead Experienced | January – August 1997 |
| Subcontractor Submits Equitable Adjustment Proposal | 31 October 1997 |
| Audit Request | 22 May 1998 |
| Subcontractor Revises Equitable Adjustment Proposal | June – December 1998 |

APPENDIX 2
Page 1 of 1

## OTHER MATTERS TO BE REPORTED

During our audit evaluation we noted that SSC is proposing certain proposal items on a total cost basis and basing other items on judgmental estimates. As a result, we are providing information on subcontract cost to date, subcontract price, an underbid item, and disclosure in SSC's financial statements as follows:

| | |
|---|---|
| Subcontract Price through Change Order 12 | $5,809,879 |
| Job Costs Shown Through 17 November 1998 | $6,928,698 |
| Revised Budgeted Costs Through 17 Nov 1998 | $6,665,460 |

We noted that SSC disclosed in their efficiency loss calculation that this job was underbid an estimated two man-hours per ton. Underbid hours extended by the 1,774 tons performed by SSC would equal an underbid of 3,548 (1,774 x 2) man-hours. SSC priced proposed efficiency loss hours at a loaded rate of $32.70 per hour. As such, this would represent an underbid of $116,020 ($32.70 * 3,548). Additionally, if you apply this two man-hour per ton underbid to the 889 sublet tons, the underbid would be increased by an additional $58,141 (889*28 * $32.70) for a total of $174,161 ($116,020 + $58,141).

We also noted the following in SSC's 1996 and 1997 financial statements:

| | |
|---|---|
| SSC Reported 1996 Net Income | $3,045,328 |
| SSC Reported 1997 Net Income | $ 179,154 |

Additionally, we noted SSC disclosed in a note to their 1997 financial statements that they incurred costs of $3,751,372 on the VA project due to delays, plan revisions and defective drawings. They stated that the contract owner is expected to dispute certain assertions contained in the proposal while accepting other provisions. SSC estimated they would reach a settlement for reimbursement of costs in the amount of $720,000 to $1,338,500. SSC advised they included $720,000 in claims receivable in the balance sheet for 1997 in their audited 1997 financial statement.

In calculating unabsorbed overhead and increased overhead amounts, SSC included overhead costs related to engineering and steel sales. SSC maintained that their bid overhead rate of 200% of fabrication labor included the overhead costs from these operations. Accordingly, this would also represent potential underbid costs as the actual rates for 1996 even including the VA bid labor exceeded 300%.

STEEL SERVICE CORPORATION

June 22, 1998

Defense Contract Audit Agency
P.O. Box 29532
New Orleans, LA 70189-0532

Attention: P. David Hampshire, Jr., CPA

Reference: Claim for Equitable Adjustment
V.A. Seismic Modernization/Phase I
Memphis, TN

Gentlemen:

Please use this letter as your authority to release the audit of the above claim to the General Contractor, Caddell Construction Co., Inc.

Thank you,

Sincerely,

Lawrence A. Cox
President

cc: Luke Green, Caddell
Ray Vinson, Construction Mediation Services

2260 Flowood Drive • P.O. Box 1144 • Jackson, MS 39215-1144 • 601-939-9222 • Fax 601-939-9359

DRAFT

Audit Report No. 1751-98J17200002

APPENDIX 4
Page 1 of 17

# DEFENSE CONTRACT AUDIT AGENCY
# AUDIT REPORT

14 August 1998

**PREPARED FOR:** Branch Manager
Defense Contract Audit Agency
New Orleans Branch Office
P.O. Box 29532
New Orleans, LA 70189-0532
e-mail Address: *fao1221@rea.dcaa.mil

**PREPARED BY:** Huntsville Branch Office
620 Discovery Drive
Building II, Suite 300
Huntsville, Alabama 35806
Telephone No. (256) 842-7700
FAX No. (256) 842-9184
e-mail Address: *fao1201@rea.dcaa.mil

**SUBJECT:** Report on Audit of Equitable Adjustment Proposal under Subcontract No. 90521-05-SC,
Subcontractor: EEE Detailing Services, Inc.
Contractor: Steel Service Corporation

**REFERENCES:** DCAA: Audit Report No. 1201-98K17200143

**SUBCONTRACTOR:** EEE Detailing Services, Inc.
969 Gadsden Highway
Birmingham, Alabama 35235

**REPORT RELEASE RESTRICTIONS:** Please Refer To Page 13

**CONTENTS:**


| | Page No. |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 4 |
| Subcontractor Organization and Systems | 11 |
| DCAA Personnel and Report Authorization | 12 |
| Audit Report Distribution and Restrictions | 13 |
| Appendixes | 14 |


**FOR OFFICIAL USE ONLY**

DRAFT

## SUBJECT OF AUDIT

As requested in your 29 June 1998 memorandum, we audited EEE Detailing Services, Inc.'s subcontract equitable adjustment proposal dated 31 October 1997 in the amount of $310,249. In accordance with your request, we audited EEE to determine whether its books and records support each element of the proposal. EEE submitted the proposal to compensate for costs incurred due to a government caused delay associated with work performed under Firm Fixed Price Subcontract No. 90521-05-SC.

EEE Detailing Services, Inc.'s submission constitutes an equitable adjustment proposal. EEE performed as a second tier subcontractor to Steel Service Corporation during the purported delay and disruption period, and provided detailed drawings of architect building drawings. The prime contract was awarded by the Department of Veterans Affairs to Caddell Construction Company. EEE's delay arises out of incomplete architect drawings provided by the government, which produced a delay in the subcontract work because subsequent revisions to the architect drawings were required. EEE could not finish their work until the architect drawings were completed.

The equitable adjustment proposal and related cost or pricing data are the responsibility of the subcontractor. Our responsibility is to express an opinion on the proposal based on our audit.

## EXECUTIVE SUMMARY

Our audit of the $310,249 proposal disclosed $69,805 in questioned costs. Questioned costs represent the net effect of additional or updated incurred cost information related to the subcontract delay cost. The claim proposal is acceptable for negotiation of a fair and reasonable price. However, the qualifications presented on pages 2 and 3 should be considered in the negotiation process.

SIGNIFICANT ISSUES:

- The results of our audit are qualified because we were unable to determine (1) the reasonableness of the number of claimed delay days; (2) whether cost overruns are solely due to the delay and disruption circumstances; and (3) the extent to which the subcontractor's initial bid estimate was reasonable and therefore provided a reasonable basis for calculating the delay and disruption values. (Please refer to qualifications on pages 2 and 3 for added explanation).

- Subcontractor's proposed revision cost was based on a contracted hourly revision rate between EEE and Steel Service Corporation. This hourly rate was stated to include direct labor, overhead, and profit. We were unable to substantiate the cost buildup in the contracted hourly rate. Therefore, we reviewed the subcontractor's cost records to determine the actual labor and overhead cost incurred for the revisions.

## SCOPE OF AUDIT

Except for the qualifications discussed below, we conducted our audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain reasonable assurance that the equitable adjustment proposal is free of material misstatement. An audit includes:

- Reviewing the subcontractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the equitable adjustment proposal;
- assessing the accounting principles used and significant estimates made by the subcontractor;
- evaluating the overall equitable adjustment proposal presentation; and
- determining the need for technical specialist assistance and (if applicable) quantifying the results of a government technical evaluation.

We evaluated the proposed costs using the applicable requirements contained in the:

- Federal Acquisition Regulations (FAR), and
- DoD FAR Supplement.

The subcontractor claims exemption under 48 CFR 9903.201-1(b)(3) from the practices required by the Cost Accounting Standards Board rules and regulations because it considers itself a small business concern.

We have had no prior audit experience with this subcontractor. Nor did we perform any significant testing during this audit of the subcontractor's relevant internal controls.

The contractor is a small business with limited resources to be applied to compliance procedures and testing. Our audit scope reflects this assessment of control risk and includes those audits tests of compliance with applicable laws and regulations that we believe provide a reasonable basis for our opinion.

QUALIFICATIONS:

- The subcontractor's proposed revision costs (labor, overhead and profit) represent labor hours incurred preparing RFI's (Request For Information) and making revisions to the government furnished architect drawings. The proposed cost is computed as the revision hours times a contracted hourly rate. The subcontractor asserts that the total cost overrun for this element was a result of government created delay and disruption circumstances. We were unable to determine if the cost overrun is comprised only of costs created by the delay and disruption problems. Further, we were unable to determine if the initial bid estimates were reasonable and therefore would not result in calculated proposed amounts which would include cost overruns not attributable to the delay and disruption scenario. No technical evaluation was requested to review these areas due to time constraints and immateriality of the dollar amounts involved.

- We were unable to determine the reasonableness of the subcontractor's calculated 395 delay days. The subcontractor asserts that the difference between the number of days initially estimated for the project and the actual number of days it took to complete the project are due solely to government created delays and disruptions. As discussed, no technical evaluation of the proposed delay days was requested due to time constraints and immateriality of the dollar amounts involved.

## RESULTS OF AUDIT

The cost or pricing data submitted by the offeror are inadequate in part (see comments on page 5, Note 2). However, the inadequacies described are considered to have limited impact on the subject proposal. The proposal was not prepared in all respects in accordance with appropriate provisions of FAR. However, as stated on page 5, Note 2, the impact of the noncompliance is considered relatively insignificant. Because the noncompliance and inadequacies are considered insignificant, we believe that the proposal is an acceptable basis for negotiation of a fair and reasonable price.

The results of audit are presented as follows:

| Cost Element | Proposed Amount (Note 1) | Questioned Amount | Note |
|---|---|---|---|
| Revisions | 112,230 | 35,646 | Note 2 |
| Delay Damages * | 140,547 | (2,231) | Note 3 |
| Profit @ 15% | 21,082 | - | Note 5 |
| | 161,629 | | |
| Efficiency Loss | 36,390 | 36,390 | Note 4 |
| Total: | 310,249 | 69,805 | |

* - Unabsorbed Overhead
( ) Denotes upward adjustment

Explanatory Notes:

1. Subcontractor's Proposal

Contractor's proposed cost is composed of Revisions (labor, overhead, and profit), Delay Damages (Unabsorbed Overhead calculated using the Eichleay Formula) and Efficiency Loss (due to loss of learning).

2. Revisions

a. Summary of Conclusions

As a result of our review we have questioned $35,646 of the proposed Revision cost. Contractor's proposed Revision cost (labor, overhead, and profit) and questioned cost is described in the schedule below.

| | | | Ref. |
|---|---|---|---|
| <u>Proposed Amount</u> | | | |
| Revisions | | | |
| Labor & O/H | | 94,390 | a) |
| Profit @ 18.9% | | 17,840 | c) |
| | | 112,230 | |
| <u>Recommended Amount</u> | | | |
| Revisions | | | |
| Labor | 37,457 | | a) |
| Overhead | 21,287 | 58,744 | b) |
| <u>Questioned Amount</u> | | | |
| Revisions | | 35,646 | d) |

a) As a result of our review we recommend $37,457 of labor cost.

<u>Calculation of Recommended Labor</u>

| Year | Rate | Hours | Amount |
|---|---|---|---|
| 1996 | $11.15 | 243.25 | 2,712 |
| 1997 | $11.31 | 3,072.00 | 34,745 |
| Total | | | 37,457 |

Contractor used a pre-established loaded Revision labor rate ($30 & $35 per hour) which included labor, overhead and profit at 18.9%. We were unable to separate the labor from the overhead, therefore, we could not question cost at the "Revision" cost element level. Contractor's proposed labor cost of $94,390 was imputed by removing the profit from the proposed cost at the 18.9 percent rate provided by the contractor during the audit.

Recommended hours were determined based on our review of the Revision timesheets. The recommended labor rates were computed using actual average hourly rates for the months of July 1996 and 1997.

b) In addition, we recommend $21,287 as overhead cost applicable to the Revision labor incurred. As noted above the contractor did not show a separate proposed cost element for overhead because of the application of the pre-established loaded rates. Therefore, we calculated a separate recommended cost for overhead as shown below.

Calculation of Recommended Overhead Cost

| Year | Base | Rate | Amount |
|---|---|---|---|
| 1996 | 2,712 | 120.00% | 3,254 |
| 1997 | 34,745 | 51.9% | 18,033 |
| Total | | | 21,287 |

The recommended overhead rates were based on 1996 and 1997 actual indirect cost adjusted for any indirect expense and unabsorbed overhead charged direct for the purpose of this delay proposal. The recommended base is direct dollars.

c) Profit was not reviewed for the purpose of this audit. Contractor is using the FAR 52.243 Standard Change clause for its recovery which is silent on the allowability of profit.

d) The total questioned Revision cost is the difference between proposed labor/overhead and recommended labor and overhead cost.

The contracted Revision labor rate does not represent actual cost for the purpose of proposing actual delay cost as allowed under the FAR 52.243 Standard Changes. However, we believe the impact of this noncompliance is considered insignificant due to the small dollars involved.

b. Basis of Contractors Cost

Contractor's proposed Revision labor cost is based on a loaded pre-established Revision labor rate applied to actual Revision hours incurred. The loaded labor rate includes labor cost, overhead cost, and profit.

c. Audit Evaluation

Our evaluation of the Revision labor was based on a review of timesheets for applicable hours incurred as during the delay period to determined the recommended hours. The labor rates recommended were based on computed actual average direct labor hourly rate for the month of July 1996 and 1997 from payroll records (contractor did not maintain labor cost records by contract) for application to recommended hours for the same years. The overhead rates applied to the recommended labor dollars were based on a review of actual overhead cost for FY 1996 and 1997, adjusted for FAR unallowable cost and recommended unabsorbed overhead

d. Contractor's Reaction

Contractor's proposal does not allow for the exclusion of calculated unabsorbed overhead from the proposed overhead.

3. Delay Damages (Unabsorbed Overhead)

a. Summary of Conclusions

As a result of our review we have questioned <$2,231> of Unabsorbed Overhead as the difference between proposed and recommended. The primary difference resulting in the questioned cost was due to the allocation ratio and the Days of Performance. The proposed allocation ratio of $257,600 contract billing to $395,600 total billings (65.1359%) did not consider total revenues for the subject contract. It also used total billings for FY 1996 and 1997 instead of just the contract period. Proposed Daily Fixed Overhead Rate was computed using 573 days (3/6/96 through 9/30/97), whereas, recommended Daily Fixed Overhead Rate was computed using 617 days (3/8/96 through 11/15/97). The recommended completion date was determined by observation of recorded timecard charges. In addition, the contractor included a credit in its proposed Unabsorbed Cost for an advance from its prime and the recommended cost excludes the credit because this cost is part of the contractor's recovery calculations. This resulted in questioned cost of $2,231 more than proposed.

b. Basis of Contractor's Cost

Proposed Delay Damages (Unabsorbed Overhead) was computed using the Eichleay Formula method as follows.

| | Contractor's Proposed Cost | |
|---|---|---|
| Revenues this project: | $ 257,600 = | 0.651359 |
| Revenue 1996 + 1997: | $ 395,600 | |
| Fixed Overhead for contract period: | | $ 338,740 |
| Fixed Overhead allocable: | | $ 220,641 |
| Days of performance: | | 573 |
| Daily Fixed Overhead rate: | | $ 385.06 |
| Number of Delay Days: | | 395 |
| Unabsorbed Overhead: | | $ 152,099 |
| Credit for prepayment: | | $ (11,552) |
| Net Unabsorbed Overhead: | | $ 140,547 |

Proposed Project Revenue is the original contract price and 1996 & 1997 Revenue is the sum of the project revenue plus revenue from other projects for the entire fiscal year. Proposed fixed overhead allocable to the contract is based on 1996 actual adjusted overhead average quarterly cost times six quarters. The six quarters is the same duration as the days of performance. Proposed Days of Performance and Number of Delay Days is based on the original contract schedule and the last date of actual work as of the date of proposal preparation. In addition, contractor gave a partial credit to the proposed cost for an advance payment from its Steel Services Corporation to cover 30 days at the proposed daily rate of $385.06.

c. Audit Evaluation

The delay damages proposed were evaluated using the contractor's Statement of Revenues and Expenses for FY 1996 & 1997 and billings to compute the allocation ratio. The allocation ratio was applied to the allowable fixed overhead to compute the fixed overhead allocable to the contract. We used the employee timesheets to determine the contract period of performance and compute the delay days. The recommended Unabsorbed Overhead and questioned cost are computed below.

| | Recommended Cost | |
|---|---|---|
| Revenues this project: | $ 520,808 = | 0.747 |
| Revenue 1996 + 1997: | $ 696,946 | |
| Fixed Overhead for contract period: | | $ 297,699 |
| Fixed Overhead allocable: | | $ 222,462 |
| Days of performance: | | 617 |
| Daily Fixed Overhead rate: | | $ 361 |
| Number of Delay Days: | | 396 |
| Unabsorbed Overhead: | | $ 142,778 |
| Credit for prepayment: | | - |
| Net Unabsorbed Overhead: | | $ 142,778 |
| Questioned Cost (Proposed minus Recommended) | | ($2,231) |

Recommended Project revenue is total contract billings for the subject contract. The 1996 & 1997 Revenue represents all revenues from total sales during the contract period.



FOR OFFICIAL USE ONLY

Proposed fixed overhead allocable to the contract is based on 1996 and 1997 actual adjusted overhead cost for the contract period. Recommended Days of Performance and Number of Delay Days are based on the original contract schedule and the estimate date of substantial completion.

d. Contractor's Reaction

Contractor concurs with our findings.

4. Efficiency Loss

a. Summary of Conclusions

As a result of our review we question the $36,390 Efficiency Cost proposed. The proposed cost for Efficiency Loss was to recover the cost of labor incurred for draftsmen having to re-orient themselves each time revisions were corrected. However, our review disclosed no support was made available for the loss ratio of 15% or its base. Therefore, we question the entire proposed Efficiency Loss cost.

b. Basis of Contractors Cost

The contractor proposed Efficiency Loss was based on a ratio of 15% applied to the original contract amount of $242,600.

c. Audit Evaluation

We requested Efficiency Loss supporting detail from contractor on 7-17-98 and 8-4-98. No support was made available.

d. Contractor's Reaction

Contractor believes the 15% efficiency loss ratio is reasonable.

5. Comments on Profit

Profit was not reviewed in this audit. In addition to this profit, the contractor proposed Revision cost also includes a profit of 18.9% which was also not reviewed as part of this audit. The contractor is using the FAR 52.243 Standard Change clause for its claim which is silent on the allowability of profit.

We held an exit meeting with the subcontractor's representative, Mr. Ray Vinson, Consultant, on 10 August 1998. Mr. Vinson disagrees with our audit position on Overhead and Efficiency Loss.

# SUBCONTRACTOR ORGANIZATION AND SYSTEMS

## I. Organization

EEE Detailing Services, Inc. is incorporated in the State of Alabama on January 1993 and is family held by two people. EEE Detailing Services, Inc. provides detailed drawings for steel fabrication companies. The company currently employs about 8 people that include two indirect. Sales for FY 1997 were $299 thousand.

## II. Accounting System

The subcontractor currently maintains the Quick Pro accounting program for its accounting system. However, the payroll system is not interfaced with the cost records. Nor does the contractor maintain job cost records by job. All costs are posted monthly to the general ledger which includes both indirect and direct cost. EEE Detailing Services, Inc. accumulates general and administrative type indirect expenses in separate accounts. The indirect costs, however, are not actually allocated to the various jobs on any specific allocation base.

The subcontractor's fiscal year is the same as the calendar year. No assessment has been made of the subcontractor's accounting system as to its ability to identify costs for individual projects.

**DCAA PERSONNEL**

| | Telephone No. |
|---|---|
| Primary contacts regarding this audit: | |
| Larry Schmidt, Senior Auditor | (256) 842-7700, ext. 172 |
| Woody Prewitt, Supervisory Auditor | (256) 842-7700, ext. 126 |
| Other contact regarding this audit report: | |
| James V. Wright, Branch Manager | (205) 842-7700, ext. 120 |
| | FAX No. |
| | (256) 842-9184 |
| | e-Mail Address |
| | *fao1201@rea.dcaa.mil |

**AUDIT REPORT AUTHORIZED BY:**

JAMES V. WRIGHT
Branch Manager
DCAA Huntsville Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

### DISTRIBUTION

| | E-mail Address |
|---|---|
| Branch Manager<br>Defense Contract Audit Agency<br>New Orleans Branch Office<br>P.O. Box 29532<br>New Orleans, LA 70189-0532 | *fao1221@rea.dcaa.mil |

### RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Make proprietary determinations in the event of an external request for access. Consider the restrictions of 18 U.S.C. 1905 before releasing this information to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.26(b)(2), DCAA will refer any Freedom of Information Act requests for audit reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requester.

3. The Defense Contract Audit Agency does not object to release of this report, at the discretion of the contracting agency, to authorized representatives of EEE Detailing Services, Inc. Nor does this Agency or EEE Detailing Services, Inc. object to the release of this report to authorized representatives of Steel Services Corporation. Please refer to Appendix 2 for a copy of the subcontractor's release statement.

4. Do not use the information contained in this audit report for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

## CHRONOLOGY OF SIGNIFICANT EVENTS

| Event | Date |
|---|---|
| First Request for Information (RFI) for Revision was submitted | 6 March 1996 |
| Subcontract is awarded to EEE Detailing Services, Inc . | 8 March 1996 |
| Change Order No. 1 to increase Contract $15,000 | 30 April 1996 |
| First Revision time charge per time card | 13 May 1996 |
| Change Order No. 2 to increase contract value $39,000 | 31 July 1996 |
| Initial subcontract anticipated completion date | 15 October 1996 |
| Revision hourly rate increase from $30 to $35/hour | 28 March 1997 |
| Last Request for Information (RFI) for Revision was submitted | * September 1997 |
| Equitable adjustment proposal submitted to Steel Services Corporation | 31 October 1997 |
| Actual substantial completion date of subcontract | 15 November 1997 |
| Last Revision time charge | 25 January 1998 |

Denotes month of this activity. Precise date is not known.

Subcontractor's Release Letter
(follows this page)