IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CADDELL CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-461C |
| | ) | (Judge Bohdan A. Futey) |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Plaintiff, Caddell Construction Co., Inc. ("Caddell"), submits the following Memorandum of Contentions of Fact and Law pursuant to this Court's Orders dated July 31, 2006 (Doc. 47) and November 14, 2006 (Doc. 49) and Appendix A, ¶ 14(a) of the Rules of the United States Court of Federal Claims:

## I. CONTENTIONS OF FACT

A. Summary of Claims and Contentions.

1. Caddell, as general contractor, sponsors the claim of its subcontractor, Steel Service Corporation ("Steel Service"), as the structural and miscellaneous steel fabricator and erector, which, from the outset of its performance, encountered conflicts, errors, omissions, and/or inadequate details in the Government's structural steel design drawings which delayed the detailing of shop drawings needed for fabrication of structural steel and, in turn, the fabrication of

structural steel. As a result of the delays and disruptions which Steel Service encountered throughout its performance, Steel Service incurred additional costs for itself, its structural steel detailer, EEE Detailing ("EEE"), and its miscellaneous steel fabricator, American Metal Works ("AMW"), in the total amount of $2,573,617.89, excluding overhead, profit, and interest, and consisting of the following:

| | | |
|---|---|---|
| Steel Service Additional Engineering Cost | | $ 400,651.65 |
| 1. Steel Service payments to EEE | $ 283,007.50 | |
| 2. Added Travel | $ 21,577.66 | |
| 3. Added Project Management | $ 89,654.25 | |
| 4. Added Printing | $ 6,412.24 | |
| Steel Service Delay Cost | | $ 1,023,441.19 |
| 1. Unabsorbed Overhead Delay Period No. 1 (05/96 - 11/96) | $ 674,923.59 | |
| 2. Unabsorbed Overhead Delay Period No. 2 (01/97 - 08/97) | $ 348,517.60 | |
| Subcontractor Claims | | $ 208,548.70 |
| 1. EEE Detailing | $ 97,805.61 | |
| 2. Williams & Beasley | $ 0.00 | |
| 3. American Metal Works | $ 110,743.09 | |
| Other Steel Service Costs | | $ 787,092.34 |
| 1. Increased Cost of Overhead | $ 100,607.47 | |
| 2. Additional Sublet Costs | $ 251,153.83 | |
| 3. Efficiency Losses | $ 435,331.04 | |
| a. VA Project $ 160,389.41 | | |

| | | | |
|---|---|---|---|
| b. Other Projects | $ 274,941.63 | | |
| Preparation Costs (Consulting and Legal) | | | $ 153,884.00 |
| | | **TOTAL** | $ 2,573,617.88 |

(Ex. P-184).

2. Based upon the express terms of the Contract, specifically, FAR 52.236-21, Specifications and Drawings for Construction (APR 1984), FAR 52.242-14, Suspension of Work (APR 1984), and FAR 52.243-4, Changes (AUG 1987), the Government is liable to Steel Service for all increased costs proximately caused by the Government's defective structural steel design.

B. The Project Design

3. On or about July 27, 1994, the Department of Veterans Affairs ("VA") entered into an Architect-Engineer Contract with Walk Jones and Francis Mah, Inc. and Allen & Hoshall, Inc., a joint venture (hereinafter collectively referred to as the "Architect/Engineer"), to furnish the professional services necessary to prepare construction documents and provide construction period services, and site visits for the "new 309,000 SF bed tower, initial seismic correction [to the existing VA Medical Center], site utilities and site work, land scape, boiler replacement and replacement parking at the VA Medical Center, Memphis, Tennessee" for $1,947,994 (Ex. P-1).

4. According to the terms of the Architect/Engineer

Contract, the Architect/Engineer agreed to "assist the Contracting Officer and his Resident Engineer to interpret the construction documents . . ." (SPC 2). With regard to shop drawings, the Architect/Engineer agreed to (i) check shop drawings "for conformity with the design concept and construction documents"; (ii) "recommend approval, disapproval, or other suitable disposition"; (iii) "evaluate the submittals with reference to any companion submittals that constitute a system"; (iv) "request the Contractor to submit related components of a system before acting on a single component" or "review all prior submittals for related components of the system before acting on a single component"; (v) participate in "joint reviews with the VA technical staff on complicated system submittals"; and (vi) "notify the resident engineer in writing of any and all deviations from the requirements of the construction documents that he found in the . . . submittals" (SPC 4). According to the Contract, "such responsibility shall be carried out with reasonable promptness as to cause no delay" (SPC 4).

5. Additionally, the Architect/Engineer Contract obligated the Architect/Engineer to "promptly review and approve, disapprove or take other appropriate action upon all VA requests. The Architect/Engineer shall submit recommendations on all shop drawings and other submittals and other requests within fifteen (15) calendar days after receipt" (SPC 7).

6. On March 31, 1995, the Architect/Engineer submitted to the VA what it called its "100% construction documents" (Ex. P-2). The VA's Structural Engineer reviewed the structural drawings and advised the VA that "they don't look good at all," "they are no where near the intended target" (Ex. P-3). The VA's Structural Engineer included 108 "Structural Comments," or deficiencies, including missing beams, beam sizes not shown, spacing of beams not shown, wrong floor elevations, sections cut in the wrong place, drawings noted on the schedule but not included, elevations and geometry of shear walls not shown, and roof member sizes not given (Ex. P-4). The VA's Structural Engineer also noted the following:

> *Precast Panel Connections: The connection details are incomplete.
> They are inadequate and proper design details are not provided.
> The Architectural and Structural drawings do not agree. The 6 inch panels require a 6" x 7" notch. Section 6/S22 on drwg. 1-S22 needs to be coordinated with Section 26/1-9.6. Architectural Section 32/1-9.4 needs to be structurally addressed.

(Ex. P-4) (emphasis in original).

7. Then, on April 25-28, 1995, the VA[1] and the Architect/Engineer held a series of meetings to review the "100% construction documents" (Ex. P-6). At the outset, the VA advised the Architect/Engineer that:

---

[1] The VA's Resident Engineer for this Project, Bill Totolo, attended the meetings.

> Due to the incomplete nature of many of the drawings, there is a serious concern for coordination between the disciplines. Is there enough time to not only finish the drawings, but to do adequate coordination in three weeks (remaining before the advertisement bids date).

(Ex. P-6).

8. With regard to the structural drawings, the VA commented that "structural drawings need a great deal of work; drawings brought to Washington by Allen & Hoshall still have many mistakes. Estimate 50% completion. Will need re-submittal. There is much coordination with architectural needed, such as the conflict with the architectural precast panel detail at the floor slab" (Ex. P-6).

9. In their exit meeting, the VA "pointed out that a post submittal will be necessary by June 6, 1995. By that time, one plot or sepia of each of the corrected drawings is to be re-submitted (along with Final Specifications). Not only are these drawings to be completely capable of being bid, but are to be properly coordinated so that they are as 'tight' as possible (meaning that they keep errors and omissions to a minimum)" (Ex. P-6). With regard to the structural drawings, the VA noted that "[t]here is much work to do on these drawings to meet 100%. Re-submit all drawings, calculations and Final Specifications by June 6. The following elements must be coordinated with the Architectural drawings: precast panels, stairs, store front

elements, catwalks, depressed slabs, dimensions, especially the slab edge. Coordination elements with other disciplines include mechanical equipment, Seismic anchorage, and pipe and shaft openings" (Ex. P-6).

10. Apparently, the June 6th re-submittal of the structural drawings was likewise unacceptable because, as indicated by the VA's June 14, 1995 Price Negotiation Memorandum, the Architect/Engineer Contract was reduced by $43,060 because the structural engineer "has not provided the quality control and coordination per the Contract, especially with respect to the structural design" which "still show many errors and omissions and require work to make a tight set of bid documents" (Ex. P-8).

C. Bidding and Award

11. Despite its knowledge of the design deficiencies, on July 6, 1995, the VA issued its Pre-Solicitation Notice for Project No. 614-011, "Seismic/Modernization, VA Medical Center," calling for offers to be received August 31, 1995 (Ex. P-9). The bids received August 31, 1995 were over the VA's budget. The Project was then re-bid on December 15, 1995, using competitive negotiation procedures (Ex. P-10). Thereafter, the VA awarded the Contract to Caddell (Ex. P-11).

D. The Contract Requirements

12. The Contract, at Section 01001, General Conditions, contains the following relevant provisions:

Part 1.46 SPECIFICATIONS AND DRAWINGS FOR CONSTRUCTION (FAR 52.236-21) (APR 1984)

(a) . . . in case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing. Any adjustment by the Contractor without such a determination shall be at the Contractor's own risk and expense. The Contracting Officer shall furnish from time to time such detailed drawings and other information as considered necessary unless otherwise provided.

***

(e) . . . the Contracting Officer will indicate an approval or disapproval of the shop drawings and if not approved as submitted shall indicate the Government's reasons therefore. Any work done before such approval shall be at the Contractor's risk. . . .

Part 1.33 CHANGES (FAR 52.243-4) (AUG 1987)

***

(d) . . . if any change under this clause causes an increase or decrease in Contractor's cost of, or the time required for, the performance of any part of the work under this Contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the Contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change under paragraph (b) of this clause shall be made for any cost incurred more than 20 days before the Contractor gives written notice as required. In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

(Emphasis added.)

13. Section 05100, Structural Steel, at Part 1.2.B, incorporates the American Institute of Steel Construction Code of Standard Practice for Steel Buildings and Bridges (1992 ed.) (Ex. P-179) and states that Sections 3.2, 3.3, 4 and 9 of AISC Code are "superseded by requirements of the General Conditions, Special Conditions, and Contract Documents."

14. Articles 3.2, 3.3 and Paragraphs 4 and 9 of the AISC Code (Ex. P-178) state the following:

**3.2. Architectural, Electrical and Mechanical**

Architectural, electrical and mechanical plans may be used as a supplement to the structural steel plans to define detail configurations and construction information, provided all requirements for the quantities and locations of structural steel are noted on the structural steel plans.

**3.3. Discrepancies**

In case of discrepancies between plans and specifications for buildings, the specifications govern. In case of discrepancies between plans and specifications for bridges, the plans govern. In case of discrepancies between scale dimensions on the plans and figures written on them, the figures govern. In case of discrepancies between the structural steel plans and the architectural plans or plans for other trades, the structural steel plans govern.

* * *

**SECTION 4. SHOP AND ERECTION DRAWINGS**

**4.1. Owner Responsibility**

To enable the fabricator and erector to properly and expeditiously proceed with the work, the owner must furnish, in a timely manner and in accordance with the contract documents, complete structural steel plans and specifications released for construction. "Released for construction" plans and specifications are required by the fabricator for ordering mill material and the preparation and completion of

shop and erection drawings. Plans provided as part of a contract bid package are considered to be "released for construction" unless otherwise noted.

**4.2. Approval**

When shop drawings are made by the fabricator, prints thereof are submitted to the owner for his examination and approval. The fabricator includes a maximum allowance of fourteen (14) calendar days in his schedule for the return of shop drawings. Return of shop drawings is noted with the owner's approval, or approval subject to corrections as noted. The fabricator makes the corrections and furnishes corrected prints to the owner. Approval of shop drawings, approval "subject to corrections noted," or similar approvals, constitute the owner's release for the fabricator to begin fabrication. The fabricator retains flexibility to determine the fabrication schedule necessary to meet the project's requirements.

**4.2.1.** Approval by the owner's authorized representative of shop drawings prepared by the fabricator indicates that the fabricator has correctly interpreted the contract requirements, and may rely upon these drawings in the fabrication process. Where the fabricator must select or complete connection details, this approval constitutes acceptance by the owner's authorized representative of design responsibility for the structural adequacy of such connections. If a fabricator wishes to change a connection that is fully detailed in the contract documents, the fabricator shall submit the change for review by the owner's authorized representative in a manner that clearly indicates that a change is being requested. Approval of this submittal constitutes acceptance by the owner's authorized representative of design responsibility for the structural adequacy of the changed detail. Approval under any of the circumstances described in this Section does not relieve the fabricator of the responsibility for accuracy of detailed dimensions on shop drawings, nor the general fit-up of parts to be assembled in the field.

**4.2.2.** Unless specifically stated to the contrary, any additions, deletions or changes indicated on the approval of shop and erection drawings are authorizations by the owner to release the additions, deletions or revisions for construction.

**4.3. Drawings Furnished by Owner**

When the shop drawings are furnished by the owner, he must deliver them to the fabricator in time to permit material procurement and fabrication to proceed in an orderly manner in accordance with the prescribed time schedule. The owner prepares these shop drawings, insofar as practicable, in accordance with the shop and drafting room standards of the fabricator. The owner is responsible for the

completeness and accuracy of shop drawings so furnished.

* * *

**SECTION 9. CONTRACTS**

**9.1. Types of Contracts**

**9.1.1.** For contracts stipulating a lump sum price, the work required to be performed by the fabricator and erector is completely defined by the contract documents.

**9.1.2.** For contracts stipulating a price per pound, the scope of work, type of materials, character of fabrication, and conditions of erection are based upon the contract documents which must be representative of the work to be performed.

**9.1.3.** For contracts stipulating a price per item, the work required to be performed by the fabricator and erector is based upon the quantity and the character of items described in the contract documents.

**9.1.4.** For contracts stipulating unit prices for various categories of structural steel, the scope of the work required to be performed by the fabricator and erector is based upon the quantity, character and complexity of the items in each category as described in the contract documents. The contract documents must be representative of the work to be done in each category.

**9.2. Calculation of Weights**

Unless otherwise set forth in the contract, on contracts stipulating a price per pound for fabricated structural steel delivered and/or erected, the quantities of materials for payment are determined by the calculation of gross weight of materials as shown on the shop drawings.

**9.2.1.** The unit weight of steel is assumed to be 490 pounds per cubic ft. The unit weight of other materials is in accordance with the manufacturer's published data for the specific product.

**9.2.2.** The weights of shapes, plates, bars, steel pipe and structural tubing are calculated on the basis of shop drawings showing actual quantities and dimensions of material furnished, as follows:

(a) The weight of all structural shapes, steel pipe and structural tubing is calculated using the nominal weight per ft and the

detailed overall length.

(b) The weight of plates and bars is calculated using the detailed overall rectangular dimensions.

(c) When parts can be economically cut in multiples from material of larger dimensions, the weight is calculated on the basis of the theoretical rectangular dimensions of the material from which the parts are cut.

(d) When parts are cut from structural shapes, leaving a non-standard section not useable on the same contract, the weight is calculated on the basis of the nominal unit weight of the section from which the parts are cut.

(e) No deductions are to be made for material removed by cuts, copes, clips, blocks, drilling, punching, boring, slot milling, planing or weld joint preparation.

**9.2.3.** The calculated weights of castings are determined from the shop drawings of the pieces. An allowance of 10 percent is added for fillets and overrun. Scale weights of rough castings may be used if available.

**9.2.4.** The items for which weights are shown in tables in the *AISC Manual of Steel Construction* are calculated on the basis of tabulated unit weights.

**9.2.5.** The weight of items not included in the tables in the *AISC Manual of Steel Construction* shall be taken from the manufacturers' catalog and the manufacturers' shipping weight shall be used.

**9.2.6.** The weight of shop or field weld metal and protective coatings is not included in the calculated weight for pay purposes.

**9.3. Revisions to Contract Documents**

**9.3.1.** Revisions to the contract are made by issuance of new documents or re-issuance of existing documents. In either case, all revisions, including revisions communicated by annotation of shop or erection drawings, must be clearly and individually indicated and the documents dated and identified by revision number. All contract drawings shall be identified by the same drawing number throughout the duration of the job regardless of the revision. The engineer of record is responsible for reviewing the overall structural design to identify all components which will be affected by a change to any individual component.

**9.3.2.** A revision to the requirements of the contract documents is made by the change order, extra work order, or notations on the shop and erection

drawings when returned upon approval.

**9.3.3.** Unless specifically stated to the contrary, the issuance of a revision is authorization by the owner to release these documents for construction.

**9.4. Contract Price Adjustment**

**9.4.1.** When the scope of work and responsibilities of the fabricator and erector are changed from those previously established by the contract documents, an appropriate modification of the contract price is made. In computing the contract price adjustment, the fabricator and erector consider the quantity of work added or deleted, modifications in the character of the work, and the timeliness of the change with respect to the status of material ordering, detailing, fabrication and erection operations.

**9.4.2.** Requests for contract price adjustments are presented by the fabricator and erector in a timely manner and are accompanied by a description of the change in sufficient detail to permit evaluation and timely approval by the owner.

**9.4.3.** Price per pound and price per item contracts generally provide for additions or deletions to the quantity of work prior to the time work is released for construction. Changes to the character of the work, at any time, or additions and/or deletions to the quantity of the work after it is released for detailing, fabrication, or erection, may require a contract price adjustment.

**9.5. Scheduling**

**9.5.1.** The contract documents specify the schedule for the performance of the work. This schedule states when the "released for construction" plans will be issued and when the job site, foundations, piers and abutments will be ready, free from obstructions and accessible to the erector, so that erection can start at the designated time and continue without interference or delay caused by the owner or other trades.

**9.5.2.** The fabricator and erector have the responsibility to advise the owner, in a timely manner, of the effect any revision has on the contract schedule.

**9.5.3.** If the fabrication or erection is significantly delayed due to design revisions, or for other reasons which are the owner's responsibility, the fabricator and erector are compensated for additional costs incurred.

**9.6. Terms of Payment**

The terms of payment for the contract shall be outlined in the contact documents.

American Institute of Steel Construction, Inc., Code of Standard Practice.

15. Only the shop drawing review time in Section 4.2 was, in fact, superseded by the General Conditions, Special Conditions and Contract documents. The only reference to the VA's time for approval of shop drawings is contained in Section 01311, Network Analysis System, which, at Part 1.8.A.3.g, states that "[t]he duration for VA approval of any required submittal, shop drawing or other submittals shall not be less than 20 work days. Refer to drawing CPM-1 for VA approval activities which will require minimum durations longer than 20 work days." Section 01340, Samples and Shop Drawings, does not state a time for VA approval of shop drawings.

E. Steel Service's Bid and Schedule for Performance.

16. On February 16, 1996, Steel Service submitted its quotation to Caddell for detailing, fabricating, and erecting 2,633 tons of structural and miscellaneous steel and metal deck for $5,350,000 (Ex. P-12). Although Steel Service's quotation did not include a schedule, both parties contemplated, at the time of bid, that steel erection would commence within three months from the VA's anticipated notice to proceed in mid-March, 1996, or by mid-June, 1996 (Ex. P-19).

17. Steel Service acknowledged the schedule was aggressive but, since it needed this Project because of a "lack of work in our shop at this time" (Ex. P-22), it had committed to a favorable price for its work based on that schedule and was relying on fabrication starting in May 1996.

18. Specifically, as indicated by its letter dated March 6, 1996, Steel Service's schedule, which was consistent with the parties' mid-June erection start date, indicated that shop drawings would be submitted from May 7, 1996 until October 31, 1996, for an erection schedule from June 18, 1996 until December 3, 1996 (Ex. P-21).

19. Steel Service's steel detailing subcontractor, EEE, immediately started the detailing process. From the outset, EEE encountered missing and/or conflicting information on the structural steel design drawings, resulting in the issuance of over 150 RFI's as of April 9, 1996 which were not being answered (Ex. P-26), prompting a meeting among the VA, the Architect/Engineer, Caddell, Steel Service, and EEE on April 18, 1996 (Exs. P-27, P-28).

20. At that meeting, the Architect/Engineer said that he was not responding to RFI's because he had not been paid by the VA (Ex. P-28).

21. In fact, as shown below, the VA did not "promptly make a determination in writing" on any of Steel Service's RFI's