submitted which will be extra (Ex. P-80).

43. Then, on January 9, 1997, the VA finally returned Steel Service's Sequence 1 shop drawings, approved as noted, with instructions to "coordinate with all precast connections" (Ex. P-85), knowing that it had just directed the precast subcontractor to resubmit a complete set of shop drawings (Ex. P-82). As a result, Steel Service still could not start fabrication, not only because of the requirement to "coordinate with all precast connections" but also because of information requested and clouded on the shop drawings but not responded to by the VA (Ex. P-87). In short, the VA's requirement to "coordinate with precast" required "a complete redesign and re-detailing from the steel perspective" because the precast subcontractor did not "supply calculations and connection design within the perimeters of the [structural steel] designs" (Ex. P-87).

44. In fact, EEE compared the structural steel design drawings to the precast shop drawings and found 85 differences between the connections and/or the dimensions shown on the structural steel design drawings and those shown on the precast shop drawings with which the VA was now requiring Steel Service to ` (Ex. P-90).

45. In addition to the problem with coordination with precast shop drawings, EEE still had many RFI's outstanding which continued to hinder its ability to prepare shop drawings even as

late as February 26, 1997 (Ex. P-99), and it still did not have a complete set of approved precast shop drawings (Ex. P-100). As a result, as of early March 1997, Steel Service still had very few shop drawings that it could release to the shop for fabrication (Ex. P-102). In fact, as of early March 1997, there were almost 40 drawings in Sequences 1 and 2 that still could not be released for fabrication awaiting responses to RFI's (Ex. P-102).

46. In the meantime, the precast subcontractor was already in production as of January 1997 without an approved set of shop drawings (Ex. P-86). As a result, only Steel Service was impacted by the fact that the precast locations and connections shown on the structural steel design drawings were erroneous, incomplete, and uncoordinated and, as a result, they could not be used by Steel Service for the purpose of connecting the precast panels to the structural steel or for the purpose of coordinating with the precast subcontractor (Ex. P-173).

47. The VA used the RFI process and the shop drawing approval process to complete the precast design (Ex. P-173). The result was that shop drawings were being added to Steel Service's "hold" list rather than released for fabrication not only because of issues with precast shop drawings but also because of the VA's failure to clearly note its approval comments on Steel Service's shop drawings, and because of the receipt of RFI responses which were changing the information shown on shop drawings already

returned as approved (Exs. P-109, P-110). As a result, as of March 25, 1997 more than 75 shop drawings in Sequences M (M-Line North), 1, 2, and 12 still could not be released for fabrication (Ex. P-108). In fact, as of late March 1997, EEE was still revising shop drawings based upon the locations for connections shown on the precast shop drawings even though there was not yet an approved set of precast shop drawings (Ex. P-111).

48. In the meantime, M-Line North which was to be erected in mid-December 1996 was not fabricated until mid-March 1997 (Ex. P-113).

49. The severity of the situation prompted EEE to write Steel Service on April 8, 1997 to outline the problems EEE had encountered, the result of which was that EEE "still [did] not have 'one' sequence fully completed . . . due to the lack of information" (Ex. P-114). According to EEE, the reasons for this are:

> (1) "[t]he revisions on this project have overwhelmed us and affected our forward progress due to having to constantly back up";
>
> (2) "[t]he lack of responses to our questions and the time it has taken to get responses we have received, have kept us stalled and jumping around to different items trying to completely finish 'some area' of this Project";
>
> (3) "[t]he inflow of other trade 'incorrect' drawings, to coordinate to, has also caused us to have to back up in all areas affected. We have found many errors in these drawings and have brought it to the attention in our letters to you and phone calls to [Caddell].

> This had ate up a lot of time it seems as though it will continue to";
>
> (4) "[m]any of the sequences that we have sent out for Approval have not been revised per all the latest revisions. This is due to time allotments. We cannot close an area out and at the same time revise it, something will get messed up. It must be taken one step at a time"; and
>
> (5) "[m]any of the other trades' drawings that we are being paid to coordinate with are not their final drawings and we are still awaiting final drawings to match out to as I have stated in earlier letters, faxes and phone calls to you. How long it will take to get these drawings and how much time it will take to match back to them I can't predict"

(Ex. P-114).

50. In fact, the VA was painfully aware of the errors and omissions in the Contract drawings and, as construction proceeded, more problems appeared. For instance, by letter dated April 28, 1997, the VA wrote the Architect/Engineer, complaining about "the numerous errors and lack of coordination on the entire contract drawings" despite the Architect/Engineer's assurance that "the drawings would be checked by competent professional personnel at that time to find the errors and omissions and thus minimize additional costs due to changes" (Ex. P-116). According to the VA, "[w]e have yet to see that the drawings have been reviewed and in fact continue to find errors and omissions. We once again request you [the Architect/Engineer] check the contract drawings for errors and omissions in order to minimize additional costs" (Ex. P-116).

51. As of April 30, 1997, Steel Service and EEE had received six different sets of precast shop drawings (Ex. P-122) and EEE was still adding to the list of steel shop drawings on "hold" because of conflicts between the precast and steel shop drawings (Exs. P-118, P-121). In fact, based upon EEE's review of the final set of approved precast shop drawings, there were 14 different locations at which the precast connections caused fouling conditions at the structural steel support in Sequences 1, 3, and 12 - the first sequences needed on the Project (Ex. P-120).

52. Problems with conflicts between the steel shop drawings and the precast shop drawings continued until mid-June 1997, delaying the fabrication and delivery of steel for M-Line North until May 21, 1997 and the start date for fabrication of the main structure until mid-July 1997 (Ex. P-135).

53. When steel fabrication could finally start on the main structure in mid-June 1997, Steel Service's shop was overbooked because Steel Service could never schedule ahead for this Project and, as a result, Steel Service had to contract with Williams Steel (Ex. P-184) to assist Steel Service with fabrication based upon materials and shop drawings provided to it by Steel Service.

54. Then, shortly after Steel Service and Williams started fabrication in mid-July 1997, the VA informed

Caddell/Steel Service that the criteria for inspection of welds would be governed by Section IX of the American Welding Society Code ("AWS") rather than the less stringent Section VIII inspection criteria despite the fact that neither the specifications nor the AWS Code required the use of Section IX on this Project (Ex. P-139). Williams Steel was not able to meet the Section IX criteria and, as a result, Steel Service had to contract with Trinity Industries ("Trinity") to fabricate the steel in accordance with the Section IX requirements.

55. Unfortunately, for reasons not the fault of Steel Service, Trinity was not able to meet the Project schedule and, as a result, Steel Service had to obtain additional subfabricators to replace Trinity (Exs. P-149, P-150).

56. As a result of the monumental delays experienced by Steel Service as outlined above, steel was still being delivered to the Project in the Fall of 1998 (Ex. P-185).

I. Steel Service's "Claims".

57. On or about October 31, 1997, Steel Service submitted to Caddell both its "claims" for the impact due to the defective structural steel design and the Section IX problem (Exs. P-157, P-159). The Section IX problem was mutually resolved among the VA, Caddell, and Steel Service without the necessity of the submission of a certified claim in accordance with the Contract Disputes Act or litigation (P-162). Similar

efforts were attempted but were not successful with regard to the instant issue and, as a result, Caddell certified its "claim" on February 3, 1998 in accordance with the Contract Disputes Act and forwarded it to the VA (Ex. P-157).

J. <u>The DCAA Audit</u>.

58. Shortly thereafter, the DCAA auditors began their audit of Steel Service's claim. That audit, which lasted approximately one year, entailed extensive discussions between the DCAA auditors and L. Ray Vinson, Steel Service's expert in this litigation, who assisted Steel Service during the Project, prepared the "claim," responded to the DCAA auditors' inquiries, and marshaled the production of hundreds of pages of documents on this and other projects being performed by Steel Service during this same time period as requested by the DCAA.

59. The issues raised by the auditors (Ex. P-165), many of which were addressed by L. Ray Vinson during the audit process, are still the focus of the Government's experts' reports of their assessment of Steel Service's "claim" in this litigation.

60. The DCAA auditors and the Government's experts raised the following primary issues:

(1) Whether portions of Steel Service's "claim" are properly calculated using the modified total cost method;

(2) Whether Steel Service's unabsorbed overhead "claim" should be calculated according to the Eichleay formula;

(3) Whether the dispute between Caddell and Steel Service was a cause of delay to Steel Service not accounted for by Steel Service;

(4) Whether Steel Service's disputes on other projects during the same period (i.e., Austin Airport, Dabhol, Montreal Stadium) were causes of delay not accounted for by Steel Service in its "claim"; and

(5) Whether Steel Service incorrectly calculated the RFI and shop drawing delays by including time that the RFI's and shop drawings were not in the VA's control.

61. Issues (1) and (2) above concerning Steel Service's quantification of its damages are addressed hereinbelow at Parts II.B.6 and 7. With regard to issue (3) above, Steel Service's dispute with Caddell was not a cause of delay as Steel Service attempted to continue preparing shop drawings as it had an obligation to mitigate its damages and, in fact, it would have prepared shop drawings and proceeded with fabrication based on the VA's assurance of payment for fabricated stored materials but for the defects in the structural steel design, the VA's slow and

incomplete responses to RFI's, its refusal to process shop drawings in other than complete sequences and its delay in approving shop drawings.

62. Additionally, as to issue (4) above, despite proof that the Dabhol and Montreal Stadium projects were irrelevant (Ex. P-168), the Government's experts continue to cite these projects as potential sources of delay. Similarly, although Steel Service did submit a claim on the Austin Airport and received a substantial change order for a new addition, the delays on that project were minimal (7,231 manhours) and did not overlap with the manhours lost on this Project (Ex. P-156). Therefore, the Government's issues are non-issues.

63. Finally, Steel Service correctly calculates the RFI delay from the time the RFI left Steel Service until the time Steel Service received the answer because, but for the VA's defective design, the RFI's would not be needed and because, as discussed hereinafter at Part II.A.1, all delay caused by defective specifications is unreasonable. Stated another way, anytime a RFI delays performance the RFI constitutes a compensable delay item. Steel Service acknowledges that RFI's should be anticipated. However, RFI's which delay performance are not anticipated and are per se compensable in time and money.

64. Steel Service calculates the shop drawing delay the same way for the same reason, i.e., the delay from Steel

Service's submittal of its shop drawings until Steel Service's release of an approved shop drawing to fabrication was caused by (a) the VA's design defects, (b) the VA's slow and incomplete responses to RFI's which prevented Steel Service from being able to submit shop drawings in complete sequences per the VA's extra-contractual requirement and which required changes to shop drawings already approved, (c) the VA's requirement that Steel Service coordinate with other subcontractors (primarily the precast subcontractor) when coordination was not possible because the VA's design was erroneous, incomplete, and uncoordinated, and (d) the VA's failure to clearly note its approval comments on Steel Service's shop drawings.

## II. CONCLUSIONS OF LAW

### A. Entitlement.

#### 1. Delay Caused by Defective Specifications "is *per se* Unreasonable".

Caddell, on behalf of Steel Service, seeks an equitable adjustment based on delays and disruptions caused by the VA. "Equitable adjustments . . . are simply corrective measures utilized to keep the contractor whole when the Government modifies a contract. . . . [T]he purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification. . . ." Amertex Enterprises, Ltd. v. United States, 1995 WL 925961, *62 (Fed. Cl. 1995) (quoting Bruce Construction Corp. v. United States, 324

F.2d 516, 518 (Ct. Cl. 1963)). To obtain an equitable adjustment in a delay claim, the plaintiff must prove that the government unreasonably delayed the contractor and that the plaintiff's costs were increased as a result. Id.

Where, as here, the delays are attributable to defective plans and specifications, all such delay "is per se unreasonable." Avedon Corp. v. United States, 15 Cl. Ct. 648, 652-53 (1988). See also, Chaney & James Construction Co. v. United States, 421 F.2d 728, 732-33 (Ct. Cl. 1970). That is because "if a contractor [is] to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." United States v. Spearin, 248 U.S. 132, 136 (1918).

Furthermore, every government contract contains an implied obligation that neither party will do anything to prevent, hinder, delay or disrupt performance. See Lewis-Nicholson, Inc. v. United States, 550 F.2d 26, 32 (1977). Thus, when the government acts unreasonably, delaying performance and increasing costs, it breaches this implied warranty and is accountable for the increased costs. Amertex Enterprises, Ltd. v. United States, 1995 WL 925961, *63 (Fed. Cl. 1995) (the government "repeatedly failed to clarify and correct ambiguities in the specifications promptly and diligently").

Here, the Contract expressly provided as follows:

> If any change under this clause causes an increase or decrease in the Contractor's cost of or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. However, except for an adjustment based on defective specifications, no adjustment for any change . . . shall be made for any costs incurred more than 20 days before the Contractor gives written notice as required. <u>In the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.</u>

FAR 52.243-4(d), Changes (AUG 1987) (emphasis added).

This express Contract provision embodies the general rule of law that <u>all</u> additional costs and delays attributable to defects in the government's plans and specifications are compensable.

In this case, Steel Service's expert, Marshall T. Ferrell, P.E., has rendered his opinion that the "Contract drawings were incomplete and inadequate for the purposes of detailing, fabrication and erection. Discrepancies, errors and omissions on the Contract drawings disrupted the detailing, fabrication and erection activities on the Project resulting in increased costs and delays to these activities" (Ex. P-175). Thus, all delay encountered by Steel Service "is <u>per</u> <u>se</u> unreasonable."

2. <u>Delay to the Contract Completion Date is Not Necessary</u>.

The Government has also inferred that the fact that the

Project completion date was not delayed as a proximate result of the VA's defective design precludes recovery for the impact of such defects on steel detailing and fabrication. However, that is not the law.

In E.R. Mitchell Construction Co. v. Danzig, 175 F.3d 1369 (Fed. Cir. 1999), the sole issue was "whether the government is liable for unabsorbed home office overhead costs of a subcontractor, whose work is delayed by the government, when the prime contractor is not delayed in the completion of its contract with the government." Id. at 1370. According to the government, the admitted delay to the mechanical subcontractor caused by its defective plans and specifications did not delay the project completion date and, therefore, the subcontractor's unabsorbed home office overhead costs were not recoverable.

The ASBCA agreed and rejected the claim. On appeal, the Federal Circuit reversed, rejecting the argument that timely completion bars, as a matter of law, a subcontractor's claim for unabsorbed overhead. As a result, the fact that the VA's defective structural steel design did not delay the overall Project completion date is irrelevant.

3. The VA was Required to Answer RFI's Promptly.

As a general rule, the government has a specific duty to timely respond to RFI's and if it fails to do so or if its answer is unreasonably delayed, it is liable. See, e.g., AVCO Corp.,

NASA BCA 869-18, 76-1 BCA ¶ 11,736 (1975); Electromagnetic Industries Inc., ASBCA 11485, 67-2 BCA ¶ 6545 (1967). The courts and boards clearly hold that the government has a duty to disclose factual information related to the work to be done if the contractor does not have access to that information. Nash, Government Contract Changes (2d Ed. 1989), at p.14-8. And where, as here, the factual information is missing or is ambiguous, the plans and specifications are defective and all additional costs and delays caused by such deficiency are the responsibility of the government. United States v. Spearin, 248 U.S. 132 (1918).

In Spearin, the United States Supreme Court held that where the specifications prescribe the character, dimensions, and location of the work, the government implicitly warrants that the contractor, if he complies with the specifications, will be able to complete the project within the contemplated time. This warranty is akin to the condition implied in every contract that neither party will do anything to hinder the performance of the other party. In other words, if defective plans and specifications cause delay, the contractor is entitled to recover damages for the government's breach of its implied warranty.

The government cannot, by errors in the plans and/or specifications, cause the contractor to incur delay and additional costs and then compensate the contractor merely by extending the contract time and paying any added direct costs

caused by changes which correct the errors in the plans. This is particularly true where, as here, FAR 52.236-21, Specifications and Drawings for Construction (APR 1984), expressly obligated the VA to "shall promptly make a determination in writing" (emphasis added).

In fact, the government has been found liable for failing to timely respond to a contractor's RFI's. Hardie-Tynes Manufacturing Co., ASBCA 20582, 76-2 BCA ¶ 11,972 (1976); Royal Painting Company, Inc., ASBCA 20034, 17 G.C. ¶ 283.

In Hardie-Tynes Manufacturing Co., the Board determined that, under the circumstances of that case, a 20-day average RFI response time was reasonable except for requests which involved an ambiguous contract drawing, in which case a shorter period of time should apply since government fault generated the RFI.

In Royal Painting Co., Inc., the contractor on a building painting contract inquired during performance whether interior surfaces of certain garages were required to be painted. Eight days later, the contracting officer responded that painting was required.

According to the Board, under the circumstances, a decision should have been made within one day and the eight-day delay was unreasonable and entitled the contractor to a contract price increase for the additional performance costs incurred as a result of the unreasonable delay.