It is clear that the VA was obligated to "promptly" resolve Steel Service's RFI's. In fact, according to Hardie-Tynes Manufacturing Co., the VA should have expected RFI's on this large and complex Project and should have established procedures for timely handling RFI's, particularly those involving defects in the structural steel design because all delay resulting from defective plans and specifications is "per se unreasonable" and is, therefore, compensable. Avedon Corp. v. United States, 15 Cl. Ct. at 652-53. See also, United States v. Spearin, 248 U.S. 132 (1918); Laburnum Construction Corp. v. United States, 352 F.2d 451 (Ct. Cl. 1963); Minmar Builders, GSBCA 3430, 14 G.C. ¶ 453.

In this case, as confirmed by Steel Service's expert, Marshall T. Ferrell, P.E., 303 of the total of 355 RFI's submitted by Steel Service/EEE were generated because of omitted or ambiguous information on the structural steel design drawings (Ex. P-173) and, as established by Steel Service's expert, L. Ray Vinson (Exs. P-157, P-172), the responses to those RFI's came after lengthy delays which delayed the preparation of shop drawings and fabrication. Under these circumstances, all delay was unreasonable.

4. The VA's "Coordination" and "Clarification" Responses to RFI's Were Not Reasonable.

It is well-established that the prime contractor is (1) obligated to coordinate the work of its subcontractors;

(2) charged with knowledge of all of the contract requirements; and, (3) responsible for performing work clearly required by the contract regardless of the contract subdivision in which the work appears. Caddell Construction Company, Inc., VABCA 3509 (May 11, 1993). In fact, the Contract in this case specifically states, in pertinent part, that:

> (a) . . . Divisions or sections of specifications are not intended to control the contractor in dividing work among subcontractors, or to limit work performed by any trade.
>
> (b) The contractor shall be responsible to the Government for acts and omissions of his/her own employees, and subcontractors and their employees. The contractor shall also be responsible for coordination of the work of the trades, subcontractors, and material suppliers. . .

Subcontractors Work Coordination (VAAR 852.236-80; 852.236-81) (Apr. 1984) (emphasis added).

According to Caddell Construction Company, VABCA 3509 (May 11, 1993), the government is not required to prepare plans and specifications that separate the work among the various trades and the prime contractor has a duty to coordinate the work of its subcontractor. See also, Capitol York Construction Corp. and J.N. Futia Co., Inc., ASBCA No. 31994, 88-3 BCA ¶ 20,997 (1988); Golden Construction, Inc., DOT BCA No. 1851, 89-1, BCA ¶ 21,307 (1988).

However, this case is not a case like Caddell where the

design information was available and could be obtained via the obligation to coordinate the work of the various subcontractors. Here, the information was missing or conflicting and could not be obtained from other design drawings or from other subcontractors and, therefore, the VA cannot hide behind the contractor's duty to coordinate.

Similarly, where, as here, the contractor encounters "obvious" errors and omissions in the plans and specifications, the contractor has a duty to seek clarification. Allied Contractors, Inc. v. United States, 381 F.2d 995 (Ct. Cl. 1967); Santa Fe Engineering, Inc., ASBCA No. 23523, 92-1 BCA ¶ 24,420. In fact, FAR 52.236-21, Specification and Drawings for Construction (FEB 1997), required that "[i]n the case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing."

Conversely, the government has a specific duty to reply to a contractor's request for clarification and if it fails to do so or if its answer is unreasonably delayed, it is liable. See, e.g., AVCO Corp., NASA BCA 869-18, 76-1 BCA ¶ 11,736 (1975); Electromagnetic Industries, Inc., ASBCA 11485, 67-2 BCA ¶ 6545 (1967). In fact, the courts and boards clearly hold that the government has a duty to disclose factual information related to

the work to be done if the contractor does not have access to that information. Nash, Government Contract Changes (2d Ed. 1989), at p.14-8. Where that is the case, the delays caused by such deficiency are the responsibility of the Government. United States v. Spearin, 248 U.S. 132 (1918).

Here, the VA tried to disguise the known defects in the structural steel design drawings by its responses to RFI's that directed Caddell to "coordinate" with other contractors and/or that stated that its response was for "clarification." However, where, as here, the design information was missing or conflicting and the information could not be supplied by Caddell and/or its other subcontractors because, for example, the VA had not made pertinent decisions or the information was missing or conflicted with other information, then the structural steel design was defective and the VA cannot escape liability under the guise of the contractor's duty to "coordinate" and/or by issuing "clarifications" to supply the missing or erroneous information.

Indeed, where the VA's "clarification" response supplied missing information not otherwise available to the contractor or corrected erroneous information shown on the plans or specifications, a constructive change occurred and the VA is nonetheless liable despite its use of the label "clarification" on its response. Nash, at pp.20-14 to 20-17. J.W. Hurst & Son Awnings, Inc., ASBCA 4167, 59-1 BCA ¶ 5095; L.W. Foster

Sportswear Co. v. United States, 405 F.2d 1285 (Ct. Cl. 1969). In this case, the principal example of the VA's misuse of the "coordination" requirement was its directive that Steel Service coordinate with the precast subcontractor.

B. Quantum

5. Proof of Quantum Need Not Be Exact.

As this Court knows, damages need not be proven with absolute certainty or mathematical certitude. Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199-200 (1965). It is sufficient if a reasonable basis for the computation is furnished provided liability, causation, and injury are established. Id.

Likewise, the government's "evident dislike" of the claim is not sufficient to overcome the presumption of reasonableness where, as here, the methodology used is based upon the contractor's "norm." See, e.g., Appeal of Essex Electco Engineers, Inc., ASBCA No. 21066, 79-2 BCA ¶ 14035, at 13-14.

6. The *Eichleay* Formula Does Not Apply to the Unabsorbed Overhead Claims.

The Government contends that the "norm" is that unabsorbed overhead claims are calculated using the Eichleay formula. However, the Eichleay formula is inapplicable in this instance for the following reasons:

(a) First, the Eichleay formula does not properly apply to a fabrication plant which bases its accounting system on

shop manhours sold at an hourly rate which rate includes overhead calculated as a percentage of the hourly rate to recover both the fixed, direct plant costs and the general and administrative costs. Thus, the Eichleay formula's use of contract billings cannot accurately capture Steel Service's unabsorbed overhead on this Project because the "mix" of contracts used to calculate Eichleay includes varying amounts of overhead depending on the shop manhours bid for each project which has no relation to the contract billing for that project as a percentage of all contract billings for the contract period (i.e., although the contract price may be high, the shop manhours may be low where most or all of the fabrication is sublet, in which case no overhead is recovered in the contract billings) (Ex. P-181). Therefore, under these circumstances, the use of a modified Eichleay formula is appropriate, calculated based upon the percentage of "lost" manhours to all manhours for the applicable period.

Although the Federal Circuit in West v. All State Boiler, Inc., 146 F.3d 1368, 1373 (Fed. Cir. 1998) and Wickham Contracting Co., Inc. v. Fischer, 12 F.3d 1574, 1580-81 (Fed. Cir. 1994), has stated that "the Eichleay formula is the exclusive means for compensating a contractor for unabsorbed overhead when it otherwise meets the Eichleay prerequisites," id. at 1580-81, West and Wickham, like other Federal Circuit decisions discussing the Eichleay formula, see, e.g., Interstate

General Government Contractors, Inc. v. West, 12 F.3d 1053 (Fed. Cir. 1993); Daly Construction, Inc. v. Garrett, 5 F.3d 520 (Fed. Cir. 1993); C.B.C. Enterprises, Inc. v. United States, 978 F.2d 669 (Fed. Cir. 1992), involved delayed performance of construction contracts - not "lost" fabrication manhours. Thus, the holdings in West and Wickham do not apply here, where the delay in performance involves a steel fabrication plant which recovers overhead costs via manhours sold.

In fact, the ASBCA has recognized that the Eichleay formula may not be applicable in the manufacturing context and has expressly limited application of Eichleay to construction contracts, holding that:

> Whereas the practice before this board has been to apply the [Eichleay] formula in construction cases where the Government delay precluded a contractor from taking other jobs to absorb the overhead, we have used different formulas in the case of manufacturing contracts.

Do-Well Machine Shop, Inc., ASBCA Nos. 35867, 35922, 92-2 BCA ¶ 24,843, at 123,959 (citing The Entwistle Company, ASBCA No. 14918; 75-2 BCA ¶ 11,420, aff'd. and modified on recons., 76-2 BCA ¶ 12,108; Therm-Air Manufacturing Co., Inc., ASBCA No. 14918, 73-1 BCA ¶ 9983; Allegheny Sportswear Co., ASBCA No. 4163, 58-1 BCA ¶ 1684)) (emphasis added).[3]

---

[3] Even manufacturing plants which mass produce "widgets" are distinguishable from steel fabrication plants where almost (continued...)

Additionally, in So-Pak-Co., Inc., ASBCA No. 38906, 93-3 BCA ¶ 26,215, the Board allowed a meat packing contractor to use the Eichleay formula but recognized that "[a]pplication of an 'Eichleay formula' recovery of unabsorbed overhead and G&A costs to a manufacturing contract, . . . is rare . . . ." Id. at 130,470.

In short, the Federal Circuit, unlike ASBCA, has not had the opportunity to consider the inequities inherent in applying the Eichleay formula in the non-construction contract context.[4] It appears clear that, given the opportunity, the Federal Circuit would agree with the ASBCA that, although Eichleay can be applied to non-construction contracts, it is not and should not be the "exclusive means" for compensating manufacturing contractors for unabsorbed overhead particularly where, as here, contract billings are not indicative of overhead absorption. See, Kauffman and Holman, The Eichleay Formula: A Resilient Means for

---

[3] (...continued)
every piece is essentially custom-manufactured.

[4] In Nicon, Inc. v. United States, 331 F.3d 878 (Fed. Cir. 2003), the Federal Circuit affirmed the trial court's holding that the contractor could not calculate unabsorbed overhead based on the Eichleay formula where the contract was terminated for convenience before the contractor commenced performance, finding the Eichleay formula inapplicable, but overruled the trial court's finding that Eichleay was the exclusive means of recovering unabsorbed overhead and remanded to give the contractor an opportunity to propose another method of allocating unabsorbed overhead. This decision indicates that the Federal Circuit will entertain other methods of allocating unabsorbed overhead where Eichleay is inappropriate.

Recovering Unabsorbed Overhead, Public Contract Law Journal, Vol. 24, No. 2 (Winter 1995), at 335.

(b) Second, if the Eichleay formula must be used, then unabsorbed overhead should be calculated as two separate claims based on:

(1) fixed plant overhead cost which would be the same as direct job overhead cost in the construction context; and

(2) home office overhead (G&A).

(c) Third, the Eichleay formula does not fairly compensate Steel Service in this instance where Steel Service had "sold" its manhours for the work for a certain period and then had to endure not one but two delays. Given the inability to replace those manhours during two, not just one, separate delay periods, the Eichleay formula does not fairly compensate Steel Service for the overhead that Steel Service would have generated from its "sold" manhours but for the two delay periods.

7. The Modified Total Cost Method Applies.

Steel Service uses the modified total cost method for calculating its claims for added travel costs, added project management costs, and added print personnel costs, having deducted from its total costs those costs for which the VA is not responsible or having issued specific cost codes to capture the additional costs directly attributable to the VA's defective

plans and specifications.

The modified total cost approach is allowed where, as here, there are no other means of precisely computing damages. Amertex Enterprises, Ltd. v. United States, 1995 WL 925961, *65 (Fed. Cl. 1995). In fact, in a similar case involving defective specifications, the Court of Claims recognized that:

> We have used this method under proper safeguards where there is no alternative, since we have recognized that the lack of certainty as to the amount of damages should not preclude recovery [in cases where] . . . the fact of government responsibility for damages was clearly established. . . .

J.D. Hedin Construction Co. v. United States, 347 F.2d 235, 247 (Ct. Cl. 1965).

Moreover, as in this case,

> . . . the right to an equitable adjustment arose almost from the beginning of the contract and continued and enlarged itself in almost every day of the contract operations . . . all due to the fault of the Government. . . . To attempt to segregate delay and lost time, set up and breakdown estimates, and loss of efficiency as opposed to normal time would be a wasteful exercise.

Delco Electric Corp. v. United States, 17 Cl. Ct. 302, 328 (1989).

Indeed, in this case, Steel Service, where possible, captured its actual increased costs attributable to the VA or deducted costs which it knew were not attributable to the VA. None of the other costs sought to be recovered can be traced to

any other cause and, as a result, "in order to prevent the government from obtaining a windfall," Youngdale and Sons Construction Co. v. United States, 27 Fed. Cl. 516, 541 (1993), Steel Service's costs should be accepted.

8. Preparation Costs are Recoverable.

In this case, Steel Service seeks to recover the costs of its attorneys and consultants incurred in connection with its request for an equitable adjustment (Ex. P-184). Allied Materials & Equipment Co., Inc., ASBCA No. 17318, 75-1 BCA ¶ 11,150; JANA, Inc., ASBCA No. 32447, 88-2 BCA ¶ 20,651; Plano Builders Corp. v. United States, 40 Fed. Cl. 635 (1998). The Government's accounting expert contends that such costs are unrecoverable because of Steel Service's counsel's use of the word "claim" in early correspondence. However, as this Court knows, the attorneys' casual use of the word "claim" is not determinative.

According to 48 C.F.R. § 31.205-33(b), "Costs of professional and consultant services are allowable . . . when reasonable in relation to the services rendered and when not contingent upon recovery of the costs from the Government [subject to 48 C.F.R. § 31.205-47]." Generally, "[c]osts incurred in connection with the prosecution of a CDA claim are per se unallowable under 48 C.F.R. § 31.205-47(f)(1)." SAB Construction, Inc. v. United States, 66 Fed. Cl. 77, 90 (Fed. Cl.

2005). However, according to Bill Strong Enterprises, Inc. v. Shannon, 49 F.3d 1541, 1549 (Fed. Cir. 1995):

> [i]n classifying a particular cost as either a contract administration cost or a cost incidental to the prosecution of a claim, contracting officers, the Board, and courts should examine the objective reason why the contractor incurred the cost. If a contractor incurred the cost for the genuine purpose of materially furthering the negotiation process, such cost should be a contract administration allowable under FAR 31.205-33, even if negotiation eventually fails and a CDA claim is later submitted. On the other hand, if a contractor's underlying purpose for incurring a cost is to promote the prosecution of a CDA claim against the Government, then such cost is unallowable under FAR 31.205.33.

Id. at 1550 (internal citations omitted) (emphasis added).

As a result, the cost of preparing a request for equitable adjustment has been allowed as part of the negotiation process. SAB, 66 Fed. Cl. at 91. See also, Johnson v. Advanced Eng'g & Planning Corp., 292 F. Supp. 2d 846 (E.D. Va. 2003) (preparation costs incurred to prepare request for equitable adjustment and to negotiate same with Government allowable); American Mechanical, Inc., ASBCA No. 52033, 03-1 BCA ¶ 32134, 2002 WL 31886895 (Dec. 20, 2002); Propellex Corp., ASBCA No. 50203, 02-1 BCA ¶ 31721, 2001 WL 1678757 (Dec. 27, 2001) (allowing the costs of preparing a REA where the Contracting Officer made a subsequent settlement offer), aff'd, 342 F.3d 1335 (Fed. Cir.2003).

Here, such costs were incurred in connection with the

preparation and negotiation of Steel Service's request for equitable adjustment and, therefore, such costs are allowable.

9. Interest Accrued From the Receipt of Caddell's Certified Claim.

According to the Contract Disputes Act, 41 U.S.C. § 611, interest on Caddell's claim accrues from the date the Contracting Officer receives the certified claim until paid as made clear in Youngdale & Sons Const. Co., Inc. v. United States, 27 Fed. Cl. 516, 562 (Fed. Cl. 1993), where the Court stated the following:

> . . . the defendant further contends that the claim submitted to the CO must, of course, first be appropriately certified and quantified to be a proper claim sufficient to activate the running of interest, and we agree. See, Skelly & Loy v. United States, 231 Ct. Cl. 370, 685 F.2d 414 (1982); Fidelity Construction Co. v. United States, 700 F.2d 1379, 1384 (1983) ("an uncertified claim . . . is . . . a legal nullity and therefore no interest can accrue"); Essex Electro Engineers v. United States, 702 F.2d 998 (Fed. Cir.1983) (emphasizing the court's finding in Fidelity); and ReCon Paving, Inc. v. United States, 745 F.2d 34 (Fed. Cir.1984). Based on the foregoing cases, it is clear that they establish the fact that a proper claim upon which interest may begin to run, once received by the CO, is one that is duly certified.

(Emphasis added).

## II. ISSUES OF FACT AND LAW

### A. Issues of Fact.

1. Whether the VA's structural steel design drawings were defective.

2. Whether the defects in the VA's structural steel design delayed the detailing and fabrication of structural steel.

3. Whether the VA's responses to Caddell/Steel Service's RFI's delayed the detailing and fabrication of structural steel.

4. Whether the VA's extra-contractual requirement to submit steel shop drawings by complete sequences was reasonable under the circumstances.

5. Whether the VA unreasonably delayed the approval of steel shop drawings.

6. Whether the VA's requirement that Steel Service prepare its shop drawings based upon the precast shop drawings was an extra-contractual requirement.

7. Whether the VA's requirement that Steel Service prepare its shop drawings based upon the precast shop drawings delayed the detailing and fabrication of steel.

8. Whether Steel Service coordinated its shop drawings with the precast shop drawings to the extent possible.

9. Whether the VA's refusal to provide a computer disk of the structural steel design drawings was reasonable.

10. Whether Caddell is entitled to the benefit of Steel Service's intended fabrication schedules in computing damages incurred because of defective plans and specifications.

11. Whether Caddell is entitled to recover damages and, if so, in what amount.

12. Whether Caddell is entitled to interest from the date of the Contracting Officer's receipt of the certified claim.

13. Whether Caddell is entitled to recover claim preparation costs of the attorneys and consultants.

B. Issues of Law.

1. Whether the VA breached its implied warranty of the adequacy and sufficiency of the plans and specifications.

2. Whether the VA breached its implied duty to cooperate with and not delay, hinder, or interfere with Caddell's performance.

3. Whether the VA is liable to Caddell under the Suspension of Work Clause, FAR 52, 242-14 (Apr. 1984).

4. Whether the VA is liable to Caddell under the Changes Clause, FAR 52.243-4 (Aug. 1987).

5. Whether the VA's failure to issue complete and adequate structural steel design drawings, its failure to promptly provide responses to cure the conflicts, inadequacies, errors and omissions in such drawings, and its failure to review and approve shop drawings within a reasonable time constitute constructive changes.

6. Whether Caddell is entitled to an equitable adjustment in the contract price because of defects in the VA's structural steel design.

7. What is the proper measure of Caddell's damages.

Respectfully submitted,

CADDELL CONSTRUCTION CO., INC.,
PLAINTIFF

By: /s/ David W. Mockbee

David W. Mockbee
MOCKBEE HALL & DRAKE, P.A.
Lamar Life Building, Ste 1000
317 E. Capitol Street
Jackson, MS 39201
(601) 353-0035 - Telephone
(601) 353-0045 - Facsimile

**CERTIFICATE OF SERVICE**

I, David W. Mockbee, do hereby certify that I have this day caused to be filed via the Official Electronic Document Filing System of the United States Court of Federal Claims ("CM/ECF") a true and correct copy of the above and foregoing Plaintiff's Memorandum of Contentions of Law and Fact. Copies of this document will be transmitted via the Court's CM/ECF System to all counsel of record. Additional copies may be obtained through the Court's CM/ECF System.

Dated: November 22, 2006.

/s/ David W. Mockbee
David W. Mockbee