IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CADDELL CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 04-461C |
| | ) | (Judge Futey) |
| THE UNITED STATES, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

In accordance with appendix A of the Rules of this Court, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law.

## INTRODUCTION

This case, brought by Caddell's steel fabrication subcontractor ("SSC"),[1] lacks merit for several legal and factual reasons, but the principal flaw in this case, and the reason why a trial may not even be necessary or appropriate, is because SSC's defective specification claim (which is SSC's predominant claim if not its entire case) fails because the contract is not a design specification. Therefore no defective specification claim

[1] As discussed below, Caddell performed and completed this project on time and did not submit a certified claim for additional time or money upon behalf of itself or for any other subcontractor. Not only does this offer telling perspective upon SSC's allegations that the contract design was "defective" – SSC is the only contractor or subcontractor that claims to have been affected by the discrepancies in the contract package. For that reason, we will refer to the plaintiff as "SSC" except where necessary to distinguish between SSC and Caddell.

can arise.[2] In addition to this fatal legal fault, the overall concept of SSC's claim is also fundamentally unavailing. First, the Government's duty to refrain from hindering or delaying Caddell, the general contractor, does not require that the Government produce a perfect set of contract drawings and specifications that will be free from discrepancies.[3] Moreover, the Government is not required to ensure harmony between Caddell and Caddell's subcontractor SSC. Nor is the Government responsible for Caddell's coordination of schedules among its subcontract trades. Here, the alleged "defects" in the Government's plans and specifications for the steel portion of the project were not true defects in the first place and instead consisted of an unremarkable number of mundane discrepancies in the contract documents. Further, whether or not the omissions were unusual in number or scope, they did not hinder or delay Caddell in any way, inasmuch as Caddell's contract was completed on time and any alleged delays or disruptions suffered by SSC

[2] We will elaborate on this point in our legal contentions below, however, we urge the Court to consider this issue in advance of trial, and, because the issue can be resolved quickly by reference to the contract itself and little or no additional evidence, we propose to file a motion for summary judgment to be determined between now and the April 17, 2007, trial date. Elimination of SSC's defective specifications claim would greatly reduce the scope of the trial or perhaps eliminate it altogether.

[3] The contract expressly provided for a question/answer process to resolve discrepancies in the contract package. Contract Part 1.46. The questions were called "RFIs" or "requests for information."

were the result of the failure of Caddell and SSC to properly coordinate their work. In fact, Caddell and SSC's disharmony (unrelated to any Government cause) was so great that Caddell and SSC cannot even agree when (or whether) SSC's subcontract was executed, their plans for when steel would be delivered to the site differed by a period of one year, and the two filed lawsuits against each other prior to SSC's subcontract even being signed. In short, SSC's attempt now to blame its allegedly-increased costs upon the Government is disingenuous given the acrimony between SSC and Caddell and SSC's own failure to ascertain the fundamental aspects of SSC's work.

SSC's pretrial memorandum methodically sets forth its case, generally in chronological order, discussing a series of mostly irrelevant facts and misapplied legal standards. In response, we will discuss each of the premises upon which SSC relies, generally in the same order presented by SSC.

## I. Response To SSC's Contentions Of Fact

**Paragraphs 1 - 11**: SSC's pretrial submission starts with a description of the pre-bid design drawing preparation and review process and a non-specific critique of the designer's work, suggesting that the structural steel drawings were not satisfactory for bidding or performance. Refuting these contentions, however, is the plain fact that both Caddell and SSC evaluated the same contract drawings and both committed to

perform this contract for a fixed price without detecting <u>any</u> deficiencies in the structural steel drawings.[4] This, of course, demonstrates either that both Caddell's and SSC's bidding reviews were cursory (a fault that cannot be blamed upon the Government), or, more likely, that the discrepancies did not surface during the bid takeoffs because they were very minor in nature.

In addition, SSC's general critique of the designer's work fails to identify even one specific discrepancy that purported to impede SSC's work. This renders SSC's general criticism of the contract documents superfluous.

**<u>Paragraph 12</u>:** SSC quotes the contract, Part 1.46 "drawings and specifications", which required Caddell to bring discrepancies in the contract package to the attention of the Government, which was done on this project by Caddell's submission of "RFIs." SSC emphasizes that the Government was to respond "promptly" to resolve each discrepancy, a provision with which we, generally, have no dispute. This is an unremarkable provision, except that the gist of SSC's case appears to be that SSC issuing RFIs was somehow extracontractual or a surprise to SSC, when, not only are discrepancies a common occurrence in all construction contracts (RFIs are an almost universal tool in construction and occur, often in numbers considerably greater

[4] SSC did not assist Caddell in assembling its bid which means that the Government's contract drawings were reviewed and bid upon by at least <u>two</u> steel subcontractors who found no remarkable deficiencies in them.

than here, in virtually all construction projects), but Part 1.46 provides clear notice that there would be RFIs on this project, and how they will be handled. With regard to the provision for a prompt response, SSC's general reliance upon the word "promptly" is virtually meaningless without consideration of each RFI, the time it was sent to the Government as it relates to Caddell's schedule for the work related to the RFI, the substance and complexity of the RFI and, of particular note in this case, the number of other RFIs submitted to the Government by Caddell in the same time frame. SSC's case does not meaningfully address any of the individual circumstances which are essential to an claim that the RFI response time actionably "hindered" the project. Instead, SSC suggests in general terms that the Government's RFI responses were not "prompt" without providing any of the analysis that is necessary to establish the circumstances surrounding particular RFIs which, in turn, would provide the necessary context to determine what "prompt" meant for each RFI.

SSC also cites Part 1.33 of the contract, the "changes" clause. Again, an unremarkable contract provision (SSC does not present a claim for "changes" per se in this case) except that SSC's excerpt from the changes clause emphasizes the provision for an equitable adjustment for the contractor's costs "attempting to comply with the defective specifications." As discussed further in our response to SSC's contentions of law,

SSC's application of the term "defective specifications" to the discrepancies in the contract documents is incorrect. The contract language cited by SSC applies to genuine "defective specifications" (design specifications that are not possible to perform) – which are not present in this case. Put simply, contract discrepancies (which did exist in the contract package) are not "defective specifications" (which did not exist in the contract package). For this reason, part 1.33 is of no aid to SSC, and SSC's repeated reference to this provision only serves to confuse matters.

**Paragraphs 13 - 15**: SSC quotes, at length, from the AISC code, apparently suggesting that portions of that code act as binding contract provisions. The remainder of SSC's submission, however, fails to squarely identify an AISC provision that SSC claims is binding upon the Government, or to apply it to the facts of the case. Instead, as SSC concedes, the contract documents themselves define the obligations between the parties. This is best illustrated by SSC's recognition that the 14-day AISC "requirement" for Government review of shop drawings (AISC 4.2.1) is "superceded" by Section 01311 of the contract (providing 20 work days for shop drawing approval and referring to longer minimum durations for other Government activities). In short, the AISC code is largely, if not totally, irrelevant to this case.

**Paragraphs 16 - 20**: SSC suggests that, even though SSC's fixed price bid for its work was submitted "without a schedule" and was based upon "a favorable price" due to "lack of work in our shop at this time," that "both parties [SSC and Caddell] contemplated, at the time of bid, that steel erection would commence . . . by mid-June, 1996." This may have been SSC's wish and apparently was SSC's own unilateral plan, but the truth is that Caddell did not share SSC's plan – at least in part because SSC's plan was impossible because steel erection could not take place for almost a year later than SSC wished. SSC's mistake appears to be the result of a lack of communication with Caddell regarding the contract's construction requirements and/or SSC's failure to read the contract prior to committing to a fixed price subcontract. Either way, SSC's failed plan to work in 1996 (which is the genesis of at least half of this case, and all of the litigation between SSC and Caddell) was certainly not caused by the contract discrepancies or the Government's supposedly slow response to RFIs or SSC's shop drawing submittals.

**Paragraph 20**: SSC appends a table prepared by Mr. Vinson (SSC's expert witness) that purports to demonstrate that the Government did not "promptly make a determination in writing" in response to SSC's RFIs. There are many reasons why this table is of little analytical value in general, of less value to SSC, or is of more value refuting SSC's point than making it. Examples

are that, as discussed above and below, steel erection could not possibly take place until June 1997, over a year after most of SSC's RFIs were answered (by May 1996) and over six months after all of SSC's RFIs were submitted. In Caddell's official project schedule, responding to, for example, SSC's "detail clarification" RFIs was simply not a critical item in April through June of 1996 and the fact that SSC had put itself over a barrel by starting work too soon is not the Government's responsibility. Next, RFI's were often submitted in large numbers on a single day, which of necessity required prioritization according to the critical items on the project schedule (which in mid-1996 was certainly not steel fabrication). See, for example, April 9, 1996 (144 RFIs), June 10, 1996 (54 RFIs), and July 1, 1996 (25 RFIs). Also, Mr. Vinson's table demonstrates that Caddell often collected large batches of numerous RFIs from SSC and held them for considerable periods of time prior to submitting them to the Government, an RFI "delay" and compounding of work for the Government that is obviously not attributable to the Government. See, for example, RFI 230 (held by Caddell for 15 days); RFI 174 (28 days); RFI 198 (33 days). SSC's suggestion that the Government is still responsible for the time Caddell held SSC's RFIs because SSC should not have had to submit any RFIs in the first place is contractually incorrect given the express provision for resolving discrepancies, and is also unsupported by authority.

**Paragraphs 22 - 25**: SSC's attempt to use our expert's (Ms. Jones's) chart, which demonstrates the analytical defects in Mr. Vinson's work, as an acknowledgment that the RFI responses were not prompt, is disingenuous, at best. Not only does the Government's chart show the inaccuracies in Mr. Vinson's chart at PX157, and that the RFI responses, in the aggregate, were much more prompt than Mr. Vinson portrays, but it calls into question all of Mr. Vinson's work, suggesting that every aspect of his analysis requires very close scrutiny. SSC's narration of alleged problems as a result of untimely RFI responses is, again, gloss without substance, and is especially inexplicable when SSC was hurrying to do its work unnecessarily because of its own failure to read the contract schedule requirements or to communicate with the prime contractor.

**Paragraph 27**: On May 28, 1996, after SSC had submitted 171 (57 percent) of its RFIs, SSC "learned for the first time that steel could not be erected until the Summer of 1997 because of the contract phasing requirements." This confirms that SSC (who committed to perform a $5 million subcontract without understanding the schedule requirements of the project that would dictate the timing of SSC's work) had a fundamental lack of communication with Caddell. Until then, SSC had been rushing to perform its work and needlessly imposing its hurry upon the Government. SSC's now-moot plan had been to deliver steel

starting in June 1996 which could not possibly be used until June 1997 at the earliest. Of course, SSC's failure to read the contract is not attributable to the Government and the Government's failure to respond to SSC's RFIs quickly enough for SSC to meet an unduly hurried schedule does not create Government liability. In short, SSC's mistaken belief that it should, or even could, fabricate steel in 1996 in order to occupy a "window" in SSC's own shop schedule is not the Government's concern and certainly not the Government's contractual obligation. Further, the Government's purportedly un-prompt RFI responses take on a new irrelevance considering that SSC was unaware of the contract and Caddell's more-informed schedule, which had long-ago been submitted to the Government.

**Paragraphs 28 - 29**: SSC argues that "the VA failed to consider Caddell/Steel Service's contract right to proceed with offsite work without delay" as if to suggest that Caddell shared SSC's desire to fabricate steel in 1996 (which it did not) or that it was not SSC's own mistake regarding the schedule that created SSC's problem. Of course, the "problem" was that SSC had acted in ignorance of the contract, and in ignorance of Caddell's schedule and ordered "$1.3 million in raw material" over a year before it could be used on the project site.

**Paragraphs 30 - 36**: Unwilling to admit its own mistake, SSC's denial took the form of creating "two claims, namely, one

against the VA . . . and the other against Caddell." In truth, both claims were groundless and could have been completely avoided if SSC had simply read the contract prior to submitting its subcontract price, had not started to perform the "subcontract" without an actual signed subcontract, or had not ordered $1.3 million worth of materials long before it was needed. Although illustrative of SSC's litigiousness and the degree of hostility between Caddell and SSC, the description of SSC's negotiation with Caddell to settle their lawsuit is largely irrelevant to this case. What is relevant, however, is that, contrary to SSC's statement that "the dispute between Caddell and Steel Service did not cause any delay . . . ," on July 25, 1996, Caddell actually terminated SSC's "right to proceed" (there was not even a signed subcontract at the time, and would not be until October 1996, so there as no SSC subcontract to terminate).

**Paragraphs 37 - 39**: SSC returns to its superfluous narration of the communications between the Government and the designer in the Fall of 1996, failing to note that virtually all of SSC's RFI's had long been submitted as of that time, and virtually all of them were already answered as well. From December 1996 forward, RFIs and RFI response times were no longer

critical to the project (if they ever were[5]), to SSC's work or, therefore, to this case.

**<u>Paragraphs 40 - 49</u>**: By the end of 1996, without RFI responses as an excuse, SSC appears to assert defective contract drawings ("erroneous, incomplete, and uncoordinated") that relate to the precast concrete subcontractor, who, tellingly, did not file a claim of any sort itself. Why SSC would be working directly from the precast <u>design</u> drawings instead of the precast subcontractor's shop drawings is a mystery. Similarly strange is that the precast subcontractor was "already in production . . . without an approved set of shop drawings" – a clear violation of the contract. In short, SSC's continued rush to perform its work early, and without appropriate information from, and coordination with, Caddell and other subcontractors is SSC's own problem, or at worst, Caddell's, but certainly not the Government's. Rather than working from totally inappropriate information, like incomplete or unapproved precast shop drawings, SSC could have, and should have, awaited their completion in order to work in an efficient and coordinated fashion. SSC's quote from a letter from one of its own subcontractors, EEE detailing, illustrates this point well.

---

[5] Virtually all of SSC's RFIs were answered prior to SSC even beginning its preparation of shop drawings. Contrary to SSC's contentions, then, RFI's did not delay the preparation of SSC's shop drawings. In fact, it is difficult to tell what activity of SSC's was delayed at all while awaiting RFI responses.

**Paragraph 50**: SSC's reliance upon correspondence between the Government and the designer as evidence in support of SSC's claim continues into 1997, again despite the fact that no other contractor or subcontractor appeared to "suffer" from the [unspecified] "errors and omissions" cited by SSC.

**Paragraphs 51 - 53**: SSC offers a description of how "conflicts" between its own shop drawings and the shop drawings of the precast subcontractor (neither of which were produced by the Government, and both of which were to be coordinated with each other by Caddell or the subcontractors themselves) caused "delays" to fabrication and delivery of steel to the project. Even if true, this is a curious assertion inasmuch as no delay was suffered on the critical path of the project, and SSC has not conducted a CPM analysis of any sort. Again, the contract discrepancies never caused a single day of delay to the project. For that reason, whether or not Caddell's subcontractors efficiently went about their work or delayed each other[6] is not the responsibility of the Government, who clearly did not delay the overall progress of the project.

[6] The fact that SSC's shop was "overbooked" and it incurred extra costs to perform its work with sub-sub-contractors is, apparently, the nature of the way SSC performs its work. The Government certainly does not warrant that the contract can be performed according to the whims of its contractor and all of its subcontractors.

**<u>Paragraph 54 - 57</u>**: SSC's description of the Government's imposition of an "extracontractual" welding inspection technique is not particularly relevant, except perhaps to SSC's damages calculations, discussed in detail in our expert witness reports, and not republished here.

**<u>Paragraphs 58 - 64</u>**: SSC attempts to paraphrase the scope of the DCAA audit that was performed upon a portion of Caddell/SSC's certified claim, the reports of our experts (Mr. Cotton and Ms. Jones), and SSC's expert's (Mr. Vinson's) response, all in under three pages. The complexity and detail of these issues suggests that they are better examined in depth at trial (and have already been touched upon above), but for now we offer the following: 1) SSC's dispute with Caddell clearly <u>did</u> affect SSC's work especially considering that the "dispute" involved the fundamental timing of SSC's work – which SSC plainly misjudged, and; 2) SSC's defense of its computation of RFI and shop drawing response time by including the time that both types of submittals were held by Caddell is plainly inappropriate.

II. <u>Response to SSC's Contentions Of Law</u>

1. <u>This Case Is Without Legal Foundation Because It Cannot Be A Defective Specifications Case</u>

SSC's case is based primarily, if not exclusively, upon the notion that the discrepancies in the Government's contract package are "defective specifications" that are "<u>per se</u> unreasonable" and that, therefore, SSC is entitled to recover all

of its costs associated with the so-called defective specifications. Pl. Memo 40-42. In support of its defective specifications arguments (which are intertwined into all of SSC's legal contentions regardless of whether SSC appears to be addressing RFI or submittal response time or the alleged contract discrepancies themselves), SSC cites United States v. Spearin, 248 United States 132 (1918), four times, and repeatedly quotes from the Changes clause of the contract which provides that the cost of attempting to comply with "defective specifications" will be compensable. Pl. Memo. 40-42.

First, SSC's case suffers from a fundamental lack of precision in its terminology. The so-called "defects" in the contract documents (inconsistencies, errors, or omissions that necessitated clarification with RFIs) are not properly called "defects" or "defective specifications" but are, instead, "discrepancies" – to use the word from Part 1.46 of the contract. Real "defective specifications" are design specifications that have proven impossible to perform, not simple discrepancies in contract documents that are resolved with RFIs and clarifications or simple contract adjustments. See PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 734, 796 (2000).

SSC's reliance upon Spearin, which is almost 90 years old, without identifiying or discussing the evolution of the "Spearin doctrine," leads to SSC's lengthy pretrial exposition upon inapposite points (and citation of numerous cases, all of which

involved true defective specification claims, not present here). The warranty of Government specifications, known as the "Spearin doctrine," provides that if the Government furnishes specifications for the production or construction of an end product and proper application of those specifications does not result in a satisfactory end product, the contractor will be compensated for its efforts to produce the end product, notwithstanding the unsatisfactory results. United States v. Spearin, 248 United States 132 (1918); Hercules v. United States, 516 United States 417 (1996). The Spearin doctrine has been discussed and clarified over the years, often with the words "design" and "performance" specifications used to differentiate between contracts for which the specifications warranty does and does not apply. Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987); J.D. Hedin Constr. Co. v. United States, 347 F.2d 235, 241 (Cl. Ct. 1965); Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 50 (1985), aff'd 790 F.2d 90 (Fed. Cir.), cert. denied, 479 United States 827 (1986); J.L. Simmons Co. v. United States, 188 Ct. Cl. 684 (1969). "Design specifications explicitly state how the contract is to be performed and permit no deviations. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve those results." Stuyvesant Dredging Co., 834 F.2d at 1582. Thus, the implied warranty applies only to "design

specifications". Only when specifications are of the design variety, and the Government mandates adherence to those specifications does the Government deny the contractor the exercise of discretion in choosing means and methods of accomplishing the work. The principle is, then, that when the Government imposes such "design" requirements and the contractor complies, the Government is, rightly, bound to accept what the specification that it mandated produces. Id.

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." . . . Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is "required to follow them as a road map."

Blake Construction Co. v. United States, 987 F.2d 743 (Fed Cir. 1993)(quoting J.L. Simmons v. United States, 188 Ct. Cl. 684 (1969)), cert. denied, 510 United States 963 (1993).

Contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels "design" and "performance," while helpful to some degree, are merely labels. It is the contract's provisions, and the amount of discretion that the contract affords the contractor – not labels urged by lawyers

– that govern whether the contractor can recover for problems that occurred during performance. Blake Construction Co. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993). The fact that the specifications may have provided some details concerning how the work was to be performed does not convert what would otherwise be a performance specification into a design specification. PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 734, 796 (2000).

Here, of course, the entire contract, including the structural steel portion of it, was a performance specification because it specified the end product (the building to be constructed) and left the discretion of how to construct the building almost entirely up to Caddell/SSC. The fact that some of the contract documents required clarification in order for the building to be constructed does not transform the contract into a design specification, nor did it render performance of the contract impossible. In fact, the clarification of discrepancies in the contract documents is expressly made a part of the contract by the very contract provision (Part 1.46) upon which SSC relies. Put another way, the issuance of RFIs by Caddell/SSC was a contractually required duty, not an attempt to perform an impossible aspect of a design specification. Because the contract was not a design specification that proved impossible to perform, the changes clause (Part 1.33) language upon which

SSC relies is simply inapplicable and no defective specifications claim can be asserted. For that reason alone, much or all of SSC's case should be dismissed without the need for a trial.

This also disposes of SSC's non-specific argument that the contract design was not complete when awarded and was refined through the submittal and RFI process. SSC's argument in this regard is hopelessly vague,[7] but misses the point anyway. It is incumbent within the contracting/construction process that contract documents are not perfect and always contain discrepancies that are resolved during construction, especially where the contract itself identifies a process for identification and resolution of discrepancies. PCL, 47 Fed. Cl. at 788.

Because Caddell's contract was not a design specification, and was not impossible to perform, SSC's defective specification claim and arguments fail.

2. SSC's Other Claims Are Without Merit

It is difficult to ascertain, given the imprecision of SSC's legal contentions and the lack of any differentiation between alleged damages caused by any of SSC's several

[7] Despite its reliance upon several pieces of uncomplimentary correspondence directed at the designer, SSC does not identify a single specific item that was not designed prior to bid or that was allegedly completed through the submittal process.

complaints, whether SSC presents additional legal bases for recovery beyond its inapposite defective specifications claim. Out of an abundance of caution, we will respond to SSC's argument that "the VA was required to answer RFI's promptly" as if it is a separate claim - even though SSC relies upon Spearin in this "claim" as well. We do not dispute the plain wording of the contract, that the Government was obligated to respond to SSC's RFIs "promptly." Contract, Part 1.33. Without identification of a single RFI that SSC considers untimely given the circumstances of that particular RFI, and without even an assertion by SSC that a certain number of days was "required," there is really no legal argument to which we can respond. On the other hand, the plain facts speak for themselves, and defeat this argument even without addressing any specific RFIs: Most of SSC's RFI's were asked and answered by the end of Summer 1996, almost an entire year before Caddell had scheduled delivery of steel to the site. By definition, then, any RFI response time would have to be truly extraordinary (perhaps more than eight months) in order to be untimely or to cause any real delay to SSC. In fact, though, the Government's RFI response times were actually much better than that.

3. SSC's Damages Calculations Are Fatally Improper

The damages issues raised by SSC in its pretrial submission are irrelevant because there is no Government

liability for SSC's claims for the reasons discussed above. Even if there is Government liability, however, SSC's damages are so improperly calculated, for a myriad of reasons described in Mr. Cotton's expert report which is not republished here, that any recovery by SSC is precluded. We briefly address the few points raised by SSC in its pretrial submission as follows.

SSC's damages argument starts with a section called "proof of damages need not be exact," which is a red flag that imprecise or ill-proven damages arguments and techniques will follow. Pl. Memo 50. Here, although SSC has revised its damages calculations no fewer than seven times since its initial claim submission (to address many of the mistakes and inappropriate cost computations identified by the Government), SSC has devoted a considerable amount of resources to cataloging RFI and shop drawing submittal response times, but SSC has failed to assign a specific effect, impact, or cost to any one of them. Instead, SSC's pretrial submission lists a series of affronts of which SSC complains, coupled with a single claim for undifferentiated damages, separated only by entity and cost categories. Pl. Memo 2-3. Of course, this is facially improper inasmuch as a claimant has an obligation to substantiate each element of its damages, in terms of both cause/effect <u>and</u> costs. As this Court explained in <u>PCL</u>:

> In order to recover for an alleged compensable delay, whether or not the delay is caused by hindrance, a contractor must demonstrate: (1) the extent of the delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. See Servidone Constr. Corp. v. United States, 931 F.2d at 861; see also William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984); Blinderman Constr. Co. v. United States, 695 F.2d 552,559 (Fed. Cir. 1982). The burden of establishing these factors falls squarely upon the contractor. William F. Klingensmith, Inc. v. United States, 731 F.2d at 809; Avedon Corp. v. United States, 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing William F. Klingensmith, Inc. v. United States, 731 F.2d at 809), reconsid. denied, 20 Cl. Ct. 158 (1990); G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 700 (1984); see also Blinderman Constr. Co. v. United States, 695 F.2d at 559.

It goes without saying that SSC has fallen woefully short of the requirement for recovering for the multiple Government-caused delays that it alleges and, as such, cannot recover.

Next, SSC seeks to justify its refusal to use the Eichleay formula to calculate its unabsorbed overhead claim, using a more inflationary overhead computation technique instead. Pl. Memo 51. SSC attempts to hide from the clear mandate from the Court of Appeals for the Federal Circuit that "the Eichleay formula is the exclusive means for compensating a contractor for unabsorbed overhead" established in West v.

All State Boiler, Inc., 146 F.3d 1368, 1373 (Fed. Cir. 1998). Pl. Memo 51. Instead, SSC suggests that this Court should adopt the rationale applied to a manufacturing contract by the ASBCA in Do-Well Machine Shop, Inc., ASBCA Nos. 35867, 35922, 92-2 BCA P 24,843. Although the ASBCA's rationale for avoiding Eichleay may be sound when faced with a manufacturing contract claim,[8] it is nonetheless outdated (all of SSC's cited cases that distinguish between manufacturing and construction overhead allocation techniques predate West). Even more obvious, this case involves a construction contract not a manufacturing contact. SSC's argument that its claim should be treated as a manufacturing contract for purposes of this case would require the Government and courts to parse construction claims into individual sub-elements for purposes of overhead compensation – something that is clearly not

[8] Actually, differentiating between construction and manufacturing contracts, in an attempt to avoid using Eichleay, is form over substance. All overhead claims are designed to allocate a percentage of a contractor's fixed overhead costs to a particular project, or in this case, to a particular claim or delay period. Whether manufacturing or construction contacts, the universal method for allocating overhead is via direct labor. r. The need for an allocation of unabsorbed fixed overhead only becomes necessary when, due solely to a government-caused work stoppage, the contractor's incurrence of direct labor costs ceases. Hence, SSC's assertion that Eichleay does not apply because SSC "bases its accounting system on shop manhours" is, at best, a misunderstanding of the purpose and application of the Eichleay formula.

justified by any precedent in this circuit, or even by Do-Well.

Next, SSC tries to justify its admitted-"modified total cost claim" by suggesting that it

> . . . where possible, captured its actual increased costs attributable to the VA and deducted costs which it knew were not attributable to the VA. None of the other costs sought to be recovered can be traced to any other cause and, as a result, "in order to prevent the government from obtaining a windfall," . . . Steel Service's costs should be accepted.

SSC has the standard backwards. SSC is not entitled to claim costs where it cannot trace them "to any other cause," but instead can only claim for costs that are exclusively and demonstrably caused by the Government. PCL, 47 Fed. Cl. at 804.

Finally, SSC suggests that it is entitled to recover its claim preparation costs because they "were incurred in connection with the preparation and negotiation of Steel Service's request for equitable adjustment and, therefore, such costs are allowable." Pl. Memo 58. SSC supports its argument with an optimistic interpretation of Bill Strong Enterprises, Inc., v. Shannon, 49 F.3d 1541 (Fed. Cir. 1995), and a plain factual error – the majority of the claim preparation costs that were questioned by Mr. Cotton were incurred after January 28, 1997, when SSC's attorneys and consultant began referring to this dispute as a "claim," and

were incurring "claim preparation" costs. A substantial portion of the questioned costs were incurred after the "claim" was certified and submitted on October 31, 1997. Even the most charitable interpretation of Bill Strong does not permit recovery of claim preparation costs – especially after the claim has been certified.

## CONCLUSION

For the foregoing reasons, and those that will be established at trial, we respectfully request the Court to find in favor of the Government and to deny Caddell/SSC's claim in total.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Bryant G. Snee
BRYANT G. SNEE
Assistant Director

s/Brian S. Smith
BRIAN S. SMITH
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attention: Classification Unit
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-0391

Attorneys for Defendant

December 7, 2006

CERTIFICATE OF FILING

I hereby certify that on December 7, 2006, a copy of foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Brian S. Smith