IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CADDELL CONSTRUCTION CO., INC. PLAINTIFF

v. No. 04-461C
(Judge Bohdan A. Futey)

UNITED STATES OF AMERICA DEFENDANT

**PLAINTIFF'S POST-TRIAL MEMORANDUM**

Plaintiff, Caddell Construction Co., Inc. ("Caddell"), as sponsor of the claim of its subcontractor, Steel Service Corporation ("Steel Service"), submits this Post-Trial Memorandum, summarizing the evidence presented to this Court over nine days through seven witnesses and 166 exhibits, (143 for Caddell and 23 for the Government), all of which conclusively establish that Caddell is entitled to judgment for the total amount of $2,549,506.24 (plus overhead and profit, interest pursuant to the Contract Disputes Act, and costs) for the costs reasonably and necessarily incurred by Steel Service (and its subcontractors) in attempting to comply with the VA's defective design.

## I. LIABILITY

### A. THE CONTRACT

1. The Contract Expressly Grants Relief.

In this case, the Contract expressly grants the relief to which Steel Service is entitled.[1] Specifically, the Contract, at §01001, ¶1.33, Changes (FAR 52.243-4) (AUG 1987), provides that:

> (d) . . . in the case of defective specifications for which the Government is responsible, the equitable adjustment shall include any increased cost reasonably incurred by the Contractor in attempting to comply with the defective specifications.

Also, as Ms. Jones, the Government's "scheduling" expert acknowledged, the AISC Code of Standard Practice (Ex. P-80) is expressly made a part of the Contract and that Code states:

---

[1]Caddell will refer throughout to its pretrial Memorandum of Contentions of Law and Fact (the "Memorandum") to avoid repetition. The law applicable to the VA's Contract obligations is contained in the Memorandum, at 40-49.

> **3.1 Structural Steel.** . . . **The contract documents can be assumed to provide complete structural steel design plans** clearly showing the work to be performed and giving the size, section, material grade **and the location of all members[** [2]], floor levels, column centers, and camber of members **with sufficient dimensions to convey accurately the quantity and nature of the structural steel to be furnished.**
>
> **3.2 Architectural, Electrical and Mechanical.** Architectural, electrical and mechanical plans may be used as a supplement to the structural steel plans to confirm detail configurations and construction information, provided all requirements for the quantities and locations of structural steel are noted on the structural steel plans.
>
> **3.3 Discrepancies.** **In case of discrepancies** between the structural steel plans and the architectural plans or plans for other trades, **the structural steel plans govern**.

The proof at trial overwhelmingly established that the VA's design was defective[3] and that the effect of the VA's defective design was compounded by the VA's late and unresponsive answers to RFI's in violation of the Contract, §01001, ¶1.46, Specifications and Drawings for Construction (FAR 52.236-21) (APR 1984) (Ex. P-11) which expressly provides, in pertinent part, that:

> (a) . . . in case of discrepancy in the figures, in the drawings, or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing.[[4]] . . .

These Contract clauses entitle Steel Service and its subcontractors to recover costs reasonably and necessarily incurred by them in the total amount of $2,549,506.24 in attempting to comply with the

---

[2]Tom Ferrell, P.E. – the only registered professional engineer who testified – also noted that the Contract Documents incorporated the Uniform Building Code that, for seismic modernizations such as this Project, required that connections for all members for seismic forces be shown on the design drawings and that the Project A/E, Allen & Hoshall, showed all such connections on the drawings.

[3]Tom Ferrell, P.E. testified, consistent with his expert report (Ex. P-173, at 3, 14, 16-17, 22 and Ex. B) that the VA's design was defective as evidenced by, among other facts, the fact that 303 RFI's out of a total of 355 were required to be submitted because of errors and omissions in the VA's design, 260 of which involved missing or conflicting design information.

[4]As Ms. Jones acknowledged, the VA held 143 RFI's for 31-45 days (Ex. Dx-1001, at 41). Even then, she assumed the RFI responses were "answers" which they undeniably were not. Tom Ferrell, P.E. testified that, in his 38 years' experience in the structural steel industry, RFI's are typically answered within 1-3 days. Ernie Hopkins said his experience was 2-3 days for RFI answers. Both men testified that "promptly" in §01001, ¶1.46 means so as not to delay the project.

VA's defective design.

2. The Contract Impliedly Grants Relief.

In addition to the express terms of the Contract, *Spearin*'s implied warranty of the adequacy of the plans and specifications[5] and the VA's duty to act in good faith and not to delay, disrupt, or interfere with Steel Service's performance dictate Steel Service's entitlement to relief from the VA's defective design (Memorandum, at 40-49).

In fact, the evidence is unrefuted that the VA (1) knew prior to bid that the design was incomplete

---

[5]In his opening statement, Mr. Smith boldly stated that *Spearin* did not apply, alleging that the VA's structural design was a performance specification and not a design specification. However, Mr. Smith's "critical" design versus performance specification defense fails as the Government offered nothing to support that theory or to rebut the mountain of evidence that the VA's structural design was the "roadmap" that Steel Service had to follow.

Mr. Smith also launched "the *Spearin* means the design is impossible of performance" balloon in his opening statement which went no further after his argument was deflated by Mr. Smith's acknowledgment that he recited the facts of and used a quote from the wrong case! In any event, a close reading of *Spearin* shows that performance of that contract was not impossible. To the contrary, Spearin refused to complete the work after the Government repudiated "all responsibility for the past and for making working conditions safe in the future." 248 U.S. 132, 138 (1918).

Next, Mr. Smith's argument that the VA's drawings were not the"roadmap" – the shop drawings were – likewise lacks merit as it was abundantly clear that the VA's design drawings were the "roadmap" for preparation of the shop drawings which are the blueprint for the fabrication shop. That same fate befalls Mr. Smith's shop drawing requirement makes the structural design a performance specification defense.

Mr. Smith, in opening, also contended that Steel Service's claim was a means and methods scheduling claim based on when Steel Service wanted to fabricate which was not a VA issue. This position too is near-sighted as Steel Service should have been able to prepare shop drawings and fabricate steel upon notice to proceed with only minimal VA involvement but for the VA's defective design.

Mr. Smith also feigned that the VA lacked notice of Steel Service's problems. Ernie Hopkins and Knute Johnson put that notion to bed as they testified about early jobsite meetings (Exs. P-27, 43) and telephone calls with the VA, pleading for RFI answers and the VA's repeated reference to its concern about shop drawing submission in its meeting minutes (Exs. P-42, 195).

These arguments, like all of the Government's contentions, were not only wholly unsupported by it but also contrary to the overwhelming proof, consisting of the testimony of Tom Ferrell, P.E. (38 years in the steel industry), Larry Cox (38 years in the steel industry), Knute Johnson (40+ years in general construction), and Ernie Hopkins (20+ years in the steel industry) that the structural design was clearly a design specification. Against this testimony, the Government offered only Ms. Jones who is not an engineer, a general contractor, a steel detailer, or a steel fabricator. In a nutshell, not one of the Government's defenses pass muster.

and uncoordinated (Ex. P-173, at 18-20); (2) did not correct the defects before Contract award (Exs. P-55, 173, at 20-24), and (3) tried to hide such defects by its evasive RFI responses (Exs. P-173, at 21; 33, 34, 35, 49, 50), by its refusal to provide the CADD disk to Steel Service (Ex. P-25) and by not revising the design drawings to incorporate the RFI responses (Ex. P-40). Under these circumstances, there can be no question that the VA's design was defective and that the VA "withheld information when it ha[d] superior knowledge of that information and a duty to disclose it to the contractor."[6] _AT&T Communication, Inc., v. Perry_, 296 F.3d 1307 (Fed. Cir. 2002).

**B. THE PROOF**

1. The VA's Design was Defective.

The proof that the VA's design was defective was unrefuted. In fact, the Government's blatant failure to call the VA's senior resident engineer (Bill Totolo), its resident engineer (Bob Mitchell), its architect (JMGR), or its structural engineer (Allen & Hoshall)[7] coupled with the VA's damning admissions (Exs. P-28, 55, 173 at 17-20; 212) make a finding that the design was defective inevitable.[8]

---

[6]The Government contends that Caddell cannot now argue "superior knowledge" because it was not specifically pled. Such was pled in Caddell's Complaint, at Count III, as it is an element of Caddell's claim that the VA breached its implied obligations to cooperate with Caddell and its subcontractors and to not take any action which delayed, interfered with or otherwise hindered Steel Service's performance. In addition, Caddell's Memorandum at ¶¶6-10 and pages 41, 48-49, also referenced the "superior knowledge" argument. During discovery, Caddell found the incriminating correspondence between the VA and its architect/engineer which confirmed its suspicions.

[7]The Government offered only the testimony of Patti Jones, who clearly lacked the credentials to carry off her "opinion" as a "P.M.P." that the design was not defective as she admittedly is not an engineer, an architect, a steel detailer, a steel fabricator, or a general contractor. Indeed, the sole basis for her "opinion" was the fact that she had worked "many" hours in the construction field, primarily as a "scheduler," and took a one-half day multiple choice test for which she paid a fee of about $250, represented owners on four school projects where contractors had made claims based upon defective design and several RFI cases where she determined there was no claim. Surely, when Ms. Jones' "opinion" is matched against the expertise of Ernie Hopkins, Larry Cox, Ray Vinson and Tom Ferrell, P.E., the Government comes up far short.

[8]Mr. Smith's attempt to "correct" the design defects by virtue of the pre-bid amendments (continued...)

And, Caddell is entitled to a presumption that the Government did not call these witnesses to testify because they could not and would not refute the fact that the design was defective and that the VA knew it, *Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1150-51 (10th Cir. 1990), as made clear by the following:

Ernie Hopkins' contemporaneous handwritten notes of the VA's conversation with its structural Engineer of Record whom he never saw again (Ex. P-28):

> *Glen Harbour stated no answers til VA pays. A&H were paid to prepare drawings for bid and not construction. VA was informed of the drawing status at their meeting. No pay, no work.*

The VA's July 22, 1996 AE Structural Steel meeting minutes (Ex. P-55):

> 1. SRE reiterated VA belief that qualify [sic] of structural documents is deficient as shown by large numbers of RFI's and responses. Also due to lack of coordination among disciplines (example: transfer girders and precast).
> 2. He emphasized that responses must be comprehensive, accurate and timely. Further, the AE must look ahead to be sure that error and omissions are caught before they are a larger problem and cannot be easily fixed. * * *
> 3. Mike Wess and Bert Poletti acknowledged the structural drawings lacked some coordination and accuracy. * * *

And the VA's fatal admission made November 19, 1997 (Ex. P-212):

> We have returned many structural steel submittals to the contractor with a note to coordinate precast supports with the precast manufacturer. We have received some documentation from the contractor and have heard there is a claim forthcoming for the many changes that have been required.
>
> We are attempting to check steel attached to the structure and are not sure all is per your design intent. * * * Be prepared to send an engineer to the job familiar with the details, changes, and design to check on the noted steel supports. * * *

More damning proof of the VA's superior knowledge of its defective design[9] was Totolo's

[8](...continued)
also backfired as Larry Cox and Tom Ferrell, P.E. testified that the pre-bid amendments (Ex. Dx-1006) primarily related to concrete and did not correct the conflicts between the architectural and structural drawings or otherwise make material changes to the June 23, 2005 structural design drawings.

[9]Mr. Smith wanted to parse the definition of "defective" design, contending that the defects were mere "discrepancies" and that the existence of "discrepancies" did not make the design "defective." That argument, as made clear by the testimony of every Caddell/Steel Service witness, is utterly disingenuous as the effect of the "discrepancies" was, as Ernie
(continued...)

evasive responses to RFI's that drastically differed from the specific answers given to him by JMGR and/or Allen & Hoshall which Totolo did not provide to Caddell[10] and which, according to Tom Ferrell, P.E., was "posturing to make the drawings look correct" (see Exs. P-33, 34, 35, 49, 50, 173). Indeed, Tom Ferrell, P.E. said Totolo "use[d] words in his responses to RFI's such as 'you may change' or 'to clarify' in an effort to disguise the fact that the information given in the Design Documents was either an error or omission or that revised design information was being transmitted in the RFI responses to the Construction Team" (Ex. P-173, at 21).[11]

If the VA's own contemporaneous documents are not enough to prove that its design was defective and that it knew that, then there was the irrefutable testimony of Ernie Hopkins, Knute Johnson, Larry Cox, Ray Vinson, and Tom Ferrell, P.E.

Specifically, Tom Ferrell, P.E. testified that, although the VA's design drawings were adequate for purposes of bidding,[12] they did not meet the AISC Code or the applicable standard of care and were

---

[9](...continued)
Hopkins said, that Steel Service was "dead in the water." And, death, whether by one huge sharkbite or 1,000 small ones, is death nonetheless.

[10]Tom Ferrell, P.E. discussed several instances where the VA's responses to RFI's were intentionally vague even though the architect/engineer had given very specific RFI answers (RFI 49, 65, 101, 266, 291) which Tom Ferrell, P.E. said were not provided to Caddell (Exs. P-33, 34, 35, 49, 50, 173). On cross, Mr. Smith argued that Tom Ferrell, P.E. did not, in fact, know whether the VA had withheld the architect/engineer RFI responses. Tom Ferrell, P.E. said that if the VA had provided both responses, Caddell/Steel Service would have been even more confused by the conflicting answers.

During the weekend break in the trial, Ray Vinson obtained and reviewed Caddell's original correspondence and RFI files and confirmed in his testimony that the VA did not provide the architect/engineer's RFI answers to Caddell, dashing yet another of the Government's "red herrings."

[11]EEE and Ernie Hopkins said the same thing early on (Exs. P-37, 39, 40). Ernie Hopkins also testified about several RFI's to which Totolo's pat response was "coordinate with gc" when the information needed was not on the design drawings and was not available from Caddell and, therefore, could only be provided by the architect/engineer (Ex. P-70).

[12]As Tom Ferrell, P.E. explained, the detailer and the fabricator prepare their estimates based on quantities, sizes, grades and lengths of members, the number of the same members and (continued...)

not adequate for detailing, fabrication and/or erection based on his review of the structural design drawings (including the sections), the details shown on the architectural drawings and his (and Ferrell Engineering's) review of the RFI's to determine if they were required due to errors and/or omissions in the design documents (Ex. P-173 and Ex. B).[13] According to Tom Ferrell, P.E., the errors and omissions that he found in the design drawings were not contractor coordination issues but, for instance, section "cuts" that did not match the condition where the section was shown to be used that could not be resolved by Caddell/Steel Service because the conflict changed the loading of the steel members and/or the member sizes which had been calculated and designed by the architect/engineer and could only be recalculated and redesigned by the architect/engineer. In fact, he testified that, out of 303 RFI's (of a total of 355) required to be submitted to the VA due to errors and omissions in the design drawings, there were 260 RFI's that were errors and/or omissions (unrelated to precast[14]) made by the architect/engineer

---

[12](...continued)
the overall complexity of the Project to estimate the number of manhours needed and cannot afford to, in essence, detail the job during the bid phase as the Government suggested was prudent.

[13]Mr. Smith, on cross of Tom Ferrell, P.E., tried to show that the errors and omissions in the June 23, 1995 design drawings had been corrected by subsequently issued addenda design drawings during the bid phase and after issuance of the credit memorandum to the architect/engineer, decreasing the contract amount due to the deficiencies in the structural design drawings (Ex. P-173, Ex. B). Tom Ferrell, P.E. showed that only the beam and column schedules were issued in the November 1995 addenda and they did not correct the errors in the design drawings.

[14]Without doubt, Tom Ferrell, P.E. trounced any notion that the steel to precast connection issue was a contractor coordination issue instead of a defective design issue. As he explained, the specific design information provided on the structural drawings conflicted with the information on the architectural drawings (e.g., the panel widths were different, among others) and, as a result, EEE could not use the connection locations shown on the structural design drawings and had to have the design coordination between the steel and precast completed by the Engineer of Record. The VA chose to provide that design coordination (i.e., the connection locations) over one year later via the Engineer of Record's approval of the precast shop drawings (Ex. P-118).

because of either missing or conflicting information (Ex. P-173 and Ex. B)[15] that could only be answered by the engineer, as the sole person familiar with the structural design requirements of the Project and the final authority on the structural stability of the Project.

As Ernie Hopkins graphically stated, steel cannot be detailed and fabricated to 1/16th-inch as required without exact dimensions and the VA never said "Steel Service, you don't need this information or it's your responsibility to provide it." The contractor Ray Vinson said, "these drawings are defective. There is not anything ordinary about these drawings." Surely, Steel Service proved beyond doubt not only that the VA's design was defective but also that the Government's "defenses" to that claim were baseless.

2. The VA's Defective Design Delayed Steel Service (and its Subcontractors).

There was likewise no question that the VA's defective design delayed Steel Service and its subcontractors. Steel Service and Caddell planned for Steel Service to commence detailing and fabricating steel immediately upon the issuance of the notice to proceed (Exs. P-19, 20, 21, 22, 23), the VA knew about this plan (Exs. P-25, 27, 175, 187, 195, 198) and was, from the outset, "concerned about the delay in submittal of structural steel shop drawings" (Ex. P-195) and promptly scheduled a meeting upon receipt of the first 146 RFI's (Ex. P-28). And, it is undisputed that EEE and Steel Service made gallant efforts to act upon that plan and failed, leaving Steel Service (and its subcontractors) "dead in the water" for not one but two fabrication "windows" and unable to fabricate even M-Line North steel until May 1997 (Ex. P-135)[16] because of the VA's defective design, its late and unresponsive RFI answers,

[15]Tom Ferrell, P.E. specifically discussed RFI 65, 190, 224, 240, 241, 242, 308 (Ex. P-173), among others, to demonstrate the errors and omissions in the design drawings, the information needed by EEE to continue detailing shop drawings and the fact that "coordination" with other trades and/or Caddell would not resolve the RFI.

[16]Patti Jones argued that all but two RFI's relating to M-Line North were "answered" by September 10, 1996 (Ex. Dx-1001, at 56) (well into the first fabrication "window") and that the M-Line North shop drawings were approved January 9, 1997 (Ex. P-85) and wonders why M-Line North was not fabricated for months. Ms. Jones assumed that the RFI responses were (continued...)

its extra-contractual requirement for submission of shop drawing in complete sequences,[17] its "approval" of shop drawings that did not allow fabrication to commence and its extra-contractual requirement that steel shop drawings "match" the precast shop drawings, even though the structural design showed the steel connections to be fabricated by Steel Service for the precast panels and the locations for those connections.

Tom Ferrell, P.E. explained that these errors and omissions and changes disrupted the detailing, fabrication and erection and prevented EEE from preparing shop drawings needed for fabrication. As he testified, when fabrication manhours are not used as scheduled, they are "lost forever as it is impossible to replace them with other projects." That is because, as both Tom Ferrell, P.E. and Larry Cox described, it might take 4 to 5 months before a replacement job is obtained and then the material procurement/delivery and shop drawing approvals have to be orchestrated -- all of which make it impossible to replace "lost" manhours.

Tom Ferrell, P.E. also explained that one RFI can disrupt the entire process whereas 1,000 RFI's if timely and appropriately answered can have no effect on schedule. He emphasized not only that here there were many RFI's that were not promptly answered but also that the RFI's were not concentrated within any particular area of the Project and were scattered throughout, preventing EEE from detailing and checking shop drawings systematically by area and rendering detailing inefficient because EEE

[16](...continued)
"answers" which they were not, that the VA's January 1997 "approved as noted" return of shop drawings allowed fabrication which it did not as Ernie Hopkins explained in detail (Exs. P-87, 88, 89, 90, 93, 95, 101, 109, 114), and that M-Line North steel was unaffected by the extra-contractual requirement that the steel shop drawings "match" the precast shop drawings which required receipt of final, approved precast shop drawings which did not occur until after April 30, 1997 (Exs. P-97, 98, 101, 102, 105, 107, 108, 109, 111, 117, 118, 120, 121). That is why M-Line North was not fabricated for months.

[17]Ms. Jones contended that §01001, ¶1.46(e) required the submission of shop drawings in complete sequences. First, a plain reading of ¶1.46(e) reveals no such requirement. Second, the division of the Project into "sequences" was done by Steel Service/EEE as their management tool and not by the VA or its architect/engineer who did not even participate in the identification of sequences. Thus, Ms. Jones' contention is untenable.

could not find any area where it could work.[18]

In summary, the VA, during the Project, and the Government, at trial, perpetuated one hoax after another in an effort to hide the ball (i.e., its defective design) in the high weeds. However, the proof was unassailable that the VA knew before bid that its design was defective and put the drawings out for bid nonetheless. Then, at trial, the Government used its "experts" who claimed to be impartial[19] to invent even more hoaxes like:

(a) the Caddell/Steel Service dispute which, in reality, was a mere blip on the Project's radar screen;
(b) the "bundling"/"dumping" RFI issue which never made the annals of this Project and surely would have made Totolo's "hit" list if it were real;
(c) Caddell's "holding" of RFI's which the VA caused by its requirement that Caddell "comb" the drawings for answers; and
(d) the subfabricators issue which was strictly a Section 9 issue.

Clearly, the Government tilted at windmills.

a. The First Fabrication "Window"

The Government, of course, downplays its breaches and heaps the blame on Caddell despite the absence of any complaint during the Project that the Caddell/Steel Service dispute and/or Caddell's "bundling"/"dumping" and/or "holding" of RFI's were the real culprits for Steel Service's delays. Indeed, the VA never blamed Caddell because the Caddell/Steel Service dispute[20] certainly never slowed

---

[18]Ms. Jones noted that EEE only had 196 revision manhours in 1996. She did not seem to understand that that was not surprising as revision time referred to the time to revise shop drawings and EEE had no shop drawings to "revise" in 1996.

[19]Cotton & Company's annual revenue for the last ten years is almost entirely generated by its work for the Government and Mrs. Jones feigned impartiality but admittedly did not even review the correspondence between the VA and the architect/engineer.

[20]The Government made Larry Cox's July 15, 1996 letter – the RFI delay is a "drop in the bucket" compared to the Caddell delay letter (Ex. Dx-1002) – the lynchpin of its defense. However, as Larry Cox testified, when that letter is put in context as his response to Caddell's July 9, 1996 letter (Ex. Dx-1001, at p. 3) that said that the VA's RFI's – not Caddell – were the sole source of the problem and considering his mindset that the RFI's would be answered any day and Steel Service released to fabricate, he stood by his statement that, at that time, he thought the RFI delay "paled in comparison" to Caddell's delay.

the RFI process[21] and the VA never complained about RFI "dumping"/"bundling"/"holding" because, as Knute Johnson testified, after the first block of ±150 RFI's submitted to the VA on April 9, 1996,[22] the VA demanded that Caddell "research," "comb the drawings for hidden information" to try to find the answers before sending the RFI to the VA so that Caddell was "duplicating the detailer's efforts." As Knute Johnson explained, the VA never complained that Caddell was "bundling"/"dumping"/"holding" RFI's – the VA only complained that Caddell had not "researched" the RFI's before sending them to the VA. According to Knute Johnson, Caddell did not have and should not have anticipated that it needed the expertise and/or the staff to accomplish this extra-contractual mission.[23]

In short, the Government's post-Project "let's blame Caddell" strategy fails for the simple reason that, but for the VA's defective design (and its attempt to hide it), the RFI's would be a non-issue and Steel Service could have fabricated within its first "window" as planned. Indeed, as Larry Cox and Ernie Hopkins testified, Steel Service was highly motivated to make its first fabrication "window" because it had purchased and received approximately $1.3 million in raw materials in March 1996, "sold" 35,000 manhours for very favorable pricing to fill an empty shop and contracted with the most qualified and most expensive detailer (EEE) and fully intended to be able to any day complete the shop drawings and fabricate steel.

---

[21]Steel Service's RFI log (Ex. P-175) shows that RFI's were submitted to and responses were received from Caddell between mid-July 1996 and Labor Day – being the duration of the Caddell/Steel Service dispute according to Larry Cox, Ernie Hopkins, and Knute Johnson – the witnesses with personal knowledge (see also, Exs. P-59, 60) and EEE's timesheets (Ex. P-171) show that EEE's hours stayed the same.

[22]Knute Johnson explained that Caddell and the VA were overwhelmed by the sheer number of RFI's received from Steel Service after issuance of the notice to proceed. Ernie Hopkins said that everyone was caught off guard by the sheer "mass of information needed so early in the job," to fill the design gaps.

[23]Section 05100, ¶1.5.A mandated that the steel fabricator – not the general contractor – have the requisite expertise and experience with structural steel (Ex. P-11).

Moreover, as Knute Johnson candidly admitted, Caddell settled its delay in the start of erection dispute with Steel Service because Caddell had accepted Steel Service's favorable pricing and its schedule for detailing, fabrication and erection of steel and because detailing and fabrication should have been able to proceed regardless of the delayed erection start and could have proceeded but for the VA's defective design. As a result, both Steel Service and Caddell believed that Caddell was responsible for and Caddell, in fact, paid Steel Service for additional handling and storage of fabricated steel and for the increased cost to erect the steel, while reserving Steel Service's rights against the VA for the increased costs incurred and being incurred in attempting to comply with the VA's defective design (Ex. P-62). Thus, the Caddell/Steel Service dispute and the "bundling"/"dumping"/"holding" of RFI's[24] are the Government's red herrings and are not the cause or even a concurrent cause for Steel Service's inability to proceed with detailing and fabrication as planned.

b. The Second Fabrication "Window".

After Caddell and Steel Service consummated their settlement on October 4, 1996 and executed

---

[24]Incredibly, Ms. Jones attempted to refute the Caddell/Steel Service witnesses with personal knowledge of the reasons for the "bundling"/"dumping"/"holding" of RFI's and the adequacy of the RFI responses. Her testimony is obviously unpersuasive in the absence of testimony from the VA and/or the architect/engineer to support her suppositions. In any event, her RFI chart (Ex. Dx-1001, at 41), created in an attempt to undermine Ray Vinson's RFI chart, shows that, as of October 16, 1996 – the date the Government chose to end the Caddell/Steel Service dispute regardless of the testimony of the witnesses with personal knowledge – the VA had held 278 RFI's from the VA's date of receipt to the VA's date of return as follows: 15 days or less - 52; 16-30 days - 65; 31-45 days - 143; 46-60 days - 7; 61-75 days - 5; 76-90 days - 3; 91-105 days - 2; 106-120 days - 1. Ms. Jones' chart coupled with the undisputed testimony of Tom Ferrell, P.E. and Ernie Hopkins that RFI's are typically responded to within 1-3 days and that the VA's RFI responses were not "answers" is proof positive that the VA – not Caddell – caused Steel Service to miss its first fabrication "window."

Additionally, although not mentioned by Ms. Jones, the VA "bundled"/"dumped" its RFI responses (Ex. P-175). For example, 25 RFI's were responded to April 23, 1996; 24 on May 7-8; 43 on May 13; 25 on May 16; and 28 on July 12. However, again, this "count" ignores the reality that the VA responses were not always "answers" and that until Steel Service could submit shop drawings for approval, the cumulative effect of the RFI's was critical and no single RFI.

their subcontract[25] (Ex. P-62), Steel Service established the second fabrication "window" from January 1997 to August 1997.[26] In the meantime, Steel Service/EEE felt that the M-Line North shop drawings were approximately 90-95% complete based on RFI responses received as of mid-October 1996 and so advised Caddell who confirmed that they should proceed with submission despite the VA's extra-contractual insistence upon "complete" submittals (Ex. P-67). On October 24, 1996, Steel Service submitted the M-Line North shop drawings which the VA promptly rejected because "Sequence is incomplete. Not enough information to review and act. Resubmit as complete sequence"[27] even though the engineer substantively reviewed the submittal and was able to "approve" or "approve as noted" some shop drawings (Ex. P-69). Shortly thereafter, the VA rejected three other submissions with "No Action Taken" based on its extra-contractual requirement for "complete" submittals despite Caddell's request

---

[25]Mr. Smith tried to make much of the fact that Caddell and Steel Service did not have a signed subcontract until October 4, 1996 (Ex. P-62). However, this defense, like all of the Government's defenses, was form over substance as Ernie Hopkins established and Knute Johnson confirmed (and the contemporaneous documents proved), the parties had agreed on the essential terms and both parties performed despite the lack of a signed subcontract.

Moreover, as Ms. Jones acknowledged, supplier selection and scheduling is a means and methods issue which is within the general contractor's discretion as long as the completion date is met.

[26]Ms. Jones contended that Steel Service's schedule for the second fabrication "window" (Ex. P-66) conflicts with its schedule for the first fabrication "window" (Ex. P-21) because the second schedule shows four months for fabrication of some sequences from "RFF" to "FC" whereas the first schedule shows two weeks for fabrication per sequence. Ms. Jones mixes "apples and oranges" to make her point. The second schedule incorporates 30 days for shop drawing review per §01311, ¶1.8.A and is "built" around Caddell's April 15, 1997 start date for erection (Ex. P-63). For that reason, the durations for fabrication per sequence are longer – not because the first schedule's duration were unrealistic.

Ms. Jones also interprets the schedule (Ex. P-66) literally even though the schedule on its face states "1. Dates will be converted to 'Actual' as job progresses. 2. All dates are tentative and subject to a reasonable degree of variance for weather, etc." and she ignores the fact that the schedule milestones are different from the first schedule (Ex. P-21).

[27]It was Steel Service – not the VA and/or the architect/engineer – that framed the sequences for shop drawing submission for its management of the Project. Therefore, the VA's rejection of the submittal as "Sequence is incomplete. Not enough information to review and act" is purely arbitrary as made clear by the architect/engineer's action on the submittal which was not provided to Steel Service and which would have allowed some fabrication to proceed.

that the VA substantively review the submittals (Ex. P-74). Without RFI answers forthcoming from the VA (Exs. P-70, 80, 81, 84), Steel Service could not submit a "complete" submittal and was "dead in the water" until mid-December 1996 when it was finally able to resubmit complete M-Line North shop drawings for review (Ex. P-85). The VA returned the submittal on January 9, 1997 "approved as noted. Coordinate with all precast connections" (Ex. P-85).

The VA's response triggered the next fiasco – the loss of the second fabrication "window" – as Steel Service was still unable to fabricate M-Line North, being the only "approved" submittal as of January 1997, because of the engineer's failure to adequately review the submittal and the VA's requirement that Steel Service "coordinate with precast" (Ex. P-87) which delayed fabrication until late May 1997 (Ex. P-135) and plagued Steel Service throughout fabrication (Ex. P-139) and erection (Exs. P-151, 158).

i. The VA's "Coordinate with Precast" Requirement.

As Tom Ferrell, P.E. explained, the structural drawings depicted a comprehensive, "fully-engineered" design for the steel connections[28] to the precast as the Engineer of Record calculated the loading placed on the steel frame by the precast panels and designed the type and exact location of each connection based on his calculations and showed those points and types of connections on the structural drawings and, as a result, there should have been no need for additional design at those locations and Steel Service and the precast subcontractor needed only to follow the design.

[28] According to Tom Ferrell, P.E., Ferrell Engineering provided minimal connection "design" services to Steel Service to accommodate the erector's preference for bolted rather than welded connections at the column splices and Steel Service's preference for a plate-type bracket at the precast support in lieu of the bracket design shown on the structural design drawings. Any other connection "design" by Ferrell Engineering was obtained from the AISC tables for simple beam connections that did not transfer axial loads, all of which were shown on the structural drawings. Tom Ferrell, P.E. testified that this minimal connection design did not convert these design specifications to performance specifications because the Engineer of Record designed the character of the connections and Ferrell Engineering only determined the dimensions of the connections, using the design (and load) information provided by the VA and the AISC tables that "tells you what connection to use."

Thus, as Tom Ferrell, P.E., Knute Johnson, and Ernie Hopkins all testified, the only coordination that should have been required between Steel Service and the precast subcontractor was to confirm that the locations of the precast embed plate matched the locations shown on the structural drawings for the steel connections. As those three also testified, that did not occur because the VA chose to correct the lack of design coordination between the architectural and structural drawings via the precast shop drawings and allowed the precast subcontractor to move and/or add embed plates within its panels that changed the connection locations (i.e., loading of the structure) to points other than shown on the structural drawings and, therefore, Steel Service could no longer "coordinate" with the precast subcontractor because it had to have the VA's approval of the design change to avoid jeopardizing the stability of the beam to which the precast panel "attached" and/or the steel structure. Thus, Steel Service was directed to"match" the steel to the precast (Exs. P-90, 97, 98) and to do that it had to await receipt of final approved precast shop drawings which did not occur until May 1, 1997 (Ex. P-117) and which even then did not allow Steel Service to complete detailing or to efficiently fabricate because of numerous fouling conditions (Ex. P-120), the constant revisions the VA made which required that Steel Service's approved shop drawings be pulled from fabrication and placed on hold (Exs. P-105, 107, 110, 111, 117, 121, 123) and conflicting dimensions between the precast shop drawings and the approval changes which had to be resolved (Exs. P-129, 134, 139).

According to Tom Ferrell, P.E., there are two ways to provide the exact locations for the steel connections to the precast panels; namely, either the Engineer of Record identifies the locations on the structural drawings (as the Engineer of Record did here) and requires the precast panel subcontractor to use the locations or the Engineer of Record approves the precast shop drawings and then directs the structural steel subcontractor to match the final approved precast shop drawings (as the VA did here). As Tom Ferrell, P.E. explained, even though the precast was partly a performance specification[29] and the

[29]As Tom Ferrell, P.E. also explained, the precast specification requirement (§03450, (continued...)

structural steel was a design specification, detailing was not delayed by the need for coordination between the steel and precast subcontractors but by the requirement that the Engineer of Record verify that the steel frame was adequate and stable based on the loads being placed on the structure at the new locations which the VA allowed the precast subcontractor to select for its panels, even though other locations were specifically depicted by the Engineer of Record on the structural design drawings. According to Tom Ferrell, P.E., the locations for the connections as shown on the structural design drawings were different from the locations shown on the architectural design drawings and, therefore, detailing could not proceed until the VA via approval of the Engineer of Record provided the correct locations which it did via the approval of the precast shop drawings over one year later (Ex. P-118).

ii. The VA's "Coordinate with GC" Requirement.

As Ernie Hopkins explained, the VA's RFI responses often used the "coordinate with gc" mantra again in an effort to disguise its defective design. However, as Ernie Hopkins testified, after months of effort, Steel Service was unable to obtain the much-needed missing dimensions via "coordination" with Caddell (and/or its other subcontractors) because the VA had not, in fact, selected the mechanical equipment and would not put the area affected "on hold" so that Steel Service could submit "complete" sequences of shop drawings or the engineer or the VA provided the dimensions or the design information/dimensions in response to the RFI and the VA just threw in its "coordination" response (Ex. P-70, RFI Nos. 252, 260). In short, the VA's "coordinate with gc" RFI response was a misnomer.

c. Fabrication.

As Ernie Hopkins testified, in July 1997 when fabrication of structural steel could finally start, Steel Service's shop was at capacity and, in order to meet the erection schedule, Steel Service

---

[29](...continued)
¶1.8.A (Ex. P-11)) for the panel "design" "stops within the panel" and pertains only to the type and number of reinforcing bars embedded in the panel and to the embed plate within the panel, including the number and size of the studs in that plate and does not include the design of the steel that welds to the panel or to the kickers or plates that weld to the beam, all of which is the engineer's responsibility. The Government did not challenge any of this.

subcontracted the fabrication of the large moment columns to Williams Steel (Ex. P-184(24)). Within days of that transaction and after Steel Service had shipped 889 tons to Williams Steel (Ex. P-184(24)), the VA changed the welding requirement from Section 8 to the more stringent Section 9 requirement (Ex. P-139) which Williams Steel could not meet. As a result, Steel Service then contracted with Trinity Industries and Orizon to fabricate the moment columns (Ex. P-146). Trinity and Orizon would not meet the Caddell/Steel Service schedule and Steel Service was ultimately forced to parse out the fabrication of the columns to multiple fabricators (Exs. P-149, 152).

Once erection started, Ernie Hopkins testified that he was stationed at the Project because of the conflicts between the steel and the precast which continued to plague the Project (Ex. P-158) and to concern the VA (Exs. P-212, 214) whose inspectors constantly noted that the steel did not match the design drawings which had never been revised.

Steel Service ultimately submitted its request for equitable adjustment for the Section 9 change (Ex. P-159) which the VA paid and its pending request for equitable adjustment (the "REA") (Ex. P-157) which was audited by the DCAA and revised as necessary (Exs. P-160, 161, 164, 218). As Ray Vinson testified, he met multiple times with the DCAA auditors and the VA in an effort to resolve the REA without success and the Contracting Officer finally issued his decision, denying the REA, in December 2003 (Ex. P-167).

d. Steel Service (and its subcontractors) were damaged by the VA's defective design.

Every Caddell/Steel Service witness graphically recounted and the contemporaneous documents confirmed the "enormous problems" encountered due to the VA's defective design. Ernie Hopkins said Steel Service was "dead in the water due to the defective design." Ray Vinson said the Project was "rampant with defective drawings" and to show the VA "what a disaster this job was," he, EEE and Ernie Hopkins prepared the "layered analysis" of the impact of the 43 RFI's on the M-Line North shop drawings that demonstrated that all but a handful of members were affected by the design "nightmare"

(Ex. P-157). Ray Vinson believed that Steel Service's inability to detail and fabricate M-Line North due to the "humongous design problem" and the "conglomeration of RFI's" that left EEE "helpless" was the cause of the loss of the first fabrication "window."

Ray Vinson also testified that the VA's refusal to review less than complete sequences of shop drawings was "disastrous" and caused impact on impact as that decision held up fabrication of the huge interior moment columns that could have fed the shop while waiting on other approvals that were held up by RFI's. He said, "everywhere Steel Service turned there was a different problem."

Then, Ray Vinson explained that shop drawings were returned by the VA "approved as noted" yet so "bloodied by revisions" that EEE's "scrubbing" before release for fabrication took an inordinate amount of time. At his suggestion, Steel Service retained Leonard Ross, P.E., a structural engineer, former president of the National Association of Steel Detailers and a steel detailer in New York City to review the shop drawings "approved" by the VA and to demonstrate (via colored drawings at Section IX of the REA, Ex. P-157) the effect of the VA's approval revisions on Steel Service's ability to release shop drawings for fabrication. According to Ray Vinson, the design defects, the late and nonresponsive answers to RFI's and the VA's requirement for submission of complete sequences delayed completion of shop drawings until October 1996 and caused the loss of the first fabrication "window." Ray Vinson also testified that these factors coupled with the VA's requirement that Steel Service "match" the precast shop drawings and the changes required after receipt of "approved as noted" steel shop drawings caused the loss of the second fabrication "window."

## II. QUANTUM

### A. STEEL SERVICE'S DAMAGES

The fact of damages is beyond cavil even according to the Government's only two witnesses. Therefore, the quantum of damages is the only question before the Court. See, e.g., Datalect Computer Services, Ltd. v. United States, No. 95-328C (Ct. Cl. 1998) and other cases cited by Mr. Cotton in his

Report (Ex. Dx-1003, at 8-9). And, as Mr. Cotton's Report makes clear – Steel Service is not required to prove its damages "with absolute certainty or mathematical exactitude" – "[i]t is sufficient if [Steel Service] furnishes the court with a reasonable basis for computation, even though the result is only approximate" (Ex. Dx-1003, at 8-9, and cases cited therein; Memorandum, at 50). In fact, even if the Court was not convinced by Ray Vinson's method of calculating damages, the Court can nonetheless award such amount as it deems appropriate under the jury verdict method of calculating damages where, as here, the issue of entitlement to relief is clear but the standard methods for calculating damages may be inadequate to quantify damages.[30] See Construction Briefings, "Jury Verdict Method of Proving Damages," No. 2007-05, May 2007 (Thompson West), citing *Dawco Const., Inc. v. United States*, 930 F.2d 872 (Fed. Cir. 1991) (overruled on other grounds by *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995)).

1. "The Increased Cost Reasonably Incurred".

In this case, "the increased cost reasonably incurred" by Steel Service (and its subcontractors), which is recoverable according to §01001, ¶1.33(d) (Ex. P-11), is determined by FAR 31.201-3, admittedly not followed by Mr. Cotton, which provides as follows:

> **31.201-3 Determining reasonableness.**
> (a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.
> (b) What is reasonable depends upon a variety of considerations and circumstances, including–
>> (1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;
>> (2) Generally accepted sound business practices, arm's-length bargaining,

[30]Steel Service does not concede this is justified for any reason, including Mr. Cotton's equivocal "opinions" that "[e]vidence exists . . . that at least some of SSC's alleged damages may have been caused by" others, "it is not clear that SSC's alleged damages have been allocated equitably," "it seems to me that $5,000 [for estimated travel cost] might be low," "I'm not sure that it is a reasonable assumption" not to have someone on site full time and "the amounts in the bid may have been understated" (Ex. Dx-1003, at 10, 13). These "opinions" are not only not valid accounting opinions but are also not within Mr. Cotton's expertise and, therefore, should not persuade this Court of anything.

> and Federal and State laws and regulations;
> (3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and
> (4) Any significant deviations from the contractor's established practices.

As established at trial by the testimony of Ray Vinson and Larry Cox and as confirmed by the calculation and documentation of damages complied in Exhibit P-184, the costs incurred by Steel Service (and its subcontractors) were reasonable according to FAR 31.201-3 which costs Mr. Cotton admitted are to be governed by industry standards and practices[31] and which have been computed according to legally cognizable methods.

a. Steel Service's Unabsorbed Overhead Calculations – $1,023,441.19

Mr. Cotton questioned Steel Service's unabsorbed overhead claim, alleging that (i) it was not computed per *Eichleay*; (ii) Steel Service's planned manhours per month and its actual manhours do not support its claimed manhours; (iii) it includes variable costs, overhead costs allocable to the service center and engineering departments, and income from scrap sales, and does not include overhead costs allocable to the 2.0 manhours underbid; and (iv) it is not adjusted for overlapping unabsorbed overhead claims on other projects. Ray Vinson rebutted all of Mr. Cotton's contentions.

i. *Eichleay* Does Not Apply.

First, Mr. Cotton's position that *Eichleay* is the only method for calculating overhead claims is a legal – not an accounting – "opinion" which only this Court can make and which this Court should

---

[31]Mr. Cotton admitted that: (1) he was not a steel detailer or fabricator and did not investigate other steel fabricators' practices in evaluating the reasonableness of Steel Service's costs; (2) he did not check with other steel fabricators as to overhead allocation and he did not dispute the validity of allocating overhead to manhours; (3) Steel Service seeks to recover both direct job and "home office" overhead and *Eichleay* recovers only "home office" overhead; (4) Ray Vinson testified that the variable overhead issues raised by Cotton had been discussed and cleared with the DCAA auditor who did not testify; (5) his report was not binding on the Court; and (6) Caddell is contractually entitled to an equitable adjustment for "any increased costs reasonably incurred in attempting to comply with defective specifications."

In fact, Ray Vinson's Rebuttal Report (Ex. P-172) was written primarily because of his concern that neither Mr. Cotton nor Ms. Jones understood the steel detailing and fabrication process and that their opinions reflected their lack of knowledge of industry standards and practices.

make without regard to Mr. Cotton's "opinion." Moreover, Mr. Cotton's "opinion" is based solely on Federal Circuit cases involving delayed performance of construction contracts – not "lost" fabrication (manufacturing) manhours – and without consideration for the ASBCA cases that recognize that *Eichleay* may not apply in the manufacturing context as explained in Caddell's Memorandum, at 51-54.

Second, as Ray Vinson explained, Mr. Cotton's reliance on *Eichleay* does not consider that *Eichleay* does not apply to an accounting system which recovers overhead (fixed, direct plant and general and administrative) based on a percentage of the cost of each manhour sold and where contract billings may have no relation to recovery of overhead (Ex. P-172) if, for instance, the contract price is high but the manhours are low or the fabrication is sublet (see, e.g., Ex. P-181).

Finally, Mr. Cotton's reliance on *Eichleay* does not take into account that *Eichleay* is inapposite because Steel Service, in fact, sold those manhours twice, was delayed twice and, as a result, "lost" those manhours twice, thereby incurring unabsorbed overhead costs twice[32] and that *Eichleay* is not geared to that scenario.

In short, *Eichleay* should not be used to limit Steel Service's unabsorbed overhead claims[33] because, as Ray Vinson said, *Eichleay* applied here "would be just playing with numbers – it has no application to steel fabricators."

ii. Steel Service's Planned and Actual Manhours Do Not Undermine Steel Service's Claim.

Mr. Cotton contended, in essence, that Steel Service's master shop schedules (Ex. P-184(4)) do not support Steel Service's claim for unabsorbed overhead for 34,742 manhours for the first fabrication

[32]Mr. Cotton notes that Steel Service's unabsorbed overhead claim is much more than the $670,520 included as overhead in its bid (Ex. P-184(4)). That is because it "lost" its overhead twice. But, as calculated, Steel Service's unabsorbed overhead claim for the first fabrication "window" is $674,923.59, only $4,403.59 more than estimated.

[33]The DCAA used *Eichleay* to calculate Steel Service's unabsorbed overhead claim which Mr. Cotton adopted (Ex. Dx-1003, Ex. 1, at 4-5), thereby both acknowledging Government liability for the VA's defective design for the entire duration of the impact for the amount of $549,780 (i.e., two fabrication "windows").

"window" or for 19,960 manhours for the second fabrication "window" and that, based on its historical manhour records (Ex. P-180), Steel Service did not, in essence, "lose" these manhours.

With regard to the master shop schedules, Ray Vinson explained that those schedules are "look ahead" schedules used by Steel Service management solely for planning purposes to identify what is in the shop – not necessarily what should be in the shop – and cannot be used to develop or substantiate (or refute) this or any other claim (Ex. P-172). He also explained that his calculation of unabsorbed overhead was cumulative, being based on the entire seven month window, realizing that scheduling is not an exact science, that schedules for all projects fluctuate to some extent weekly and/or monthly and that Steel Service had the ability to "work out its manhours by shifting them [among projects] to make up or give up [time] when needed." For instance, Ray Vinson noted that Steel Service's manhours in October 1996 were almost at capacity by virtue of its efforts to "pull work from wherever it could get it" (Ex. P-184(5)) yet it still lost more than 35,000 manhours for the overall period. In short, the master shop schedules are for planning/scheduling purposes and have no relevance to the calculation of Steel Service's unabsorbed overhead.

For similar reasons, Steel Service's historical manhours support rather than torpedo Steel Service's claim as they demonstrate that Steel Service can shift its manhours to accommodate its needs and can meet or exceed its anticipated capacity (Ex. P-180, see, e.g., February 1995, January 1996, February 1997, August 1998, December 1998). Most important, the historical manhours show that the manhours for the first and second fabrication "windows" are below historical averages and far below capacity (Exs. P-172, 180). In short, rather than disprove, Steel Service's historical manhour records prove that Steel Service had the capacity and the ability to fabricate the manhours had they been available and was prevented from doing so by the VA's defective design (Exs. P-172, 180).

iii. Ray Vinson Satisfied the DCAA as to the Allocable Overhead Costs

Ray Vinson testified that he and the DCAA auditor resolved those issues which the DCAA

auditor had about costs allocable to overhead, the correspondence confirms his testimony (Exs. P-160, 161, 164, 172, 184(6), 218), the Government did not call the DCAA auditor as a witness to refute that and Mr. Cotton did not refute Ray Vinson's testimony. Thus, Mr. Cotton's objections are unsupported.

Ray Vinson also testified that Steel Service makes adjustments in its bid for scrap steel income that it receives from the sale of such steel and that it would, therefore, be double-dipping to make another adjustment (Ex. P-172). Mr. Cotton did not refute this.

Likewise, Ray Vinson testified that the 2.00 manhours per ton which Steel Service underbid should not be factored into the unabsorbed overhead calculation because the net effect is zero when the overhead that would be attributable to those unabsorbed manhours is also added as it would have to be.

iv. There Were No Overlapping Unabsorbed Overhead Claims.

Contrary to Mr. Cotton, the Dabhol project that was suspended in 1995 and reactivated in late 1997 was a small project that did not overlap with this Project as Ray Vinson testified and as Steel Service's labor records confirm (Exs. P-172, 184 (5), 184(7)). Ray Vinson said the same about the Beaumont job.

According to Ernie Hopkins, the Austin Airport project was the project that Steel Service hoped would mitigate some of the VA impact but those hopes were dashed when that project was delayed by issues similar to those on this Project. However, as Ernie Hopkins also explained, Steel Service obtained three projects to mitigate the Austin Airport delays, thereby mitigating its lost manhours on that project from 18,758 manhours[34] to 7,231 manhours (Ex. P-156). Ray Vinson, who assisted in preparing the claim, testified that the remaining 7,231 lost manhours were primarily lost during December 1996 and, therefore, did not overlap the fabrication "windows" for this Project (Ex. P-172). Therefore, no adjustment should be made to Steel Service's unabsorbed overhead calculation due to other projects.

[34]Mr. Cotton focused only on the total 18,758 manhours estimated for the Austin Airport project and neglected to mention Steel Service's significant mitigation efforts (Ex. Dx-1003, at 14).

b. Steel Service's Modified Total Cost Calculations – $400,651.65

As an initial proposition, Ray Vinson's testimony as to the applicability of the modified total cost method of calculating damages was not contradicted directly by either Government witness. Mr. Cotton simply said that he did not agree with Ray Vinson's damages calculations but did not suggest that another method should have been used.

Additionally, as Ray Vinson and Larry Cox testified, the payments to EEE and the additional costs incurred for travel, printing and project management were all necessary and reasonable and actually incurred to perform the Project as a result of the VA's defective design. Ernie Hopkins and Ray Vinson testified that Ernie Hopkins' travel and time devoted to this Project were inordinate due to the VA's defective design, that the costs were reasonably and necessarily incurred, and that the bid allowances were reasonable (Ex. P-172). As Ray Vinson also explained, the DCAA auditor, unlike Mr. Cotton, reviewed the underlying travel vouchers and the budgeted amounts and did not question the calculation (Ex. P-172).

In fact, as Ray Vinson explained, Steel Service created a new cost code to track the unanticipated actual expense of printing personnel required as a result of the VA's defective design.

Additionally, there can be no legitimate complaint about the additional monies paid to EEE to keep it working and to compensate it for some of its delays and for the VA's unjustified refusal to provide the CADD disks,[35] all as substantiated by EEE's invoices and its time sheets (Exs. P-171, 184(8), 184(16)).

Steel Service has satisfied the elements of the modified total cost method (Memorandum, at 54-56) and is entitled to recover all such costs.

---

[35]Ernie Hopkins and Ray Vinson's undisputed testimony was that the CADD disk would have revealed the errors and omissions in the VA's design and that was why the VA refused to provide it. Ray Vinson testified that the VA was obligated to furnish the CADD disk to Caddell/Steel Service based on 48 C.F.R. §52.227-14 where "contractor" means any entity contracting with the Government.

c. Steel Service's Other Costs – $787,092.34

There was really no Government rebuttal to Steel Service's claims for its increased overhead costs, its additional sublet costs and its inefficiency claims. In fact, with regard to the increased overhead costs, Mr. Cotton apparently missed Ray Vinson's calculations that establish that the 30% increase[36] was, in fact, justified as Steel Service's overhead had actually increased by 33% (Ex. P-184(23)(a), (b), (c)).

Similarly, Mr. Cotton also apparently misunderstood the basis for the subletting claim which he contends is, at least in part, attributable to the Section 9 claim (Ex. Dx-1003, at 5). However, as Ernie Hopkins, Larry Cox and Ray Vinson all testified, the sublet to Williams Steel occurred because Steel Service's shop was at capacity in July 1997 – over one year later – when fabrication could finally start. The Section 9 requirement explains why Williams Steel did not actually fabricate the steel shipped to it (Exs. P-184(24), 139, 146).

The basis for Steel Service's inefficiency claims was clearly established by Larry Cox and Ernie Hopkins and Ray Vinson who testified that the VA's defective design and its ripple effect clearly caused inefficiencies to this Project and to other projects during the first fabrication "window." In addition, Ray Vinson substantiated the manhours which were deducted from total actual manhours per ton to determine the 2.84 inefficient manhours.

Based on the undisputed testimony, Mr. Cotton's efforts at undermining these claims fall short.

d. Steel Service's Subcontractors' Claims – $210,548.70.

There was absolutely no defense raised to EEE's claims and only a half-hearted attempt to discredit AMW's claim which was based on essentially the same type of documents and basis as Steel Service's. Therefore, these claims should be allowed for the reasons stated hereinabove.

e. Steel Service's Preparation Costs – $127,772.35.

Mr. Cotton sought to deny this claim solely because of the casual use of the word "claim"

---

[36]Indeed, Mr. Cotton paid so little attention to this claim that he shows that Steel Service's increase overhead rate was 35% instead of 30% (Ex. Dx-1003, at 5).

beginning January 28, 1997 in the attorney's billing statements to Steel Service, despite correspondence which established that the VA, Caddell and Steel Service were still meeting and communicating in an effort to resolve the REA as late as February 2002 (Ex. P-172). In fact, Ray Vinson testified that, based on his prior dealings with Totolo and his discussions with him on this Project, he believed that the REA would be amicably resolved up until receipt of the Contracting Officer's Final Decision in 2003 (Ex. P-167). Therefore, there was no "prosecution of claims" per 48 C.F.R. §31.205-47 until denial and Mr. Cotton's arbitrary "claim" date holds no water. Thus, Steel Service's preparation costs are recoverable (Memorandum, at 56-58).

f. Interest is Recoverable.

The Contract Disputes Act, 41 U.S.C. §611, allows interest on Steel Service's certified claim from submission until paid at the U.S. Treasury rates (Memorandum, at 58).

g. Overhead and Profit are Allowed by Contract.

Caddell's 2.98% overhead and profit (Ex. P-218) is allowed by §01001, ¶1.34. Steel Service's (and its subcontractors') overhead and profit is allowed by §01001, ¶1.35 and is computed for its subcontractors as noted in Exhibit P-184 and for Steel Service as noted below.

## CONCLUSION

Caddell/Steel Service and its subcontractors have established that the VA's design was defective, that they were damaged as a result for not one but two fabrication "windows" and that the costs they reasonably incurred in attempting to comply with the VA's defective design was $2,782,149.52, including profit and overhead and excluding interest and costs, as computed below by "window":

| ITEM | WINDOW 1<br>May - Nov 1996 | WINDOW 2<br>Jan - July 1997 |
|---|---|---|
| SSC payments to EEE (see EEE claims below) | | |
| Added travel | | $ 21,577.66 |
| Added Project management | | $ 89,654.25 |

| ITEM | WINDOW 1<br>May - Nov 1996 | WINDOW 2<br>Jan - July 1997 |
|---|---|---|
| Added printing | | $ 6,412.24 |
| SSC overhead/profit | | $ 7,632.21 |
| SSC unabsorbed overhead | $ 674,923.59 | $ 348,517.60 |
| SSC overhead/profit | $ 35,496.62 | $ 19,175.88 |
| EEE revision time<br>809.25 MH - 574.5 MH = 234.75 MH<br>234.75 x $30 | $ 7,042.50 | $ 105,050.00 |
| EEE delay damages<br>371 days - 46 days = 325 days<br>325 days x 501.58 | $ 8,025.16 | $ 163,013.50 |
| EEE inefficiency (½ per year) | $ 14,178.76 | $ 14,178.76 |
| EEE overhead/profit | $ 8,662.22 | $ 8,662.22 |
| SSC overhead/profit | $ 4,450.00 | $ 16,495.22 |
| EEE delay charges per 07/13/1996 letter | $ 39,000.00 | |
| EEE add for electronic disk | $ 15,000.00 | |
| SSC overhead/profit | $ 4,450.00 | |
| AMW delay damages | $ 67,353.48 | $ 29,175.60 |
| AMW increased overhead | | $ 7,273.86 |
| AMW overhead/profit | $ 3,470.08 | $ 3,470.07 |
| SSC overhead/profit | $ 5,491.18 | $ 4,450.00 |
| SSC increased overhead rate for 1997 + overhead/profit | | $ 100,607.47<br>$ 6,780.37 |
| Additional cost to sublet to Williams + overhead/profit | | $ 251,153.83<br>$ 14,307.69 |
| SSC inefficiency VA + overhead/profit | | $ 160,389.41<br>$ 9,769.47 |
| SSC inefficiency (other projects) + overhead/profit | $ 274,941.63<br>$ 15,497.08 | |

| **ITEM** | **WINDOW 1 May - Nov 1996** | **WINDOW 2 Jan - July 1997** |
|---|---|---|
| Claim Preparation Costs + overhead/profit | | $ 127,772.35<br>$ 8,138.67 |
| Subtotal | $ 1,177,982.30 | $ 1,523,658.33 |
| Caddell Overhead/Profit at 2.98% | $ 35,103.87 | $ 45,405.02 |
| **TOTAL** | **$ 1,213,086.17** | **$ 1,569,063.35** |

Respectfully submitted,

CADDELL CONSTRUCTION CO., INC., PLAINTIFF

By: /s/ David W. Mockbee
David W. Mockbee
MOCKBEE HALL & DRAKE, P.A.
Lamar Life Building, Ste 1000
317 E. Capitol Street
Jackson, MS 39201
(601) 353-0035 - Telephone
(601) 353-0045 - Facsimile

## CERTIFICATE OF SERVICE

I, David W. Mockbee, do hereby certify that I have this day caused to be filed via the Official Electronic Document Filing System of the United States Court of Federal Claims ("CM/ECF") a true and correct copy of the above and foregoing Plaintiff's Post-Trial Memorandum. Copies of this document will be transmitted via the Court's CM/ECF System to all counsel of record. Additional copies may be obtained through the Court's CM/ECF System.

Dated: June 14, 2007.

/s/ David W. Mockbee
David W. Mockbee