IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CADDELL CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 04-461C |
| | ) | (Judge Futey) |
| THE UNITED STATES, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

In accordance with this Court's order at the close of trial, defendant, the United States, respectfully submits the following post trial brief.

INTRODUCTION

The trial of SSC's[1] defective specifications case revealed an even more flawed claim than depicted in our pretrial submission. In sum, SSC's case rests upon three unavailing contractual premises: First, that the Government's plans and specifications were "design specifications." Second, that the design specifications were "impossible" to perform.[2] Third, that, even if the contract was not a design specification, the Government hindered and delayed SSC's performance to the point of being redressable under the changes clause.

---

[1] We refer to the plaintiff as SSC and will distinguish between SSC and Caddell where necessary.

[2] A design specification and impossible performance are fundamental elements of a defective specifications claim. PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745, 796 (2000). If either element is absent, no Government liability exists. Id.

As we have noted previously, all three elements of SSC's case are easily defeated by this Court's logic in PCL Constr. Services, Inc. v. United States, 47 Fed. Cl. 745 (2000)(affirmed but not published by the Court of Appeals for the Federal Circuit at 96 Fed. Appx. 672 (2004)). In PCL, this Court addressed, and rejected, claims virtually identical to SSC's for, among others, defective specifications and hindrance/changes allegedly manifested by a large number of RFIs, delayed responses to RFIs, and other forms of "maladministration" of the contract by the Government.[3] Id. The PCL decision sets forth the requirements for each type of claim at length – none of which is met here by SSC. Id.

Because SSC's case is without a legal foundation, regardless of the testimony of its witnesses at trial, our post-trial brief will concentrate primarily upon the legal arguments that defeat SSC's claim. In addition, we will discuss several exhibits and portions of the trial testimony that further demonstrate the lack of merit in SSC's case. To the extent necessary, we will present

[3] PCL's project was extremely complex and in a difficult location. Id. at 754, 789, 796. PCL complained of multiple design changes to the Government's 465 contract drawings. Id. at 757. The design changes were captured in 144 contract modifications. Id. at 752. PCL claimed that these changes and PCL's issuance of 1,244 RFIs demonstrated that the Government's contract drawings and specifications were "severely defective." Id. at 752. This Court rejected PCL's defective specification and RFI claims for essentially the same reasons that we contend SSC's claims should be rejected here.

a closer look at the many pieces of contradictory factual evidence regarding SSC's case in our reply brief.

## ARGUMENT

### I. Neither The Contract As A Whole, Nor The Structural Steel Sections, Are A Design Specification, So The Legal Basis For Caddell's Case Is Absent

The contract in this case contained a garden-variety set of drawings and specifications that defined the building that Caddell was to construct. PX 11.[4] Although not an un-complex project, Caddell's contract clearly did not dictate the means and methods for construction, which was left to Caddell's discretion. Id.

It is SSC's position that the discrepancies in the structural steel portion of the Government's contract package were "defective specifications" that are "per se unreasonable" and that, therefore, pursuant to Spearin, SSC is entitled to recover all of its costs associated with the so-called defective specifications. Pl. Memo 40-42. SSC is wrong and its claim should be denied in its entirety.

As we noted in our pretrial submission, SSC's case suffers from a fundamental lack of precision in its terminology. The so-called "defects" in the contract documents (inconsistencies,

---

[4] SSC's pretrial memorandum is cited as "Pl. Memo #." Trial exhibits are cited as "PX #, p. #" and "DX #, p. #." Trial testimony is cited as "Tr. # (witness name)."

errors, or omissions that necessitated clarification with RFIs) are not properly called "defects" or "defective specifications" but are, instead, "discrepancies" – to use the word from Part 1.46 of the contract, which explains that discrepancies (including errors and omissions in the contract drawings) should be brought to the attention of the Government. PX 11 p 37.

A true "defective specification," for which the Government may be liable, is a design specification that has proven impossible to perform, not simple discrepancies in contract documents that are resolved with RFIs and clarifications or simple contract adjustments. See PCL, 47 Fed. Cl. at 796; Hercules v. United States, 516 U.S. 417 (1996); Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir. 1987); J.D. Hedin Constr. Co. v. United States, 347 F.2d 235, 241 (Cl. Ct. 1965); Utility Contractors, Inc. v. United States, 8 Cl. Ct. 42, 50 (1985), aff'd 790 F.2d 90 (Fed. Cir.), cert. denied, 479 U.S. 827 (1986); J.L. Simmons Co. v. United States, 188 Ct. Cl. 684 (1969).

> Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." . . . Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the

> specifications, but is "required to follow them as a road map."

Blake Construction Co. v. United States, 987 F.2d 743 (Fed Cir. 1993)(quoting J.L. Simmons v. United States, 188 Ct. Cl. 684 (1969)), cert. denied, 510 United States 963 (1993).

Thus, the implied warranty applies only to "design specifications." Id. The principle is, then, that when the Government imposes such "design" requirements and the contractor complies, the Government is, rightly, bound to accept what the specification that it mandated produces. Id.

Contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels "design" and "performance," while helpful to some degree, are merely labels. It is the contract's provisions, and the amount of discretion that the contract affords the contractor – not labels urged by lawyers – that govern whether the contractor can recover for problems that occurred during performance. Blake Construction Co. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993). The fact that the specifications may have provided some details concerning how the work was to be performed does not convert what would otherwise be a performance specification into a design specification. PCL, 47 Fed. Cl. at 796.

Here, of course, the entire contract, including the structural steel portion of it, was a performance

specification, because it specified the end product (the building to be constructed) and left the discretion of how to construct the building almost entirely up to Caddell/SSC.[5] PX 11. SSC identified no contractual language whatsoever that removed Caddell/SSC's discretion for choosing the means and methods of construction (including steel fabrication).

The fact that some of the contract documents, including portions of the structural steel drawings, are quite detailed (because Caddell was not expected design the building itself) certainly does not transform the contract into a design specification because, by and large, the details pertain to the structure itself and not how it is to be constructed, in what precise sequence, and certainly not how or when the steel was to be fabricated. PCL, 47 Fed. Cl. at 788; Blake Constr. Co. v. United States, 987 F.2d at 746; Penguin Indus., Inc. v. United States, 209 Ct. Cl. 121, 123-25 (1976) (no design specification despite the fact that the specifications were "detailed"). In fact, the crux of this case, the schedule for steel fabrication, was utterly unaddressed by the contract.

---

[5] In addition to allocating the discretion for means/methods to SSC, the contract also required SSC to do its own designs for connections and interfaces between structural steel elements and precast concrete panels, a task that was performed by Mr. Ferrell. Tr. 913 (Ferrell).

For that reason alone, SSC's portion of the contact cannot be a design specification. Id.

Despite the fact that SSC elicited from several witnesses self-serving (and suspiciously new and conclusory[6]) "opinions" that the steel portion of the contract was a "design specification" and repeatedly emphasized the meaningless fact that the Government was responsible for the design of the building, the contract design as a whole, including its structural steel section in particular, was a performance specification because it clearly left the means and methods of performance to the contractor. PX 11; Tr. 3158, 3387 (Jones).

Thus, the testimony upon which SSC relies is unavailing because the witnesses failed to differentiate between a "design specification," discussed above, and an ordinary contract package by which the Government furnishes the design for the contractor to build, using its own discretion for the means and methods of construction (as was the case in PCL).

Mr. Hopkins, for example, testified incorrectly that a performance specification has ". . . no detailed set of plans issued," is "what you might call an architectural rendering or something like that," and "[e]ssentially what's happening is

---

[6] Despite his involvement since the inception of the contract, Mr. Hopkins repeatedly used the term "design specification" or "roadmap" for the first time on record at trial. Tr. 650 (Hopkins).

that owner is really pushing the design down to the contractor level." Tr. 109 (Hopkins).

Similarly, Mr. Johnson testified on the basis of his previous "excruciating" discussions with "lawyers" that a design specification exists "[i]f it is represented as fully designed, then the responsibility for that design rests with the person that put that out for bid." Tr. 804-5 (Johnson).

Mr. Ferrell, although an expert, was equally incorrect:

> In a performance specification, some guidelines are given as to what's required for the finished product, and whoever is under a performance specification provides the full design to meet the final end requirements. In a design specification, a design specification, the design is shown on your structural documents or whatever kind of documents.

Tr. 927 (Ferrell).

Even the most cursory reading of the PCL case, or frankly, any other defective specifications case, reveals that SSC's witnesses are considerably uninformed. It is black letter law, that even a detailed design that is furnished by the Government can be (and usually is) a performance specification from which no defective specifications claim can arise.

## II. Even If The Contract Was A Design Specification, SSC's Performance Was Not Impossible

Even if the Government's contract constitutes a "design specifications" by removing the performance discretion from

the contractor, Government liability for a defective specification only exists if the contractor's performance was impossible. See PCL, 47 Fed. Cl. at 796; Stuyvesant, 834 F.2d at 1576; J.D. Hedin, 347 F.2d at 241. This is why part 1.46 of Caddell's contract provided for compensation for "attempting to comply" with the specification. PX 11, part 1.46 (emphasis added). Here, The fact that some of the structural steel drawings required clarification in order for the building to be constructed does not render performance of the contract impossible or, indeed, actionable in any way, absent proof of exclusively Government-caused delay. PCL, 47 Fed. Cl. at 788. Despite SSC's unhappiness with the number of RFI's that SSC generated (a meaningful portion of which were considered "not required" by SSC's own engineering expert), the simple fact remains that the building was constructed without substantial change to the original design, and the building was constructed within the contractual time period (plus time extensions that are unrelated to the structural steel). DX 1003. As such, the performance of the contract was not impossible, even if it was a design specification. In the language of the changes clause upon which SSC's case rests, SSC did not "attempt[] to comply" with the specifications but did, in fact, comply with the specifications.

The clarification of discrepancies in the contract documents by RFIs is expressly made a part of the contract by the very contract provision (Part 1.46) upon which SSC relies:

> In cases of discrepancy in the figures in the drawings or in the specifications, the matter shall be promptly submitted to the contracting officer, who shall promptly make a determination in writing.

PX 11, p. 37.[7] Thus, the issuance of RFIs by Caddell/SSC was a contractually-required duty, not an attempt to perform an impossible aspect of a design specification. Id. Because the contract was not impossible to perform, the changes clause (Part 1.33) language upon which SSC relies is simply inapplicable and no defective specifications claim can be asserted.

It is inherent in the contracting/construction process that contract documents are not perfect and always contain discrepancies that are resolved during construction, especially where the contract itself identifies a process for identification and resolution of discrepancies. PCL, 47 Fed. Cl. at 788; Tr. 3414 (Jones). SSC's claim, based upon Mr. Vinson's analysis, entirely misses the mark, because Mr.

[7] Mr. Vinson was aware of this provision, yet wrote into the certified claim that "RFI response should be immediate, within 24 to 72 hours" and intentionally omitted any reference to Part 1.46 of the contract. Tr. 2556-60 (Vinson). Mr. Vinson neglected to account for the fact that Caddell held virtually every RFI well-beyond 72 hours before submitting them to the Government. Tr. 2558 (Vinson).

Vinson equates any discrepancy in the drawings that requires reconciliation by the Government with a "defective specification." Tr. 2846 (Vinson). Needless to say, this position is entirely incorrect given the clear contractual provisions regarding resolution of discrepancies. PCL, 47 Fed. Cl. at 788. Because SSC's contract was not impossible to perform, and because the mere generation of RFI's are not actionable "defects," SSC's defective specification claim fails.

III. The Government Is Not Liable For Hindering SSC

Without the foundation of a defective specifications claim, SSC's case essentially evaporates. Nevertheless, we address the implied argument by SSC that, even if no defective specification exists, the Government hindered SSC's performance by purportedly responding late to SSC's RFIs and shop drawing submittals.

SSC's implied hindrance claim fails because although SSC's witnesses testified to a vague series of perceived affronts during the project, they did so without adequately linking the Government's purported hindrance to specific schedule or cost damages to SSC. Accordingly, SSC's evidence is insufficient because a claimant has an obligation to substantiate each element of a hindrance/delay claim, in terms

of both cause/effect and costs. As this Court explained in PCL:

> In order to recover for an alleged compensable delay, whether or not the delay is caused by hindrance, a contractor must demonstrate: (1) the extent of the delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. See Servidone Constr. Corp. v. United States, 931 F.2d at 861; see also William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir.1984); Blinderman Constr. Co. v. United States, 695 F.2d 552,559 (Fed. Cir. 1982). The burden of establishing these factors falls squarely upon the contractor. William F. Klingensmith, Inc. v. United States, 731 F.2d at 809; Avedon Corp. v. United States, 15 Cl.Ct. 648, 653 (1988). Moreover, "[o]nly if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl.Ct. 474, 476 (1990) (emphasis in original) (citing William F. Klingensmith, Inc. v. United States, 731 F.2d at 809), reconsid. denied, 20 Cl. Ct. 158 (1990); G.M. Shupe, Inc. v. United States, 5 Cl. Ct. 662, 700 (1984); see also Blinderman Constr. Co. v. United States, 695 F.2d at 559.

PCL, 47 Fed. Cl. at 801.

The evidence at trial, particularly Ms. Jones's analysis of SSC's RFI and shop submittal response times compared to the actual RFI and response times, proves that SSC's claim of hindrance is vastly exaggerated and unsupported. DX 1003 p. 34-37, 51. Instead of the Government delaying responses to RFI and shop submittals, Ms. Jones made clear that it was Caddell, and not the Government, that impeded the transmission of RFIs

and shop drawings. Id.; Tr. 3662 (Jones). Particularly telling was the fact that, of the total time claimed by Mr. Vinson to be "Government caused delay," the Government actually had control of the RFIs and shop drawings for less than 50 percent of that time. Id. In short, SSC has fallen woefully short of the requirement for recovering for the multiple Government-caused delays that it alleges and, as such, cannot recover on a hindrance/delay claim.

## IV. SSC's Factual Allegations Were Disproven At Trial

Absent a contractual basis in the form of a defective specifications claim or a hindrance/delay claim, there is no need to examine the remainder of SSC's many complaints about the Government's administration of the contract because none of them give rise to Government liability and, certainly, none of them have been adequately proven at trial. Nevertheless, we present below a series of proposed factual findings that further contradict SSC's allegations and trial testimony.

### 1. SSC's And EEE's Fixed Price Bid Disproves SSC's Case

One way to disprove SSC's allegations of substantial defects in the contract drawings is by reference to EEE's own bid. It is undisputed that Caddell and SSC and EEE and all other bidders evaluated the same contract drawings now alleged to be "deplorable" (Tr. 2187 (Cox)), and all bidders and subcontractors committed to perform the contract for a fixed

price without detecting any of the discrepancies in the structural steel drawings.[8] Tr. 2193 (Cox). This, of course, demonstrates either that Caddell/SSC/EEE's bidding reviews were cursory (a fault that cannot be blamed upon the Government), or, more likely, that the discrepancies did not surface during the bid takeoffs because they were minor in nature.[9] Although SSC's witnesses repeatedly suggested that a thorough pre-bid examination of the drawings by its detailer (whose sole task was to produce detail drawings from the contract drawings) prior to bidding a fixed price would "not notice" deplorable drawings "at the bid stage" because "[t]hey just don't have the resources." (Tr. 2195, 2225 (Cox)), the fact remains that the so-called problems with the contract drawings were not identified by numerous knowledgeable parties, including Mr. Edgill himself. Id. (Cox).

Additionally, SSC's failure to produce Mr. Edgil, whose troubles were at the center of SSC's purported problems, is

---

[8] SSC did not assist Caddell in assembling its bid, which means that the Government's contract drawings were reviewed and bid upon by at least two steel subcontractors who found no remarkable deficiencies in them. Tr. 244 (Johnson).

[9] None of the other bidders (each of whom, presumably conferred with a detailer) identified defects in the structural steel drawings, rendering it highly unlikely that severe defects, as alleged by SSC, existed in the structural steel drawings.

both inexplicable and telling from an evidentiary standpoint.[10] A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1400 n. 9, (Fed. Cir. 1986) ("When a party knows of a witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable.").

2. SSC's Own Evidence Demonstrates That The RFI Process Was Seriously Obstructed By SSC And Caddell

The thoroughness and candor of SSC's certified claim and complaint was put into serious doubt by the fact that SSC did not admit until trial that Caddell's practice was to "hold" then "dump" SSC's RFIs upon the Government. DX 1001, p. 306-16. Indeed, Mr. Hopkins, SSC's project manager, had never seen Caddel's RFI log (despite its inclusion in the certified claim), and did not know until trial that Caddell had held and dumped RFIs. Tr. 515, 521 (Hopkins). SSC's late-breaking attempt to excuse Caddell's practice (that Caddell was contractually required to review RFIs before submitting them to the Government) was utterly unsupported by any evidence

[10] Although Mr. Hopkins offered lengthy, unqualified, and unsupported speculation as to EEE's problems, his attempt to make up for Mr. Edgil's absence was weak, at best, because it was based only upon Mr. Hopkins's self-serving and second-hand speculation.

that Caddell had, in fact, done so and, even if Caddell did review the RFIs, that hardly justifies hoarding them in massive bunches. In any event, SSC cannot complain that the Government is liable for delayed RFI responses, purportedly caused by "defective drawings," when Caddell itself aggravated the purported RFI response problem exponentially. DX 1001, p. 306-16. EEE and SSC's early complaints about RFI response times – some made <u>before</u> the Government had even received any RFIs – do more to defeat SSC's claim than to support it because they clearly demonstrate Caddell's culpability in SSC and EEE's problem. DX 1001 p. 33-37. Further, and even more egregious, is the fact that Caddell <u>continued</u> to hold and dump RFIs <u>after</u> EEE and SSC complained about the need for prompt responses to RFIs. <u>Id.</u>

In addition to SSC's lack of forthrightness in acknowledging Caddell's contribution to the RFI response times in its certified claim and complaint, SSC also failed to admit until trial that SSC itself had contemporaneously evaluated the impacts to SSC's plan caused by the RFIs versus Caddell and concluded as follows:

> <u>The RFIs</u> are undoubtedly a problem which have delayed Steel Service and its detailers. However, again, this delay is also a drop in the bucket compared to the delay caused by Caddell – but a delay which could have and would have been avoided if Caddell had told Steel Service at the outset that steel was not needed

> until July 1997. Steel Service would have had a year to resolve the conflicts in the drawings. Instead, Steel Service, acting upon Caddell's schedule for steel, marshalled its forces and directed them to proceed full speed ahead.

DX 1002 p. 1750.

SSC’s contemporaneous assessment of fault between the Government and Caddell provides a succinct summary of SSC’s entire problem on this project: SSC should have had approximately one year to engage in the RFI/shop drawing process prior to fabricating steel. Instead, SSC hurried to fill its “window” and Caddell woefully misunderstood the sequence of performance. Tr. 768, 823 (Johnson). The delay to SSC and its detailers caused by the Government’s responses to RFIs was, indeed, and particularly after segregating Caddell’s own holding/dumping of the RFIs, “a drop in the bucket.”

3. Mr. Ferrell’s Opinions Undercut SSC’s Case

Although SSC’s engineering expert, Mr. Farrell’s, analysis (PX 173) was shown to suffer from factual errors and a lack of thoroughness (Tr. 1044-1060 (Ferrell)), as well as being generally vague, two of his expert opinions seriously undercut SSC’s case. Mr. Farrell’s RFI analysis concluded that approximately one out of every seven RFI’s (approximately 14 percent of the total) was “not required.” PX 173; Tr. 955-56 (Ferrell). Mr. Ferrell testified that:

> We found that 52 RFIs out of this 355 total were not required due to discrepancies in the contract documents. Some of these RFIs were not required due to the fact that the design drawing information was correct. Some of these RFIs were Steel Service Corporation requests for alternate proposals.
>
> * * * *
>
> Some were actually duplicates of previously submitted RFIs. That occurred two times. Some of the RFIs that were not required addressed issues between Steel Service and its subcontractors, for instance, its steel erector. There were five of those. And some just had no impact on detailing, fabrication or erection of the steel. It might have been a material grade or whatever that might have affected a mill order, but it really didn't affect the detailing and fabrication. It occurred early enough and the answer came early enough, it didn't affect that. So there were a total of 52 out of these 355 RFIs.

Id.[11]

Obviously, the submission of unrequired RFIs to the Government, at the same time that Caddell was holding SSC's RFIs then dumping them on the Government, and SSC was needlessly hurrying to submit RFIs because of its scheduling miscommunication with Caddell, inhibited the Government's ability to promptly respond to RFIs. Mr. Ferrell agreed that

[11] At the time that SSC's claim was certified, Mr. Vinson/SSC had not engaged in any kind of analysis to filter out RFIs that were "not required" – a task that was only performed by Mr. Ferrell seven years later. As a result, SSC's certified claim assigned fault to the Government for "delayed response" to every single RFI, including those that SSC now acknowledges were "not required." Tr. 2567 (Vinson).

the Government was justified to ask Caddell to review SSC's RFIs for necessity prior to submitting them to the Government. Tr. 1084-5 (Ferrell).

Second, Mr. Ferrell concluded in his report, and testified at trial, that RFI "[q]uantities don't mean much when you're addressing RFIs. It's the content of the RFIs. These things do occur on most every project." Tr. 956 (Ferrell). Yet neither Mr. Ferrell, nor anyone else on behalf of SSC (including Mr. Vinson) performed any kind of analysis to attempt to segregate Government-response delays from Caddell/SSC-caused response delays, or to assess the cause/effect relationship between <u>any</u> RFI response delay SSC's work or the project as a whole. This fundamental omission supports our position that SSC's hindrance claim is not adequately presented or supported. <u>See</u> <u>PCL</u>, 47 Fed. Cl. at 801.

4. <u>Exhibit 180 Defeats SSC's Case</u>

The basic premise of SSC's case is that the Government should compensate SSC for "downtime" in SSC's shop, when SSC was purportedly unable to fabricate the steel for the project during two "windows," one in 1996 and the other in 1997. PX 343. The simple fact, however, is that SSC's fabrication facility experienced very little downtime at all during those periods. SSC's own "shop hours" labor records prove that

SSC's shop was not inactive during the majority of SSC's first window, and SSC's shop was not inactive at all during SSC's second window. PX 180. In fact, just the opposite. SSC's own records demonstrate that, even with all of the problems with the Government project of which SSC complains, both in 1996 and 1997 (including RFI responses, shop drawing responses and all other allegedly Government-cause problems), SSC's shop was working only less-than-average during May and June 1996. Id. During the remainder of SSC's first window (July through November 1996) and the entirety of SSC's second window (January through July 1997), SSC's shop was working at the rate it has during SSC's previous five-year history. Id.

Despite the fact that exhibit 180 was SSC's own record, was used by Mr. Vinson in his rebuttal report (PX 181) and is consistent with monthly shop hours used by Mr. Vinson in his own report, Mr. Vinson protested that SSC's own information was "meaningless," "tainted," and "just playing with numbers." Tr. 2480, 2492, 2498-99, 2501, 2747-59, 3448 (Vinson). However, Mr. Vinson's many protestations are unfounded – there was no evidence in the record that contradicts Exhibit 180 (Tr. 2497 (Vinson)), and the aggregate number of hours depicted in exhibit 180 closely matches the aggregate number of shop hours depicted in SSC's certified claim (PX 157, volume 2 of 2, p. 368), which was prepared from records relied

upon by Mr. Vinson, certified to be "accurate and complete" by both SSC and Caddell, and reiterated to be accurate and complete at trial. Tr. 3456 (Vinson).

As a result, SSC's own shop records show that SSC was either never significantly impacted by its lack of steel fabrication for the Government work after June 1996, or that SSC effectively mitigated its damages – virtually in their entirety. The result is the same, the fundamental premise of SSC's case was disproven by PX 180.

5. SSC Did Not Even Have A Contract During Its Entire First Window

SSC asserts that the Government is responsible for its inability to work during the "first window." As SSC's firm price quotation, and ample trial testimony, made clear, SSC failed to specify dates of performance in its fixed price bid to Caddell. Thus, its oft-repeated assertion that SSC's price was discounted to fill its "first window" and that SSC was "desperate" to fabricate steel in May 1996, ring hollow. PX 12, p. 6; Tr. 552 (Hopkins); Tr. 2493, 2662 (Vinson).

Mr. Hopkins's attempt to rely upon "Mississippi law" (Tr. 477 (Hopkins)) regarding, apparently oral contracts, aside, there was no written agreement between SSC and Caddell concerning the schedule for performance of SSC's work, until their subcontract was signed in October 1996. DX 1001 p 204-5. Further, SSC itself represented in its August 29, 1996,

SSC v. Caddell court-filing that "[t]here is no contract between the parties based upon Caddell's subcontract form and proposed Change Order No. 1" and "there was never a meeting of the minds mutually accepting the material terms thereof specifically including but not limited to time of performance." DX 1002 p. 1507-08.

In short, SSC is attempting in this case to recover for its inability to perform work during a time period that was not legally binding upon any party – by any contract. Because Caddell did not have any contractual obligation to facilitate SSC's performance during SSC's first window, no liability for SSC's delayed performance can be passed through to the Government.

### 6. Caddell's Bid And Plan Of Performance Was Fundamentally And Fatally Flawed

The testimony was clear at trial that Caddell and SSC never had a "meeting of the minds" regarding the basic sequence for construction until several months into contract performance. Prior to bid, SSC was "desperate" to fill its shop "window" from approximately May 1996 through September 1996. SSC and Caddell's communications in this regard, however, were poor or non-existent, because Caddell did not intend to begin steel erection four months into a three-year project. It was not until May 1996 that Caddell realized that

the project had to be built "upside down" because of the contractual phasing/sequence requirements. Tr. 768, 823 (Johnson). The result, as substantiated by SSC in its lawsuit against Caddell, was that Caddell (not the Government) had "fraudulently induced" SSC to commit to perform in May 1996, when Caddell could not possibly use SSC's steel until over a year later. DX 1002. This not only caused SSC to produce sloppy and incorrect preliminary schedules, it caused SSC to hurry to produce RFIs as quickly as possible which overloaded the Government (making a "prompt" response by the Government difficult. The problem was further compounded by Caddell's holding and dumping of RFIs.

7. SSC's October 1996 Subcontract Disproves Its Case

SSC signed its subcontract agreement in October 1996, well after most of the RFI's were asked and answered, and months after SSC alleged that the contract drawings were defective. DX 1001 p 204-5. Thus, SSC proceeded with agreeing and performing its subcontract, for a fixed price, after October 1996, with full knowledge of the "contents of the contract drawings and the other conditions under which SSC was to perform. Id. Moreover, there was no actual delay between October 1996 and the conclusion of the project anyway. The schedule agreed upon by SSC and Caddell in October 1996 provided for steel fabrication to take place upon a schedule

that would allow steel erection to begin "approximately mid-April 1997 to mid-May 1997 (weather permitting)" and to continue "until completion on or about November 1997." Id. In fact, that is almost precisely when SSC's fabrication and erection took place, but for unrelated weather delays that occurred. DX 1001. Consequently, and by definition, nothing that occurred after October 1996 caused SSC any delay in meeting its October 1996 subcontract schedule. Therefore, no Government liability for post-October 1996 delays can exist.

8. SSC's Original Price Is Unsupported

Despite SSC's allegation that its original bid price was "discounted" in order to fill its mid-1996 shop time, another fundamental premise of SSC's case, there was no evidence at trial to prove it. Tr. 697 (Hopkins); Tr. 2359 (Vinson). SSC has never produced its bid documents or calculations, whether to substantiate its allegation of a discounted price or not. Tr. 2893 (Cotton). As a result, another foundation of SSC's claim (that SSC "lost" money by not fabricating steel during its "first window" in 1996) is without any factual support.

More disturbing, however, is Mr. Vinson's testimony and indication in the certified claim that, rather than there being a "miscommunication" between SSC and Caddell regarding the time that SSC would fabricate and erect steel (with SSC desperate to fill its May 1996 window and Caddell "unaware" of

the contract phasing requirement that made steel erection prior to 1997 impossible), Caddell knew full well of the contracts phasing requirement, but "took a calculated risk in order to lower its bid price," and induced SSC to bid low based upon what Caddell knew to be an impossible schedule. PX 157 p 8; Tr. 2657-60 (Vinson). Assuming this is true (and SSC certified that the information in its certified claim was "accurate and complete" (PX 157 pp 2, 5)), then Caddell did, indeed, commit fraud against SSC – as SSC alleged during the project. DX 1002 p 1607. SSC can hardly blame the Government now for the fraud perpetrated upon it by Caddell.

9. Caddell's Damages Theory Is So Fraught With Inaccuracy That No Damages Can Be Awarded

For the reasons discussed above, there is no Government liability for SSC's claims, therefore SSC's highly-questionable damages claim, prepared by Mr. Vinson, is irrelevant. Even if there was Government liability, however, SSC's damages are so improperly calculated, for a myriad of reasons described in Mr. Cotton's expert report and amplified in his testimony, that any recovery by SSC is precluded. DX 1003. We will not republish Mr. Cotton's testimony and conclusions in this brief, but instead will briefly reiterate some of Mr. Cotton's points from our pretrial submission.

At the outset we note that SSC has now revised its damages calculations no fewer than eight times since its initial claim submission to address many of the mistakes and inappropriate cost computations identified by the Government. Yet, despite a considerable effort to catalog RFI and shop drawing submittal response times, SSC still has failed to assign a specific effect, impact, or cost to any one of them. Instead, SSC presents a single claim based upon undifferentiated causes, separated only by SSC's sub-entities and cost categories. PX 184.

SSC's overhead claim is objectionable because it ignores the clear mandate of the Court of Appeals for the Federal Circuit that "the Eichleay formula is the exclusive means for compensating a contractor for unabsorbed overhead" established in West v. All State Boiler, Inc., 146 F.3d 1368, 1373 (Fed. Cir. 1998). Pl. Memo 51. SSC suggests that this Court ignore Eichleay and adopt the rationale applied to a manufacturing contract by the ASBCA in Do-Well Machine Shop, Inc., ASBCA Nos. 35867, 35922, 92-2 BCA P 24,843. However Eichleay is the law of this circuit. Indeed, all of SSC's cited cases that distinguish between manufacturing and construction overhead allocation techniques predate West.[12] Moreover, this case

---

[12] Actually, differentiating between construction and manufacturing contracts, in an attempt to avoid using Eichleay, (continued...)

involves a construction contract, not a manufacturing contact. SSC's argument that its claim should be treated as a manufacturing contract for purposes of this case would require the Government and courts to parse construction claims into individual sub-elements for purposes of overhead compensation – something that is clearly not justified by any precedent in this circuit, or even by Do-Well.

Next, SSC tries to justify its admitted-"modified total cost claim" by suggesting that it

> . . . where possible, captured its actual increased costs attributable to the VA and deducted costs which it knew were not attributable to the VA. None of the other costs sought to be recovered can be traced to any other cause and, as a result, "in order to prevent the government from obtaining a windfall," . . . Steel Service's costs should be accepted.

SSC has the standard backwards. SSC is not entitled to claim costs where it cannot trace them "to any other cause," but instead can only claim for costs that are exclusively and

---

[12](...continued)
is form over substance. All overhead claims are designed to allocate a percentage of a contractor's fixed overhead costs to a particular project, or in this case, to a particular claim or delay period. Whether manufacturing or construction contacts, the universal method for allocating overhead is via direct labor. r. The need for an allocation of unabsorbed fixed overhead only becomes necessary when, due solely to a government-caused work stoppage, the contractor's incurrence of direct labor costs ceases. Hence, SSC's assertion that Eichleay does not apply because SSC "bases its accounting system on shop manhours" is, at best, a misunderstanding of the purpose and application of the Eichleay formula.

demonstrably caused by the Government. PCL, 47 Fed. Cl. at 804. SSC has failed to establish the justification for employing a total cost claim.

Finally, SSC suggests that it is entitled to recover its claim preparation costs because they "were incurred in connection with the preparation and negotiation of Steel Service's request for equitable adjustment and, therefore, such costs are allowable." Pl. Memo 58. SSC supports its argument with an optimistic interpretation of Bill Strong Enterprises, Inc., v. Shannon, 49 F.3d 1541 (Fed. Cir. 1995), and a plain factual error – the majority of the claim preparation costs that were questioned by Mr. Cotton were incurred after January 28, 1997, when SSC's attorneys and consultant began referring to this dispute as a "claim," and were incurring "claim preparation" costs. A substantial portion of the questioned costs were incurred after the "claim" was certified and submitted on October 31, 1997. Even the most charitable interpretation of Bill Strong does not permit recovery of claim preparation costs – especially after the claim has been certified.

## CONCLUSION

For the foregoing reasons, we respectfully request the Court to find in favor of the Government and to dismiss Caddell's complaint with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Bryant G. Snee
BRYANT G. SNEE
Assistant Director

s/Brian S. Smith
BRIAN S. SMITH
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attention: Classification Unit
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-0391

Attorneys for Defendant

June 15, 2007

CERTIFICATE OF FILING

I hereby certify that on June 15, 2007, a copy of foregoing "DEFENDANT'S POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Brian S. Smith