IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CADDELL CONSTRUCTION CO., INC. | PLAINTIFF |
| v. | No. 04-461C<br>(Judge Bohdan A. Futey) |
| UNITED STATES OF AMERICA | DEFENDANT |

**PLAINTIFF'S POST-TRIAL REPLY MEMORANDUM**

Plaintiff, Caddell Construction Co., Inc. ("Caddell"), as sponsor of the claim of its subcontractor, Steel Service Corporation ("Steel Service"), submits this Post-Trial Reply Memorandum, responding to the Post-Trial Brief submitted by Defendant, the United States, as follows:

**INTRODUCTION**

The Government ignores the undisputed proof at trial in steadfastly arguing that:

1. The Contract is a performance specification because the Contract does not specify "the manner in which the work was to be performed" (i.e., the means and methods of performance); or

2. If the Contract is a design specification, then Steel Service failed to establish as a condition of its claim that performance according to the design was "impossible"; or

3. Whether or not the design was defective, the VA did not delay or hinder Steel Service's performance.

First, this Contract is, as the Contract and every document and Caddell/Steel Service witness confirmed (and no Government witness even addressed), a design specification because the VA specified in precise detail "the character, dimension and location of the construction work" to be performed. Second, Steel Service does not have to prove impossibility of performance in order to recover. Finally, Steel Service established, without doubt, that the VA's defective design, its late and nonresponsive RFI answers, its extra-contractual requirement that shop drawings be submitted in complete sequences, its "approval" of shop drawings that did not allow fabrication to commence, and its extra-contractual requirement that steel shop drawings "match" the precast shop drawings delayed/hindered Steel Service's

performance. Thus, this Court should find in favor of Caddell as a matter of undisputed fact and law.

## ARGUMENT

### I. THE CONTRACT WAS A DESIGN SPECIFICATION.

> It is well settled that where the government orders a structure to be built, and in so doing prepares the project's specifications prescribing the character, dimension, and location of the construction work, the government implicity warrants, nothing else appearing, that if the specifications are complied with, satisfactory performance will result.

*J.L. Simmons, Inc. v. United States*, 412 F.2d 1360, 1373 (Fed. Cir. 1969) (citing *United States v. Spearin*, 248 U.S. 132 (1918)). In other words,

> [d]esign specifications explicitly state how the contract is to be performed and permit no deviation. Performance specifications, on the other hand, specify the results to be obtained, and leave it to the contractor to determine how to achieve the results.

*Stuvyesant Dredging Co. v. United States*, 834 F.2d 1576, 1582 (Fed. Cir. 1987) (citing *Simmons*, 412 F.2d at 1362).

Stated another way,

> Performance specifications 'set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective..., selecting the means and assuming a corresponding responsibility for that selection.' (Citation omitted.) Design specifications, on the other hand, describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.'

*Blake Construction Co. v. United States*, 987 F.2d 743, 745 (Fed. Cir.) (quoting *Simmons*, 412 F.2d at 1362), *cert. denied*, 510 U.S. 963 (1993).

Government counsel[1] seeks to avoid liability for the VA's defective design, contending that this

---

[1] Since the Government did not have an agency representative testify or even in the courtroom at anytime during trial, the defense of this case, particularly the arguments made both at trial and in briefs, can only be attributed to Government counsel, not to the Government.

The absence of a Government representative or fact witness does not alter Caddell's burden, but it does make it appropriate to point out that the difference between lawyer "argument" and "substantive proof" is of critical importance in considering the merits of this case.

Contract is a performance specification because this Contract did not specify "the manner in which the work is to be performed" as required before a contract qualifies as a design specification. In short, Government counsel contends that a contract, to be a design specification, must also specify the means and methods of performance and that since this Contract did not do that, this Contract is a performance specification.

Government counsel is wrong for two reasons. First, as controlling case precedent makes abundantly clear, the phrase, "the manner in which the work is to be performed," means "the location of the construction work" and not the "means and methods" of performance as Government counsel contends. And, Government counsel cites no case and there is no case that holds that a design specification must also specify the means and methods of performance.

Second, the fact that the VA left the means and methods of performance to Caddell has no bearing on whether this Contract is a design specification. Indeed, as the Courts have long recognized, it is expected that:

> ... contractors typically are granted at least some discretion even when specifications are largely of the design variety, and the labels 'design' and 'performance', while helpful to some degree, are merely labels. <u>It is the contract's provisions, and the amount of discretion that the contract affords the contractor, that govern whether the contractor can recover for problems that occurred during construction</u>.

*PCL Construction Services, Inc. v. United States*, 47 Fed. Cl. 745, 796 (2000) (citing *Blake Construction Co*., 987 F.2d at 746), *affirmed on other grounds*, 96 Fed. Appx. 672 (Fed. Cir. 2004).[2]

[2] In the Government-cited *PCL* case, the Court of Federal Claims spent many pages of a 59-page opinion, deciding that the contract in that case was a performance specification. The Federal Circuit, in a 5 page opinion, affirming the lower court, dismissed the lower court's finding that the contract was a "performance specification, or a mix of design and performance specifications, but not exclusively design specifications which carry with them an actionable implied warranty," stating that "[t]his reasoning appears to us to be at least questionable, but we need not reach this issue because we conclude that, even if the USBR breached its obligation, the [contractor] failed to establish that this breach caused an injury." 96 Fed. Appx. at 675. Therefore, the lower court's finding that the contract was a performance specification is entitled to no weight in this Court's consideration of the case at bar.

Aside from the fact that the Federal Circuit made short shrift of the design versus performance specification issue, the *PCL* case is grossly dissimilar from the case <u>sub judice</u> because of the <u>repeated warnings</u> in the PCL contract that the design was incomplete and that the contractor "shall expect that there may be some omissions, discrepancies, and conflicts within the design documents and with the actual field and construction conditions." 37

(continued...)

This Contract's provisions clearly make it a design specification. Undeniably, §05100 and the structural design drawings– not even discussed by Government counsel[3] – prescribe in minute detail "the character, dimension, and location of the construction work." *Simmons*, 412 F.2d at 1373. Indeed, at Part 1.2.A, the VA, by incorporation of 15 different specifications from the American Society for Testing and Materials, told Steel Service exactly the type steel, bolts, tubing, washers, studs, nuts, zinc coating and fasteners to be used. And, at Parts 1.4.B and C, the VA required Steel Service to submit certified manufacturer's test reports, certifying compliance with the VA's specified standards for these materials.

Similarly, at Parts 1.4.D.1 and 5.C, the VA required Steel Service to submit certification of the welders' qualifications and specified precisely what those qualifications were. Likewise, at Parts 2.2 and 3, the VA directed how fabrication and erection were to be performed, inspected and tested (Part 2.4). Likewise, the 51 structural design drawings (including the beam and column schedules), considered individually and in conjunction with the architectural design drawings, specify the exact dimensions, locations, sizes and connections for each piece of steel required to be fabricated and assembled to form the structural frame for this Project.

In addition to the Contract's provisions, the Project correspondence indicates that the VA considered the Contract to be a design specification. Specifically, the VA's January 31, 1996 acceptance letter to Caddell confirmed that Caddell was required "to furnish all labor and materials and perform all work" for the Project "[a]ll in <u>strict accordance with specifications</u> dated July 20, 1995 <u>and drawings</u> listed therein," together with amendments thereto (Ex. P-11). Similarly, if the Contract were a performance specification, then there would have been no need for Steel Service's 303 RFIs (Ex. P-175), requesting very specific design information and/or the VA's responses to Steel Service's RFIs that, as

---

[2](...continued)
Fed. Cl. at 789.

[3] Indeed, Government counsel could not focus upon the Contract because he could not then make his argument with a straight face.

Tom Ferrell, P.E. testified, were intended to "cover up" the defects in the VA's structural design (Exs. P-33, 34, 35, 49, 50). In fact, if this Contract were a performance specification, then there would be no need for the VA's November 19, 1997 request to the architect to "send an engineer to the job familiar with the details, changes and design" to be sure the "steel attached to the structure... is per your design intent" (Ex. P-212).

Moreover, if this were a performance specification, then the VA would not have been concerned pre-bid that the "structural drawings need a great deal of work" (Ex. P-173 at Ex. "C") nor would there have been any need for the VA to employ a structural engineer or to deduct money from the architect/engineer for its incomplete design (Ex. P-173 at Ex. "D") or to confront the architect/engineer about "deficient" "structural documents" that lacked "coordination among disciplines" (Ex. P-55). However, the VA was concerned and the reason is crystal clear – this Contract is a design specification and Government counsel's last-ditch effort to avoid liability by attempting to make this Contract a performance specification must be rejected.

## II. IMPOSSIBILITY OF PERFORMANCE IS NOT A REQUIREMENT. BUT, IF IT IS, WHICH IS DENIED, THEN STEEL SERVICE'S PERFORMANCE WAS IMPOSSIBLE.

Next, Government counsel seeks to graft a new hurdle onto the design specification test, claiming that Steel Service can only recover if its performance pursuant to the VA's design specification was impossible. In support, he cites *PCL, Stuyvesant*, and *J.D. Hedin Construction Co. v. United States*, 347 F.2d 235 (Ct. Cl. 1965). However, these cases do not require that a defective design specification be impossible to perform[4] to be actionable as Government counsel alleges. To the contrary, the test is whether the "faulty specifications prevent or delay completion of the contract." *Simmons*, 412 F.2d at

[4] In *PCL*, tried by Mr. Smith and cited by him, the contractor completed the project and even obtained a certificate of substantial completion, albeit many days late, and complained about delays and disruptions arising from the Government's defective design drawings – not impossibility of performance. 37 Fed. Cl. at 780. Likewise, in *Stuyvesant*, the contractor was able to dredge the channel -- it just took him longer than anticipated. 834 F.2d at 1580. Finally, *Hedin* held that the Government "breached its implied warranty [of the adequacy of its design] for which Plaintiff is entitled to recover delay damages," thereby confirming that impossibility is not the test for recovery for defective design. 347 F.2d at 245.

1374. See also *Hedin*, 347 F.2d at 241; *Litchfield Mfg. Corp. v. United States*, 338 F.2d 94, 95 (Ct. Cl. 1964).

But, even if impossibility is the test, which is denied, then every Caddell/Steel Service witness confirmed that Steel Service was "dead in the water" as a result of the VA's defective design for not one, but two, fabrication "windows." Surely, that proof, which was not disputed, satisfies the Government's newfound requirement and entitles Caddell (and Steel Service and its subcontractors) to recover under §01001, Part 1.33 (d)[5] for the "increased cost reasonably incurred... in attempting to comply with the [VA's] defective specifications (Ex. P-11).

## III. THE VA'S DEFECTIVE DESIGN AND ITS EXTRA-CONTRACTUAL DEMANDS DELAYED STEEL SERVICE AND ITS SUBCONTRACTORS AND THE GOVERNMENT IS LIABLE TO THEM. [6]

Where, as here, "faulty specifications prevent[ed] or delay[ed] completion of the contract, the contractor is entitled to recover delay – damages for the defendant's breach of its implied warranty...." *Hedin*, 347 F.2d at 241. Indeed, the overwhelming evidence at trial established that the VA exclusively caused the delay to Steel Service not only by its defective design[7] that required the submission of over 303 RFIs[8] and by its late and nonresponsive RFI answers but also by the VA's extra-contractual

---

[5] The Government means Part 1.33 when it cites Part 1.46.

[6] The Government argues that there was no delay because the Project was constructed within the Contract time, as extended. However, the Government knows that it can still be liable to a subcontractor whose work is delayed by the Government, even though the prime contractor is not delayed in completion of its contract. *E.R. Mitchell Construction Co. v. United States*, 175 F.3d 1369, 1374 (Fed. Cir. 1999). The Government also claims that there was no substantial change to the original design. Apparently, the Government forgets that the VA allowed the precast subcontractor to completely redesign the steel to precast connections via its approved shop drawings. That was a substantial change to the original design.

[7] Contrary to the Government's contention, neither Ray Vinson nor any other Caddell/Steel Service witness testified about and/or relied upon minor discrepancies in the design to justify relief. To the contrary, the Caddell/Steel Service witnesses testified at length about the crippling effect of the VA's defective design. Ray Vinson testified at length about the 47 RFIs that stalled M-Line North which, in his opinion, led to the loss of the first fabrication "window."

[8] The Government gloats over the fact that, according to Tom Ferrell, P.E., 52 of the 355 RFIs submitted were not required. The Government neglects to mention that, of those 52 RFIs, Tom Ferrell, P.E. testified that 8 had no impact on detailing, fabrication, or erection and hence, they were deleted from his "count;" 5 addressed issues between Steel Service and its subcontractors; 2 were duplicates; 3 were Steel Service's requests for alternate

(continued...)

demands, including its requirement that Caddell research each Steel Service RFI for the answer[9] before submitting the RFI to the VA, its requirements that shop drawings be submitted in "complete" sequences and that Steel Service "match" its steel to the approved precast shop drawings, all of which crippled Steel Service for not one, but two fabrication "windows."

In fact, the Government's own expert's (Ms. Jones) analysis proved that the VA delayed Steel Service and its subcontractors. Specifically, she confirmed that 143 of the 278 RFIs (out of 303 total) (more than 50%) that she analyzed were held by the VA for 31-45 days; 65 (24%) were held for 16-30 days and 52 (19%) were held for 15 days or less (Ex. DX1001, at 41). According to Tom Ferrell, P.E. and Ernie Hopkins, being the only testimony before the Court, "promptly" means 1-3 days or so as not to delay the Project.[10] Thus, Ms. Jones' analysis proves that the VA violated §01001, Part 1.46(a) by failing to "promptly make a determination in writing" concerning any "discrepancy in the figures, in the drawings, or in the specifications" – even when one assumes that the RFI response was an "answer" which was rarely the case.

The Government had no defense to Caddell's contentions at trial and it cannot conjure up one

---

[8](...continued)
proposals; and 34 were not required because the design information was correct (Ex. P-173, at 16). The Government likewise neglects to mention that 303 RFIs were, according to Tom Ferrell, P.E., required "because of errors, omissions or discrepancies in the Contract Drawings" (Ex. P-173, at 16). The Government also neglects to mention that Tom Ferrell, P.E. testified, consistent with his report, that the number of RFIs does not measure the adequacy of the Contract Documents and that the number of RFIs becomes excessive when "the number and/or content of RFIs reach a point where productivity is hindered to the point that schedules and/or costs are affected." *Id.* at 17. He testified that, in his opinion, that occurred here.

[9] Contrary to the Government's contention, there was no proof that Caddell's "research" of each Steel Service RFI was limited to reviewing the "necessity" of the RFI. In fact, the uncontradicted testimony of Knute Johnson -- the only witness who testified who has personal knowledge -- was that the VA required Caddell to "comb" the design drawings to ferret out the answers and then submit the RFI's to the VA only if an answer could not be found which was always the case.

[10] Government counsel, citing *PCL*, contends that Caddell's burden was to establish both the extent and the cost of the delay attributable to each RFI. However, neither *PCL* nor any other case supports such a position and, as every Caddell/Steel Service witness testified, it was not one RFI but the cumulative effect of the RFIs (i.e., the fact that the responses were late and were nonresponsive) that delayed Steel Service and its subcontractors. And, as Ernie Hopkins explained, the information that Steel Service needed was not rocket science. Therefore, Ernie Hopkins never understood why the VA delayed so long giving Steel Service the information and/or why it obfuscated as it did.

post-trial. Thus, this Court must accept the unrefuted proof at trial that the VA (via its defective design and its extra-contractual demands obviously imposed to cover up its defective design) proximately caused the delay to Steel Service and its subcontractors.

## IV. THE GOVERNMENT DID NOT AT TRIAL, AND CANNOT NOW, OFFER "PROOF" IN AN ATTEMPT TO UNDERMINE THE UNCONTRADICTED PROOF.

Next, Government counsel ignores the fact that the Government presented no proof at trial on the issues that it raises and takes advantage of the post-trial briefing stage to take pot shots at Steel Service in a futile attempt to undermine the uncontradicted proof. However, as demonstrated here and at trial, the Government has no facts and no law to counter the overwhelming evidence.

**A. Caddell/Steel Service/EEE's bid review -** Government counsel contends that Caddell/Steel Service/EEE knew, or should have known about the VA's defective design by virtue of the bid process and apparently assumed the risk. But, he cites no facts nor law to bolster his theory. And, his argument is contrary to the undisputed testimony of Ernie Hopkins and Larry Cox, both of whom testified that they participated in the bid process, and Tom Ferrell, P.E., who explained the bid process and all of whom confirmed that estimates are prepared based on quantities, grades, lengths and sizes of members, the number of the same members and the overall complexity of the Project and that they do not have the time nor money to invest in an in-depth review of the design drawings to ferret out defects in a job they may not get. In short, Government counsel's argument is based on a totally unrealistic view of the bid process and its purpose. [11]

---

[11] The Government notes that Steel Service did not call Earl Edgil to testify and asked this Court to assume that his testimony would have been unfavorable, citing *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 n.9 (Fed. Cir. 1986). However, as *Dick* makes clear, the pivotal issue is whether the witness is "within [Steel Service's] control to produce." Mr. Edgil was not within Steel Service's control. However, even if he were, his testimony would clearly be redundant of Ernie Hopkins' testimony, who testified in detail about his letters to/from Earl Edgil. Also, given the trial time constraints, it would be an injustice to draw any presumption because Mr. Edgil was not called to "echo" the testimony of Ernie Hopkins and Tom Ferrell, P.E.

Government counsel also tries to belittle Ernie Hopkins' testimony, contending that he did not make up for Mr. Edgil's absence. Government counsel apparently forgets not only that Ernie Hopkins had experience in detailing, but also that the Government could have easily taken Mr. Edgil's deposition before trial. Therefore, Government counsel's post-trial attempt to discredit Ernie Hopkins is self-serving prattle.

Interestingly, Government counsel boldly cites Caddell for not calling Mr. Edgil when the Government

(continued...)

**B. "Bundling" and "dumping" RFIs** - The Government contends that Caddell – not the VA[12] – is responsible for the RFI delay by virtue of Caddell's "bundling" and "dumping" of Steel Service's RFIs[13] but ignores the unrefuted testimony of Knute Johnson who said, without qualification, that the VA foisted upon Caddell the extra-contractual obligation to ferret out answers to Steel Service's RFIs and that that extra-contractual requirement caused the purported "bundling" and "dumping." More important, there was never any complaint by either the VA or its architect/engineer about Caddell's alleged practice of "bundling" and "dumping." Obviously, if Mr. Totolo thought that Caddell was a source of delay, he would have made that fact known as evidenced by his other candid rebukes.

**C. Tom Ferrell's opinions** - Without an engineering expert of its own, Government counsel must, of necessity, cast dispersions upon Tom Ferrell, P.E. However, try as he might, Government counsel cannot undermine Tom Ferrell's credibility, his experience, or his opinions. First, Government counsel misstates Tom Ferrell, P.E.'s testimony when he says that Tom Ferrell, P.E. said that 52 of 355 RFIs were "not required." Tom Ferrell, P.E. testified, consistent with his report (Ex. P-173) that 52 out of 355 RFIs "were not required <u>due to discrepancies in the Contract Documents</u>." As he stated, the answers to 34 of those 54 RFIs confirmed – not that they were not required to be submitted – that the design information was correct; 3 were requests for alternate proposals; 2 were duplicates; 5 concerned

---

[11](...continued)
significantly chose not to call anyone from the VA, the architect/engineer and/or the DCAA. Indeed, the Government had <u>not one fact witness at trial to testify for it</u>. The proper inference that their testimony (which would not have been merely cumulative as Mr. Edgil's would have been) would be unfavorable is loud and clear.

[12] The Government conveniently overlooks the fact that the VA "bundled" and "dumped" RFIs. Plaintiff's Post-Trial Memorandum, at 12, n. 24.

[13] The Government also continues to focus upon Larry Cox's "drop in the bucket" letter and upon its contention that Steel Service "evaluated" the RFI impact. But, the Government turns a blind eye to Larry Cox's undisputed testimony that his July 15, 1996 "drop in the bucket" letter (Ex. DX1002) must be read in context with Caddell's July 9, 1996 letter (Ex. DX1001, at 3) as Larry Cox's response to Caddell's contention that Caddell's delay to steel erection paled in comparison to the delay caused by the VA's RFIs. As Ray Vinson's "evaluation" revealed, as of July 1996, Steel Service had, in essence, lost its first fabrication "window" and, even though it hoped to be able to start detailing and fabrication "any day," Caddell's delay to erection would cause Steel Service to incur additional storage, handling and erection costs, among others. In short, Larry Cox's "drop in the bucket" letter is not the Government's panacea.

issues between Steel Service and its subcontractors which would not have been submitted to the VA; and 8 did not impact detailing, fabrication or erection (Ex. P-173, at 16).[14] In any event, Government counsel neglects to mention that Tom Ferrell, P.E. said that 303 RFIs out of 355 (85%) were required due to the VA's defective design (Ex. P-173).

Second, contrary to the Government's contention, there was no need for Tom Ferrell, P.E. or Ray Vinson (or anybody else) to analyze the alleged delay caused by Caddell in the RFI process because, as Knute Johnson testified without contradiction,[15] the RFI delay which occurred while the RFI was in Caddell's hands was exclusively caused by the VA by virtue of its extra-contractual demand that Caddell first ferret out the answer to Steel Service's RFIs. Without proof to support it, the Government's contention stands on shaky ground and there was no need to attempt to allocate alleged delay to Caddell.

**D. Exhibit P-180** - Next, the Government attempts to use selective Steel Service manhour data (Ex. P-180) to undermine Steel Service's unabsorbed overhead claim. The Government's attempt fails for two reasons. First, Ex. P-180 was prepared in response to Mr. Cotton's allegation in his expert report that Steel Service's "historical records" did not substantiate its unabsorbed overhead claim (Ex. DX 1003, Notes to Ex. 1, at 3). In support of his allegation, he relied upon purported Steel Service manhour information from an unidentified source[16] which appeared to Steel Service and Ray Vinson to be unreliable. Hence, Ex. P-180 was generated in 2006 as a "check" from the best 1994-1998 data Steel Service still had available. That "check" confirmed that Mr. Cotton's "data" and his opinion were unreliable.

---

[14] The Government also states that Tom Ferrell, P.E. agreed that Caddell should review Steel Service's RFIs for "necessity" prior to submitting them to the Government. That review is far different from the review mandated by the VA that Caddell "comb" the design drawings for the answers to the RFIs before submission to the VA.

[15] Indeed, the Government could have called Bill Totolo, the VA's senior resident engineer, to rebut Knute Johnson's testimony. The Government did not do so and, therefore, this Court must accept Knute Johnson's unrefuted testimony.

[16] When asked, Mr. Cotton could not identify the documents other than to say they were among the thousands of pages produced to the DCAA. And, even though DCAA produced its documents, including an index, those "manhour" records were not found.

Second, Ex. P-180 (while repeatedly referenced as unreliable by Ray Vinson) confirms that Steel Service, over the seven (7) month period(s) for the first and second "windows," had the manhour capacity to fabricate this Project and had lost manhours (Ex. P-184). In fact, Ray Vinson uses Steel Service's actual manhours (obtained from contemporaneous sources included in Ex. P-184) during the two "windows" to prove just that, namely, that Steel Service had the manhours available to fabricate this Project and lost them (Ex. P-157, at X-14). Ray Vinson also testified that Steel Service's manhour data (Ex. P-180) proves that Steel Service has the ability to move manhours up or around to meet its projects' needs.

The Government, on the other hand, contends that, on a monthly basis, Steel Service did not lose manhours. However, as Ray Vinson explained, the impact of the VA's defective design was that Steel Service lost two entire fabrication "windows" (not parts thereof) and, therefore, to fully compensate Steel Service for the VA's breaches, the damage had to be computed on a cumulative basis rather than monthly based upon the net manhours "lost." Indeed, Ex. P-180 (no matter how suspect) corroborates that the VA's defective design impacted Steel Service and Ray Vinson's testimony that Steel Service had the ability to "work out manhours" by shifting them among available jobs to make up or give up manhours when needed. Therefore, what Steel Service purportedly did on a monthly basis does not justify any reduction to Steel Service's claim.[17]

**E. The Caddell/Steel Service "contract"** - The Government contends, without citation to law or facts, that Steel Service cannot recover for its inability to perform work during the first "window" because it did not have a "contract" with Caddell. The Government's position is contrary to every fact proven at trial and the law. Indeed, every witness who testified for Caddell/Steel Service confirmed that, as made clear at the March 4, 1996 meeting (Ex. P-19) and as confirmed by Steel Service's March 6,

[17] The Government misstates Ray Vinson's testimony when it says that Ray Vinson testified that Steel Service's own manhour information was "meaningless," "tainted," and "just playing with numbers." That testimony related to Ex. P-180 only – not to Steel Service's historical manhour data – which was included in Ex. P-184.

1996 letter to Caddell with its attached schedule (Ex. P-21), Steel Service and Caddell had an agreement whereby Steel Service would fabricate this Project within its first fabrication "window." In fact, Knute Johnson testified that Caddell settled with Steel Service because Caddell's estimating team committed to Steel Service's fabrication "window" when it accepted Steel Service's favorable price. And, as confirmed by every Caddell/Steel Service witness and every document introduced by Caddell/Steel Service into evidence, the parties unquestionably performed pursuant to that agreement that they reached in February 1996 (Ex. P-17). Therefore, for the Government to claim that the absence of a written contract undermines Steel Service's claim is not only disingenuous but also just plain wrong.

**F. Caddell's "plan"** - Government counsel grasps at straws when he tries to make something out of Knute Johnson's admission that Caddell misunderstood the sequence of work since there was no proof and no logic to support the Government's contention that this oversight impacted Steel Service's ability to detail and fabricate steel. In fact, the uncontradicted proof was to the contrary – Steel Service should have been able to and could have detailed and fabricated steel upon the issuance of notice to proceed regardless of Caddell's failure to understand the sequence of the work, but for the VA's defective design.[18]

**G. Post-October 1996 delay** - Steel Service certainly hoped that the delay was behind it when it executed its written subcontract with Caddell in October 1996 (Ex. P-62). And, on October 24, 1996, Steel Service submitted the first shop drawings, being the M-Line North shop drawings, which it estimated to be approximately 90 to 95% complete (Exs. P-67, P-69). That submittal started the wave of the VA's delay to Steel Service's second fabrication "window" as the VA rejected that submittal on the basis that "sequence is incomplete" despite the lack of any contractual basis for its rejection and the fact that the Engineer of Record reviewed and approved, or approved as noted, several shop drawings

[18] Government counsel argues that Caddell caused Steel Service to produce "sloppy and incorrect preliminary schedules" and to "hurry to produce RFIs as quickly as possible" (Post-Trial Brief, at 23). Government counsel conjures up these allegations out of thin air as there was no proof, much less innuendo at trial, that Steel Service's schedules were "sloppy and incorrect" or that it hurried to produce RFIs as quickly as possible. Therefore, this Court should ignore Government counsel's after-the-fact meritless attacks.

which would have allowed Steel Service to commence fabrication. The VA compounded the delay by rejecting the next three submittals for the same reason (Ex. P-74).

Finally, on January 9, 1997, the VA returned "approved as noted" the M-Line North shop drawings with its deadly note to Steel Service to "coordinate with all precast connections" (Ex. P-85) and so "bloodied" with revisions as to delay fabrication for months. That "approval" led to the loss of the second fabrication "window" as the precast shop drawings were not approved by the VA until May 1997 (Ex. P-118). As a result, for the Government to allege that there was no delay from and after October 1996 ignores the whole shop drawing debacle[19] and the VA's wholesale redesign of the steel to precast connections via the precast subcontractor's shop drawings.

**H. Steel Service's bid price** - Contrary to the Government's contentions, every Caddell witness who testified confirmed that Steel Service's bid price was a favorable price given to Caddell to fill a hole in its shop and that that was the reason Caddell agreed to settle with Steel Service. And, Steel Service introduced its estimate recap into evidence without objection from the Government (Ex. P-184(4)). Therefore, the Government's argument that Steel Service failed to lay the foundation for its first fabrication "window" lacks any factual support.

Moreover, although Steel Service did, in fact, produce all of its "bid documents" to the Government, the Government's witnesses admittedly lacked the expertise to (1) recognize Steel Service's 3 3" binders as its estimate and take-off for the Project even though the white notebooks were clearly labeled "Estimate;" or (2) to review them to substantiate Government counsel's newfound contention that Steel Service's estimate was flawed. Additionally, the Government was offered the opportunity pre-trial to review Steel Service's estimate and take-off again and never responded to Steel Service's offer, never mentioned any of this at trial and should not be allowed to ambush Steel Service now.

---

[19] Ms. Jones' analysis of the shop drawing review time (Ex. DX1001, at 53) is useless as Steel Service's claim is not based on the time shop drawings were "out" for approval – it is based on the impact to fabrication from the date of submission to the date the shop drawing could be released for fabrication.

Finally, Government counsel's allegation that Ray Vinson testified that Caddell committed fraud and that some reference in the REA also makes such allegation (Post-Trial Brief, at 24-25) is simply not founded in the record at trial. The evidence at trial was undisputed that Caddell made a mistake in not catching the phasing required until Knute Johnson came on board and discovered it, not that a "fraud" was committed on Steel Service.[20]

**I. Steel Service's damages**

**1. Steel Service's unabsorbed overhead claim**

Steel Service incorporates the authorities and explanation contained in its Memorandum, at 51-54 and urges this Court to consider the logic of the ASBCA cases that recognize that *Eichleay* may not apply in the manufacturing context and the fact that the Federal Circuit has not had the opportunity to consider the application of *Eichleay* under the facts sub judice where overhead is recovered via manhours.

**2. Steel Service's modified total cost calculations**

Contrary to the Government's contentions, Steel Service did not calculate its modified total cost claims backwards. The costs that it captured were, without question, proximately caused by the VA with the exception of those costs which were deducted which were plainly not attributable to the VA. Thus, Steel Service may possibly have mischaracterized its claims, but it certainly does not claim recovery of costs not attributable to the VA.

**3. Steel Service's preparation cost**

The unrefuted evidence at trial was that Caddell and the VA continued to negotiate until at least mid-February 2002 (Ex. P-166). Therefore, for the Government to now rely upon the arbitrary use of the word "claim" on January 28, 1997 – over a year before the REA was even submitted (Ex. P-157) -- is indefensible under any interpretation of *Bill Strong Enterprises, Inc. v. Shannon*, 49 F.3d 1541 (Fed.

[20] Interestingly, the Government challenges Ray Vinson when its own expert, Mr. Cotton, was debarred by the Government. The Government also notes that the REA damages computations prepared by Ray Vinson were revised multiple times. As Ray Vinson explained, he revised the damages in an effort to appease the DCAA and to foster settlement – not because he made a mistake.

Cir. 1995).

**CONCLUSION**

The Government has not given this Court reason to deny Caddell/Steel Service relief, in whole or in part. Therefore, this Court should award damages in the total amount of $2,782,449.52, excluding interest and costs which are likewise recoverable.

Respectfully submitted,

CADDELL CONSTRUCTION CO., INC., PLAINTIFF

By: /s/ David W. Mockbee
David W. Mockbee
MOCKBEE HALL & DRAKE, P.A.
Lamar Life Building, Ste. 1000
317 East Capitol Street
Jackson, Mississippi 39201
(601) 353-0035 - Telephone
(601) 353-0045 - Facsimile

**CERTIFICATE OF SERVICE**

I, David W. Mockbee, do hereby certify that I have this day caused to be filed via the Official Electronic Document Filing System of the United States Court of Federal Claims (“CM/ECF”) a true and correct copy of the above and foregoing Plaintiff’s Post-Trial Reply Memorandum. Copies of this document will be transmitted via the Court’s CM/ECF System to all counsel of record. Additional copies may be obtained through the Court’s CM/ECF System.

Dated: June 28, 2007.

/s/ David W. Mockbee
David W. Mockbee