IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CADDELL CONSTRUCTION CO., INC., Plaintiffs, | ) | |
| v. | ) | Case No. 04-461C (Judge Futey) |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S POST-TRIAL REPLY BRIEF

In accordance with this Court's order at the close of trial, defendant, the United States, respectfully submits the following post-trial reply brief.

ARGUMENT

I. SSC's[1] Post-Trial Brief Is Inaccurate And Unsupported

SSC's entire post-trial brief, which occupies over 28 pages (including 36 often-lengthy single-spaced footnotes that appear designed to circumvent the Court's 30-page limitation), does not contain a single citation to the trial transcript. Pl. Br. 1-28.[2] This, despite the fact that a large percentage of SSC's contentions begin with "Tom Ferrell, P.E., testified that . . ." (Pl. Br. 6), ". . . as Knute Johnson testified, . . ." (Pl. Br. 11), "Indeed, as Larry Cox and Ernie Hopkins testified, . . ." (Pl. Br. 11), "[i]n his opening statement, Mr. Smith boldly

[1] We refer to the plaintiff as SSC and will distinguish between SSC and Caddell where necessary.

[2] SSC's post-trial brief is cited as "Pl. Br. #." Trial exhibits are cited as "PX #, p. #" and "DX #, p. #." Trial testimony is cited as "Tr. # (witness name)."

stated that . . . " (Pl. Br. 3 n.5), "as Ernie Hopkins graphically stated . . ." (Pl. Br. 8), and "[l]ikewise, Ray Vinson testified that. . . ." Pl. Br. 23. Without competent transcript citations, all of these contentions are merely SSC's own self-serving characterizations of the testimony, are of suspicious accuracy at best, and are difficult, at best, to verify. For that reason alone, SSC's post-trial brief is of little probative value and should be disregarded in its entirety.

Further refuting the accuracy of SSC's characterizations and, indeed, its post-trial brief as a whole, is the inaccuracy of SSC's purported quotes from the trial. SSC's post-trial brief contains approximately nine "quotations" that appear to depict direct quotes of testimony from the trial. Pl. Br. 8, 9, 10 n. 20, 11, 18, 22. Not only do these quotes suffer from an utter lack of citation to the trial record, but our review of the trial transcript reveals them to be largely fiction, as described below. Because of the limit upon the size of our post-trial reply, we will focus upon these objective inaccuracies.

1. At page eight of its post-trial brief, SSC represents as follows:

> . . . Ernie Hopkins graphically stated, steel cannot be detailed and fabricated to 1/16th-inch as required without exact dimensions and the VA never said "Steel Service, you don't need this information or it's your responsibility to provide it."

(Underlining added). A word-search of the trial transcript reveals that Mr. Hopkins never stated such a thing (or any similar combination of words). Obviously, if SSC's purportedly direct quotes from the trial testimony are inaccurate, there is little reason to trust SSC's characterizations of the testimony – which constitute the vast majority of SSC's post-trial brief.

2. At page eight of its post-trial brief, SSC represents as follows:

> The contractor Ray Vinson said, "these drawings are defective. There is not anything ordinary about these drawings."

(Underlining added). What Mr. Vinson actually said was: "Mr. Smith, these drawings are defective. This is not anything ordinary about what he encountered on these drawings." Tr. 2515 (Vinson)(underlining added). The difference between SSC's "quote" and the actual testimony is important, not only to show that SSC's post-trial brief is untrustworthy, but because the actual testimony suffered from a weakness that saturated SSC's case – Mr. Vinson (or other SSC witnesses) speculated gratuitously about what other critical-but-absent witnesses (in this case Mr. Edgil of EEE detailing) thought, said, or "encountered on these drawings."

3. At page nine of SSC's post-trial brief, SSC depict's Mr. Ferrell, P.E.'s, testimony as follows:

> As he testified, when fabrication manhours are not used as scheduled, they are "lost

> forever as it is impossible to replace them with other projects."

(underlining added). Although SSC's quote is only slightly inaccurate, Mr. Ferrell's actual testimony was:

> (Perusing document.) Based on my experience in the steel fabrication industry, my conclusion number 5 states that when planned shop fabrication man-hours on a project are not used in the space or in the time frame in which they have been scheduled, it is virtually impossible to replace those man-hours with hours from another project. These hours are lost forever.

Tr. 938 (Ferrell). Here, SSC's inaccurate quotation is not substantive, but it does ignore the fact that SSC did, in fact, "replace those man-hours with hours from another project," as evidenced in both PX 180 and PX 157, volume 2 of 2, p. 368. This information, which was contained in SSC's certified claim (prepared by Mr. Vinson in 1997), was clearly available to Mr. Ferrell. Consequently, his opinion regarding "lost" shop hours is factually irrelevant and incorrect, as well as being misquoted by SSC.

4. At page 10, note 20, of SSC's post-trial brief, SSC attempts, yet again unsuccessfully, to explain away Mr. Cox's contemporaneous assessment of the Government's RFI delays as a "drop in the bucket" as follows:

> However, as Larry Cox testified, when that letter is put in context as his response to Caddell's July 9, 1996 letter (Ex. Dx-1001, at p. 3) that said that the VA's RFI's - not Caddell - were the sole source of the problem and considering his mindset that the RFI's

> would be answered any day and Steel Service released to fabricate, he stood by his statement that, at that time, he thought the RFI delay "paled in comparison" to Caddell's delay.

(underlining added). Although Mr. Cox did, indeed, use the words "paled in comparison" in his testimony, the "context" he described did little to help SSC's case:

> It was stacked in the plant by sequence, by job, and we were full. I mean, like I say, there was 130 truckloads in there, and, believe me, that's an awful lot, an awful lot to put in there. And then in addition to that, you know, I'm looking at erection costs that moves them out a year. There's other subcontractor and material supply costs, too. So, I mean, it paled on comparison to, you know, 62 RFIs over here.

Tr. 2121 (Cox). First, it is telling that Mr. Cox only considered "62" RFI's to have impacted SSC at all, an assessment that is far more consistent with Ms. Jones's analysis than Mr. Vinson's. In addition, despite SSC's post hoc attempts to distance itself from its own contemporaneous admissions, the fact remains that SSC contemporaneously evaluated Caddell's liability at less than $500,000 and the Government's impact as a "drop in the bucket" or that it "paled in comparison" to $500,000. This at a time when Mr. Vinson was "an extension of his [Mr. Cox's] management." Tr. 2277, 2279-80, 2665 (Vinson). In short, SSC's own president provided the evidence that demonstrates the disingenuousness of SSC's case against the Government.

5. At page 11 of SSC's post-trial brief, SSC purports to quote Mr. Johnson's testimony as follows:

> . . . as Knute Johnson testified, after the first block of +150 RFI's submitted to the VA on April 9, 1996, the VA demanded that Caddell "research," "comb the drawings for hidden information" to try to find the answers before sending the RFI to the VA so that Caddell was "duplicating the detailer's efforts."

(Underlining added). Although SSC's failure to include a transcript citation following quoted material is a breach of basic legal-writing standards, of greater concern is the fact that SSC's purported quotes are non-existent. The word "comb" was not used at all (by anyone) during the trial, nor did Mr. Johnson use the word "duplicating" or words similar to "duplicating the detailer's efforts."

Regarding the gist of SSC's argument, however, Mr. Johnson did testify as follows:

> The senior resident engineer, Mr. Totolo, demanded that our jobsite staff research every one of these RFIs to ensure that there wasn't an answer to the question hidden somewhere in the drawing. We started submitting these and there was a great hue and cry that came up from the VA that we hadn't reviewed them.

Tr. 753 (Johnson). Given the fact that the contract clearly required submittals (which implicitly includes RFIs) ". . . shall be checked before submission by technically qualified employees of Contractor for accuracy, completeness and compliance with contract requirements" (PX 11; DX 1002 pp. 409-11 ), and the fact

that SSC's own expert deemed one out of every seven of SSC's RFIs to be "not required" because "[s]ome of these RFIs were not required due to the fact that the design drawing information was correct" (PX 173; Tr. 955-56 (Ferrell)), the "hue and cry" raised by the Government was hardly unreasonable, and certainly not extra-contractual.

6. At page 18 of SSC's post-trial brief, SSC argues that the Government's requirement for SSC to submit shop drawings in sequential groups was extra-contractual. SSC offers:

> Ray Vinson also testified that the VA's refusal to review less than complete sequences of shop drawings was "disastrous" and caused impact on impact as that decision held up fabrication of the huge interior moment columns that could have fed the shop while waiting on other approvals that were held up by RFI's. He said, "everywhere Steel Service turned there was a different problem."

(Underlining added.) First, Mr. Vinson and SSC's contractual interpretation is incorrect. Contract Section 1340 is entitled "Samples and Shop Drawings" and provides, at Part 1-3:

> Submit for approval, all of the items specifically mentioned under the separate sections of the specification, with information sufficient to evidence full compliance with contract requirements.

Part 1-9, paragraph E:

> Submittal drawings (shop, erection or setting drawings) and schedules, required for work of various trades, shall be checked before submission by technically qualified employees of Contractor for accuracy, completeness and compliance with contract requirements.

Item 7 of Paragraph E states:

> When work is directly related and involves more than one trade, shop drawings will be submitted to Architect-Engineer <u>under one cover.</u>

PX 11; DX 1002 pp. 409-11 (underlining added). Not only is the requirement for "complete" submittals "under one cover" binding upon SSC, and part of Caddell's coordination duties, but it makes practical sense as well when virtually all submittals involved "more than one trade."

In addition, and once again, SSC's mischaracterization of the testimony is blatant. Mr. Vinson never said "everywhere Steel Service turned there was a different problem," or any similar combination of those words.

7. At page 22 of SSC's post-trial brief, in an attempt to defuse further proof (From Mr. Cotton) that SSC's own master shop schedules demonstrate that SSC did not "lose" manhours as claimed by SSC, SSC indicates as follows:

> With regard to the master shop schedules, Ray Vinson explained that those schedules are <u>"look ahead"</u> schedules used by Steel Service management solely for planning purposes to identify what is in the shop – not necessarily what should be in the shop – and cannot be used to develop or substantiate (or refute) this or any other claim (Ex. P-172).

(Underlining added). SSC's assertion is difficult to follow, but in any event incorrect. SSC's shop schedules (and SSC's shop records) demonstrate clearly that SSC's "windows" <u>were</u>, in fact, filled with fabrication work at historically-consistent levels

despite the so-called "lost" Government work. PX 180; PX 157, volume 2 of 2, p. 368. In addition, and again, the inaccuracy of SSC's quotations are disturbing. Mr. Vinson never used the words "look ahead" at trial, nor did any other witness.

8. According to SSC, at page 22 of its post-trial brief;

> He [Mr. Vinson] also explained that his calculation of unabsorbed overhead was cumulative, being based on the entire seven month window, realizing that scheduling is not an exact science, that schedules for all projects fluctuate to some extent weekly and/or monthly and that Steel Service had the ability to "work out its manhours by shifting them [among projects] to make up or give up [time] when needed."

(Underlining added).

SSC's depiction of Mr. Vinson's testimony is incorrect. Mr. Vinson did not testify as "quoted" by SSC, or by using the word "shifting" or "make up" at any time. Instead, it was Mr. Mockbee who "testified" as follows:

> Are you suggesting then that when you see actual man hours of 72,000 and capacity of 111,000, that the Steel Service would have been able to shift among the availability in the months to make up where necessary and to give up where necessary?

Tr. 2363 (Mockbee). Not only is this a good example of the leading questioning that dominated SSC's case, but it also makes little sense. SSC's argument that it had the capacity to perform Government work during its already-occupied fabrication "windows" does nothing to refute the fact that SSC's overhead was already absorbed by the 72,000 hours of work that SSC actually performed

– which fully mitigated SSC's purported loss of shop hours, and removed any purported "right" to recover "lost" shop hours from the Government.

In sum, SSC's post-trial brief is little more than a collection of unverifiable characterizations by SSC regarding what it wished had occurred at trial. In addition, where SSC has attempted to portray what did occur at trial in its post-trial brief, SSC has done so inaccurately. As a result, SSC's post-trial brief is untrustworthy and should be disregarded by the Court.

II. The Contract Was A Performance Specification

SSC's post-trial brief continues SSC's goose chase regarding the Spearin doctrine. Pl. Br. 3-8. We have briefed the requirements for a defective specifications claim, and SSC's failure to demonstrate Government liability for defective specifications, ad nauseum in our pretrial submission and post-trial brief – and we will not repeat those arguments here. Suffice to say, however, that SSC's entire case is based upon the argument that its contract was a design specification, and it was not. SSC incorrectly believes that the evidence required to persuade this Court that its contract was a design specification was to have its witnesses say that the contract is a design specification. Of course, this is incorrect, and SSC offers no argument in its post-trial brief, or evidence at trial, that the contract removed from SSC the discretion upon how to perform the

contract – which is the critical element of a design specification. SSC's repeated assertion that, because the Government issued a "design" for the project, thus, the contract was a design specification, goes nowhere.

Instead, the contract clearly required Caddell and SSC to exercise their discretion in the scheduling and performance of the very tasks (steel detailing and fabrication) upon which this case is based. Put another way, Caddell and SSC was permitted and required to schedule its own steel detailing and fabrication efforts. SSC's choice of two so-called fabrication "windows" were distinctly not part of any "roadmap" supplied by the Government, and were entirely part of Caddell's means and methods of contract performance. As a result, SSC's contract was not a design specification, no defective specifications claim exists, and the "defective specifications" portion of the changes clause to Caddell's contract does not apply.

III. <u>SSC's Witnesses Contradicted SSC's Case</u>

SSC's post-trial brief suffers from an obvious lack of any transcript support whatsoever. This does not mean, however, that the testimony of SSC's witnesses was without probative value and, in fact, quite the contrary. Although our page limitation prevents an unabridged recounting of instances where SSC's witnesses supported the Government's position in this case, we offer the following examples:

1. Despite his professed years of experience in the steel fabrication industry and as a project manager, Mr. Hopkins revealed several surprising gaps in his knowledge of SSC's work, SSC's own interactions with Caddell, and SSC's certified claim and case. Importantly, Mr. Hopkins was not even aware until his cross examination at trial of Caddell's repeated practice of holding and dumping SSC's RFIs. Thus, Mr. Hopkins's oft-repeated indignation at what he believed was the Government's delay in responding to SSC's RFI's was misdirected. Mr. Hopkins testified as follows:

> Q And this, Mr. Hopkins, is Caddell's RFI log. You have seen that, haven't you?
>
> A No. Actually, I haven't gone through Caddell's RFI log.
>
> Q It was included in Mr. Vinson's certified claim, which I thought I heard you say you participated in.
>
> A Participated in doesn't mean I did the claim and had all the documents. I simply helped him with stuff he asked me for.

Tr. 515 (Hopkins). In fact, Mr. Hopkins' "participation" in SSC's claim did not even involve reading it:

> Q Did you read SSC's REA prepared by Mr. Vinson?
>
> A What is an REA?
>
> Q Request for equitable adjustment.
>
> A No, I have not read all of his document. I helped prepare it with him, as far as getting the information, but I have not said down and gone through it, line item by line item.
>
> Q How about, at all? Did you ever read the REA?

A No. I mean, other than yes. Some of the stuff that is in it, is stuff that I gave to him. There are things that came to me, and asked me questions. And I looked at some of that, and said, here is what I know should be there. But no, I have not sat down and read the document from front to back.

Q How about at all?

A And I am not aware of anything that is in it.

Tr 531-532 (Hopkins). Mr. Hopkins had never read SSC's complaint either:

Q Okay. Did you read the complaint in this case?

A I have not read the complete complaint. I am well aware of the general gist of what we are after, and what we are going for, because I had to present the information on it.

Tr. 533 (Hopkins).

2. Mr. Vinson's aversion to PX 180, a shop-hour summary document that he prepared himself, became apparent when he was confronted with the reality that PX 180 totally undercuts SSC's case. His disavowal of PX 180 appeared to border upon desperation:

A This is just numbers. There is no - nothing that can be relied upon with this document. It's just data we asked to be pulled from 10-year-old computer disks.

Q Right.

A And it is what it is.

Q You keep saying that. Remind me again why 10-year-old computer disks are more unreliable than say one-year-old computer disks.

A For a number of reasons. The data was not accumulated for this purpose to be able to pull apart. They have their own accounting system that this data

> could be generated per project, for instance had to be done manually after this many years. We just simply tried to go back and extract whatever was electronically still available, and not everything was.

Tr. 2495 (Vinson).

> Q Okay. Ms. Hall goes on to say, "I'm advised that Steel Service's preparations for Y2K rendered many of its electronic files either unavailable or unusable." Do you see that?
>
> A Yes.
>
> Q All right. One of the electronic files that was not rendered unavailable or unusable by Y2K was the records that generated Plaintiff's 180, right?
>
> A One eighty was all these numbers that you were showing me previously?
>
> Q The meaningless chart.
>
> A Yes.

Tr. 2504 (Vinson).

> Q Can you direct me to a single exhibit that contradicts what we're looking at, PX 180?
>
> A I could not sitting here but I probably could if I had 30 minutes to look at the accurate data that comes directly from their accounting.
>
> Q Okay. And that is when you produced this chart?
>
> A I believe that's accurate.
>
> Q Okay. And at no time between your production of this chart and as you sit here on the witness stand right this second did you take the 30 minutes that you just said it would require to find evidence that contradicts this chart?
>
> A I simply have no need to. This chart is meaningless to me period, and I have no need to do that, but I'm saying that it could be done at least in portions of it could be done.

Tr. 2497-8 (Vinson).

3. Mr. Johnson, who helped prepare Caddell's bid, admitted that SSC's intent, and entire job plan, to fabricate steel during its "first window," was the result of Caddell's fundamental misunderstanding of the project at bid time:

> Q So Caddell, when it bid this project, did or didn't understand that it was to be performed, in your words, upside down?
>
> A I believe they did not.
>
> Q Caddell bid this project without knowing that it had to be performed upside down?
>
> A I believe that to be true.
>
> Q All right. That sounds like a fairly serious lack of diligence in bidding the project. Would you agree?
>
> A I don't know how to answer the question. You're asking me to draw a conclusion.

Tr. 825 (Johnson). Considering the magnitude of Caddell's mistake, and the assumptions that it caused SSC to make about hurrying to fabricate steel one year prior to when it was required, it is clear that the Government's purported impact to SSC caused by RFIs and shop drawing reviews was indeed a "drop in the bucket."

## CONCLUSION

For the foregoing reasons, we respectfully request the Court to find in favor of the Government and to dismiss Caddell's complaint with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Bryant G. Snee
BRYANT G. SNEE
Assistant Director

s/Brian S. Smith
BRIAN S. SMITH
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attention: Classification Unit
1100 L St. NW
Washington, D.C. 20530
Tele: (202) 616-0391

Attorneys for Defendant

June 28, 2007

CERTIFICATE OF FILING

I hereby certify that on June 28, 2007, a copy of foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Brian S. Smith