# In the United States Court of Federal Claims

**No. 04-461C**

**(Filed September 7, 2007)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **CADDELL CONSTRUCTION CO., INC.** | * | |
| | * | |
| **Plaintiff,** | * | **Construction Contract,** |
| | * | **Design Specification, Breach** |
| **v.** | * | **of Implied Warranty,** |
| | * | **Causation, Superior** |
| **THE UNITED STATES,** | * | **Knowledge** |
| | * | |
| **Defendant.** | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | | |

***David W. Mockbee***, Jackson, Mississippi, attorney of record for plaintiff, and ***Mary Elizabeth Hall***, co-counsel.

***Brian S. Smith***, Department of Justice, Washington, D.C., with whom was ***Assistant Attorney General Peter D. Keisler***, for defendant. ***David M. Cohen***, Director, and ***Bryant G. Snee***, Assistant Director.

## OPINION & ORDER

***Futey***, **Judge**.

This government contract case is before the court following a trial on liability and damages. Plaintiff claims, on behalf of its steel fabrication subcontractor, that defendant provided structural steel drawings that allegedly contained conflicts, errors, omissions, and/or inadequate details. Plaintiff maintains that the purportedly defective drawings resulted in a delay and additional costs. Plaintiff, therefore, requests an equitable adjustment of $2,782,149.52. Defendant argues that the designs were not defective and that plaintiff, not defendant, was the cause of the alleged delays.

Factual Background

Caddell Construction Co. ("plaintiff" or "Caddell") is a general contractor whom defendant hired to modernize and strengthen the VA Medical Center in Memphis, Tennessee. Caddell, as the general contractor, sponsors the claim of its subcontractor, Steel Service Corporation ("SSC") in this case.

On July 27, 1994 the Department of Veteran Affairs ("VA") contracted with an architecture and engineering firm ("Architect/Engineer") to prepare plans and construction services for a "new 309,000 SF bed tower, initial seismic correction [to the existing VA Medical Center], site utilities and site work, land scape, boiler replacement and replacement parking at the VA Medical Center, Memphis, Tennessee" ("the Project").[1] Plaintiff alleges that the VA repeatedly found the Architect/Engineer's plans to be insufficient, but, despite its knowledge of the design deficiencies in the plans, the VA issued a pre-solicitation notice for the construction on July 6, 1995.

The initial bids on the project were over the VA's budget, and the project was re-bid on December 15, 1995, using competitive negotiation procedures. In the end, the VA awarded the contract to Caddell. On February 16, 1996, SSC submitted its quotation of $5,350,000 to Caddell for detailing, fabricating, and erecting[2] the steel required for the Project. SSC claims that its bid was low because it had a "window"[3] in its shop that it needed to fill, and according to the contract documents and what it was told by Caddell, the Project fit into that "window." The quotation itself, however, did not include a schedule.

Plaintiff alleges that, at the time SSC submitted its bid, both Caddell and SSC contemplated that the steel erection would begin in May 1996.[4] In a letter dated March 6, 1996, SSC informed Caddell that shop drawings would be submitted starting May 7, 1996, anticipating an erection schedule beginning June 18, 1996.[5]

---

1 ***Plaintiff's Exhibit (PX) 1*** at 2.

2 ***PX 12***.

3 A "window" in a steel fabrication shop is essentially man-hours and storage space that have yet to be allocated to a job. ***Trial Transcript (Tr.)*** at 104-06. Once the fabricator wins a job, the "window" is closed and the time cannot be assigned to any other projects. ***Id***.

4 ***Tr.*** at 113-114.

5 ***PX 21.***

SSC anticipated that its work would be complete by October 31, 1996.[6] Caddell received the Notice to Proceed on March 18, 1996.

Even before receiving the Notice to Proceed, SSC and E.E.E. Detailing ("EEE"), SSC's steel detailing sub-contractor,[7] began working on the project. EEE, however, was allegedly unable to proceed because it encountered missing and conflicting information on the structural steel drawings provided by the VA. EEE began generating Requests for Information ("RFI") almost immediately in an attempt to clarify the plans and resolve any conflicts in the plans so that it could proceed with detailing. EEE forwarded the RFIs to SSC, who sent them on to Caddell, who then sent them to the VA. In the first month of the project, between March 19, 1996, and April 19, 1996, SSC/EEE sent approximately 180 RFIs to Caddell. By the end of the project, SSC/EEE had made in the neighborhood of 300 RFIs.

In the meantime, Caddell was attempting to set up its field offices and operations for the project. It had not done so by the time it received SSC's first 150 RFIs, and were, in fact "using [the project manager's] apartment for an office" and making copies at a local copy shop.[8] Caddell, therefore, could not immediately forward those RFIs to the VA and instead sent them all in a bundle on April 9, 1996, unbeknownst to SSC. The VA objected to having RFIs "dumped" on it in this manner and asked that Caddell review all the RFIs to ensure that they were not coordination issues or that the RFI could not be answered by information contained in the plans. SSC claims that the VA did not respond to over half of its RFIs for more than 30 days and that many of the responses were insufficient.

As a result of the numerous problems with the structural steel drawings and the RFIs, the VA met with Caddell, SSC, and EEE from May 28-31, 1996. At the May 28th meeting, SSC learned, for the first time, that erection on the project would not begin until 1997. As Lawrence Cox, President of SSC stated in a letter to the President of Caddell,

---

6 ***Tr.*** at 165.

7 A steel detailer creates two types of drawings for use by steel fabricators, such as SSC: shop drawings and erection drawings. Shop drawings "translate" the general design drawings from the architect or engineer into specific drawings used to create each steel member in the structure. Erection drawings are used at a construction site and show where and how to erect each piece of steel and how each piece connects to the others. ***Tr.*** at 150-164.

8 ***Tr.*** at 750.

> At the May 28, 1996 meeting with the VA, Steel Service and Caddell, Steel Service learns the truth. At this meeting, Bill Totolo, the VA project manager, asked Steel Service when it was originally told by Caddell to first have steel on the project. Ernie [Hopkins, SSC's project manager] said between mid-June and mid-July [1996]. Caddell personnel were silent and Totolo then asked Steel Service what date it now was to have steel on the job and Ernie said August-September 1996. Caddell was again silent.
>
> Totolo then asked Bob Bradley what was Caddell planning to do with all that steel and when was Caddell planning to erect the main steel. Mr. Bradley hemmed and hawed something about finalizing the schedule.
>
> Totolo, still not having the answer he wanted, asked Mr. Bradley when Caddell would receive the generator to which Mr. Bradley responded November 1996. Totolo then asked when Caddell would receive the switchgear and Mr. Bradley said January 27, 1997.
>
> At that point, it became clear to Steel Service that Caddell would not need steel for several months after arrival of the switchgear and that Caddell had known of this for sometime without telling Steel Service and possibly its other subcontractors.[9]

SSC, however, had already ordered $1.3 million in raw materials and had already begun fabrication preparations, anticipating a June 1996 start date. SSC believed that, because the delay from Summer 1996 to Summer 1997 was both known and calculable, it now had a claim against both Caddell and the VA for an equitable adjustment as a result of the alleged postponement and its effect on SSC's costs. Although Caddell and SSC attempted to negotiate this dispute, they reached an impasse and SSC sued Caddell. ***See Steel Service Corporation v. Caddell Construction Co., Inc.***, 96-CV-606-BN (Miss. Cir. Ct. 1996). In its complaint, SSC alleged that Caddell had engaged in fraud, negligent misrepresentation, and breach of contract.[10]

The dispute between Caddell and SSC was settled in September 1996. Caddell agreed to pay SSC $445,000 for the additional costs to handle and store the fabricated steel and the costs for the delay in the erection start. SSC also reserved its right to a "pass through" claim against the VA, the basis of the case before this court.

---

9 ***Defendant's Exhibit (DX) 1002*** at 1754.

10 ***DX 1002*** at 1602-1614.

SSC and Caddell also signed a subcontract at this point, which had been under negotiation since SSC's bid was accepted back in February 1996.

At this point, SSC established a new schedule for fabrication that fit into a second "window" of time in its shop.[11] SSC now planned to fabricate the bulk of the steel between January 1997 until early summer of 1997. Beginning in October 1996, SSC, through Caddell, began submitting shop drawings to the VA for approval. Plaintiff admits these drawings were incomplete. Plaintiff alleges, however, that it only submitted the plans with missing information because the VA had failed to answer certain RFIs that were necessary to complete each sequence[12] of drawings. The VA rejected these drawings and asked that they be resubmitted only when each sequence was complete. Each time SSC attempted to get approval for incomplete shop drawings, the VA rejected the drawings.

Even after SSC completed some of the sequences and the VA approved those drawings, SSC's detailer had to re-draw portions of the drawings. This was primarily because the pre-cast concrete subcontractor's shop drawings did not match up to SSC's approved drawings. EEE, therefore, had to change certain aspects of the drawings to harmonize the structural steel drawings with the pre-cast contractor's drawings. SSC contends that these additional alterations were made because the overall plans were defective and because the VA did not fulfill its contractual responsibility to adequately respond to RFIs. SSC maintains that these factors, and the fact that the VA would not approve incomplete sequences caused SSC to postpone fabrication from January 1997 to April 1997. SSC claims that as a result of the delay, it lost its second "window" and incurred additional expenses because it did not have the space or hours to fabricate in its shop and had to sublet some of its work out to subcontractors.

SSC completed its work on the Project in early 1998 and the entire building was completed later that year, according to schedule. SSC prepared a claim for equitable adjustment which was subsequently revised. As of August 15, 1998, SSC's

---

[11] SSC also solicited business to occupy the time now left open because the VA project was pushed to 1997. It succeeded in its bid on a project to expand the Austin Airport ("the Austin Airport job") to occupy the now available shop hours, but that work was also delayed, allegedly for reasons similar to those claimed here.

[12] A structure is divided into "sequences" in order to break a building into parts for ease of erection. ***Tr.*** at 137-138. Essentially, each sequence is a building block of a structure, made up of steel beams welded or bolted together. The contractor and steel fabricator agree on an order for the assembly of the sequences, and, once assembled, the sequences make up the entire building. ***Id.***

claim totaled $3,497,100.37.[13] A portion of the claim was settled among Caddell, the VA, and SSC soon after.[14] The remainder of the claim was certified and submitted to the VA on February 3, 1998.[15] In the fall of 1998, the government audited SSC's claim and found portions of it to be incorrect or unsupported.[16] The contracting officer rejected SSC's claim in December 2003 and plaintiff filed this case on March 19, 2004. A trial was held from April 17, 2007 to April 23, 2007 and continued on April 30, 2007 until May 3, 2007.

## Discussion

Plaintiff seeks recovery based upon a theory that the contract drawings in this case were design specifications, which carry an implied warranty of accuracy, as set forth by the Supreme Court in ***United States v. Spearin***, 248 U.S. 132 (1918).

> *Spearin* stands for the proposition that when the government includes detailed specifications in a contract, it impliedly warrants that (i) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (ii) if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences. As with any contract-based claim, however, to recover for a breach of warranty, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused by the breach.

***Hercules Inc. v. United States***, 24 F.3d 188, 197 (Fed. Cir. 1994) (citing ***Spearin,*** 248 U.S. at 136-37; ***San Carlos Irrig. and Drainage Dist. v. United States***, 877 F.2d 957, 959 (Fed. Cir. 1989); ***Wunderlich Contracting Co. v. United States,*** 351 F.2d 956, 968 (Ct. Cl. 1965)).

## I. Design Specification

"In the world of government contracts, a jurisprudential difference exists between what are known as 'design specifications' and 'performance specifications.'" ***See Travelers Cas. and Sur. of America v. United States***, 74 Fed.

---

[13] ***PX 157*** at X-54.

[14] ***PX 159***; ***Tr.*** at 447, 2461. The VA issued a change order as to this part of the claim, as per SSC's request.

[15] ***PX 157.***

[16] ***PX 165.***

Cl. 75, 89 (2006) (citing **JOHN CIBINIC, JR. ET AL., ADMINISTRATION OF GOVERNMENT CONTRACTS** 276-86 (4th ed. 2006)). Therefore, the court must first determine whether the contract in this case was a design specification and, therefore, falls under the ***Spearin*** doctrine.

Plaintiff claims that the contract in question was a design specification while defendant claims that the contract was a performance specification. Although defendant contends that the court could determine which party is correct purely on legal grounds, whether a contract is a design or performance specification is a mixed question of fact and law. ***Id.*** (citing ***White v. Edsall Constr.***, 296 F.3d 1081, 1085 (Fed. Cir. 2002); ***Hercules, Inc.***, 24 F.3d at 197-98).

A design specification binds the contractor to build according to specific instructions dictated by the owner. ***See White***, 296 F.3d at 1084. In contrast to a performance specification, which merely lays out the "objective without specifying the method of obtaining the objective," a design specification lays out "the actual method of performance." ***Id.*** "Design specifications . . . describe in precise detail the materials to be employed and the manner in which the work is to be performed. The contractor has no discretion to deviate from the specifications, but is 'required to follow them as one would a road map.'" ***Blake Const. Co., Inc. v. United States***, 987 F.2d 743, 745 (Fed. Cir. 1993) (quoting ***J.L. Simmons Co. v. United States***, 412 F.2d 1360, 1362 (Ct. Cl. 1969)).

In order to determine whether a contract is a design specification, "[t]he relevant inquiry concerns the quality and quantity of the obligations that the specifications impose." ***Travelers***, 74 Fed. Cl. at 89 (citing ***Mega Constr. Co., Inc. v. United States***, 29 Fed. Cl. 396, 418 (1993)). "[D]etailed measurements, tolerances, materials, *i.e.*, elaborate instructions on how to perform the contract" together may constitute a design specification. ***Stuyvesant Dredging Co. v. United States***, 11 Cl. Ct. 853, 860 (1987). "Contracts may have both design and performance characteristics." ***Blake Const. Co.***, 987 F.2d at 746.

Plaintiff argues that because the contract in this case "prescribe[s] in minute detail 'the character, dimension, and location of the construction work'"[17] it is a design specification. In particular, plaintiff points to the fact that the contract specified "the type steel, bolts, tubing, washers, studs, nuts, zinc coating and fasteners to be used."[18] In addition, plaintiff avers that the contract dictated how fabrication and erection were to be performed, inspected, and tested. Finally,

---

[17] ***Plaintiff's Post-Trial Reply Memorandum*** at 4 (quoting ***J. L. Simmons***, 412 F.2d at 1373).

[18] ***Id.***

plaintiff claims that the structural and architectural drawings "specify the exact dimensions, locations, sizes and connections for each piece of steel required to be fabricated and assembled to form the structural frame for this Project"[19] indicating that this contract was a design specification and not a performance specification.

Defendant maintains that the contract in question was a performance specification because it "specified the end product (the building to be constructed) and left the discretion of how to construct the building almost entirely up to Caddell/SSC."[20] Although defendant admits that the contract documents were detailed, defendant argues that because these details are not instructions on how to construct the building, the contract was not a design specification. Finally, defendant avers that because the contract did not provide the "means and methods" for the construction, the contract was a performance specification.

The court agrees with plaintiff that, at the very least, the structural steel portion of the contract was a design specification. Although the government did not dictate every aspect of the construction of the building and left certain key aspects of the construction, such as sequencing and scheduling, up to Caddell, the details and specifications for the structural steel were design specifications. Nine pages of the contract are devoted to specifications for the structural steel with specific instructions on what type of bolts, washers, nuts, welds, finishes, and connections, among other things could be used for the construction.[21] This was clearly a "road map" for the structural steel fabricator to follow.

In addition, the building itself was designed to meet specific earthquake proofing guidelines and the contractor had to strictly follow that design. The contract reads on its first page that the construction must be done "in strict accordance with specifications," making it clear that the contract was, at least in part, a design specification.[22] The contractor could not deviate from the design of the structure because any variation could effect the load bearing ability of certain beams or the flexibility of joints and render the building seismically inadequate.

Although defendant urges this court to follow the court's decision in ***PCL Construction Services, Inc. v. United States***, the two cases are factually dissimilar. In ***PCL Construction***, plaintiff "promised that its construction efforts would include

---

19 ***Id.***

20 ***Def.'s Post-Trial Brief*** at 6.

21 ***PX 11*** at 05100-1 to 05100-9.

22 ***Id.*** at 1.

. . . its own 'engineering efforts' to address design problems as they occurred." ***PCL Construction Services, Inc. v. United States***, 47 Fed. Cl. 745, 798 (2000). Plaintiff made no such assurances with regard to the steel structure in this case. In fact, plaintiff was obligated to fabricate the steel exactly according to the plans and to clear any questions of discrepancies or missing information with the government. Plaintiff could not "fill in the blanks," if necessary. Neither SSC nor Caddell staffed anyone on the Project who had the expertise necessary to make any changes while ensuring that the building served its purpose and was still earthquake resistant. All of the engineering aspects were up to the government by way of its Architect/Engineer. Plaintiff had no authority to deviate from the plans from the structure, making the contract a design specification.

II. Breach of the Implied Warranty

A design specification contract carries with it an implied warranty that "satisfactory contract performance will result from adherence to the specifications." ***Franklin Pavkov Const. Co. v. Roche***, 279 F.3d 989, 995 (Fed. Cir. 2002). In ***Spearin***, the Supreme Court explained

> [I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work . . ..

***Spearin***, 248 U.S. at 136. As stated above, in order to recover damages, plaintiff must show "that the warranty was breached and that their damages were caused by the breach." ***Hercules***, 24 F.3d at 198 (citing ***San Carlos***, 877 F.2d at 959). In other words, the court must determine whether the specifications were defective and whether plaintiff's costs increased as a result.

The parties disagree on what exactly constitutes a breach of the ***Spearin*** implied warranty. Defendant maintains that a design specification is only defective if it was impossible to perform. Plaintiff, on the other hand, argues that faulty specifications need only "prevent or delay completion of the contract."[23] Neither one of these formulations is correct. Defendant plainly overstates the case law and plaintiff's definition is incomplete and lacks citations to any precedential case law.

---

[23] ***Pl.'s Post-Trial Reply Memorandum*** at 5 (quoting ***J.L. Simmons***, 412 F.2d at 1374) (emphasis omitted).

Although design specifications are meant to give a contractor a very detailed guide on how to complete a project, they "need not be paragons of perfection" but must be "reasonably accurate." ***Travelers***, 74 Fed. Cl. at 89 (citations omitted). A defective specification is one that is "so faulty as to prevent or unreasonably delay completion of the contract performance." ***Wunderlich v. United States***, 351 F.2d 956, 964 (Ct. Cl. 1965). Furthermore, the government's documents must be "substantially deficient or unworkable" in order to be considered a breach of the contract. ***Id.*** If there are many errors or omissions in the specifications, the government breached the contract if "the cumulative effect or extent of these errors was either unreasonable or abnormal" taking into account the scope and complexity of the project. ***Id.***

The majority of plaintiff's witnesses' testimony at trial focused on the effect of the RFI process on the fabrication of steel. Essentially, plaintiff's witnesses tried to show that the number of RFIs and the short time period during which they were generated indicated that the plans were faulty. In addition, plaintiff's witness Ernie Hopkins, testified that Earl Edgill, the steel detailer repeatedly remarked that the contract drawings were "the worst . . . he ha[d] seen in twenty-three years of business."[24] Plaintiff's expert witness Thomas Ferrell examined SSC's RFIs and the government's responses and concluded that the government's plans were inadequate.

Defendant maintains that the discrepancies in the plans are not actionable. First, defendant argues that SSC was contractually obligated to generate RFIs when it encountered inconsistencies or missing information. Therefore, defendant claims that the mere fact that SSC had to ask questions of the government is not evidence that the plans were faulty. Furthermore, defendant avers that the building was constructed without substantial modification and within the contractual time period, which is evidence that the plans were not defective.

After reviewing the evidence presented at trial under the standard set out above, the court concludes that the plans were not defective. Although plaintiff's witnesses repeatedly testified that the plans were massively flawed, their statements were conclusory, with little or no evidentiary support. At trial, plaintiff's witnesses pointed to the number and nature of the RFIs generated on the project as a basis for the conclusion that the plans were defective. The court, however, does not agree that there was an unusually high number of RFIs or that the RFIs showed that the plans were so riddled with conflicts or missing information that the problems with the contract documents rose to the level of defectiveness.

---

[24] ***Tr.*** at 283; ***PX 37***.

First, the court notes that under § 1.46 of the contract, it was Caddell's and SSC's duty to issue RFIs.[25] In addition, "[t]he implied warranty . . . does not eliminate the contractor's duty to investigate or inquire about a patent ambiguity, inconsistency, or mistake when the contractor recognized or should have recognized an error in the specifications or drawings." ***White***, 296 F.3d at 1085 (citing ***Blount Bros. Constr. Co. v. United States***, 346 F.2d 962, 972-73 (Ct. Cl. 1965)). Therefore, the fact that SSC issued RFIs, or even a large number of RFIs, is not an indication that the plans were defective. Furthermore, in order for the RFIs to be evidence that the plans were defective, they must cumulatively demonstrate a serious deficiency in the plans.

Although plaintiff does not argue that the sheer number of RFIs indicates that the plans were defective, both Ernie Hopkins and Lawrence Cox repeatedly testified that the fact that so many RFIs were generated so quickly very early in the process is an indication that the plans were faulty.[26] Although the court does not disagree that SSC issued a surprising number of RFIs in a short span of time, this was not solely attributable to the government. SSC instructed EEE "to proceed full speed ahead"[27] so much so that EEE actually began detailing and creating RFIs before the Notice to Proceed was even issued. In addition, SSC had put together an extremely ambitious, possibly unrealistic schedule, that required EEE to work at an accelerated pace. If SSC had known, however, that erection was not going to start until 1997, EEE could have spent more time going over the plans, finding any discrepancies or missing information before it attempted to put together shop drawings. Plaintiff's witnesses admitted that the project would have run more smoothly if this had been the case, and the documents show that SSC believed it could have avoided any delay if SSC had known it would have a year to "resolve the conflicts in the drawings."[28] Therefore, because both SSC's questionable schedule and Caddell's misunderstanding regarding when erection was to begin were clearly the main reasons SSC generated a high number of RFIs at the very beginning of the project the number of RFIs is not evidence that the plans were defective.

Plaintiff also attempted to show that the information sought by the RFIs and the effect of waiting for replies from the government indicate that the plans were

---

25 ***PX 11*** at 01001-40 to 41.

26 ***See e.g., Tr.*** at 283-292, 2240.

27 ***DX 1002*** at 1750.

28 ***Id.***

defective. Plaintiff's expert witness Thomas Ferrell, P.E.,[29] testified that the information sought in the majority of RFIs was required to proceed with detailing and fabrication. Plaintiff's witness Ernie Hopkins also testified that SSC was "dead in the water, because of the problems on the design end."[30]

This evidence, however, is undercut by the fact that SSC did not seek any change orders during the course of the project as a result of the RFIs, nor is it now claiming it should have. Under the contract, "[i]f any change . . . causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, . . . the Contracting Officer shall make an equitable adjustment and modify the contract in writing."[31] If the answers to the RFIs had included major changes to the design of the building that increased SSC's costs and indicated that the plans were defective, SSC would have or should have requested change orders.[32] Therefore, SSC's claims regarding the nature of the RFIs are simply not consistent with its actions while the project was proceeding.

For plaintiff to prove that the plans were defective, it would have had to show that the plans were "unworkable." As plaintiff concedes, however, EEE continued detailing the plans while RFIs were outstanding. Obviously, if the number or nature of the RFIs had been so all-encompassing, EEE could not have moved forward, and the plans could have been considered defective. Clearly, however, the plans were workable (and therefore not defective) as they were, albeit the fact that there were certain errors or inconsistencies.

SSC undoubtedly faced a number of problems on the project in question. Defective specifications, however, was not among them. The most daunting hurdle

---

[29] Mr. Ferrell's company provides engineering services to SSC, including on the contract at issue in this case. Although the court qualified Mr. Ferrell as an expert at trial, this fact certainly effects the weight the court will give his testimony.

[30] ***Tr.*** at 287.

[31] ***PX 11*** at 01001-34.

[32] As mentioned above, the VA did issue one change order and compensated SSC accordingly. ***Tr.*** at 447. That change order, however, involved a modification of the welding standards on this project and was not part of the defective specification claims or this case. ***Tr.*** at 2461.

SSC faced was actually its own contractor, Caddell.[33] Although plaintiff claims SSC was "dead in the water" during its first "window" of time because of the design issues, it was actually delayed because Caddell held on to many of SSC's RFIs for anywhere from a week to a month. Moreover, Caddell sent the RFIs over to the VA in bundles of up to 145 at a time. Needless to say, when the VA received so many RFIs at once, it was difficult to answer each of them quickly. If Caddell had sent the RFIs promptly, SSC could have gotten answers quickly and continued its work, as Ernie Hopkins testified.[34] Clearly, SSC's difficulty in producing shop drawings had little to do with the design and, at least in the first "window," everything to do with Caddell's failure to send the RFIs to the VA right away.

All of the complications plaintiff's witnesses testified about were small problems that, had Caddell not operated in the way it did, would not have interfered with SSC's work. A defective design is far more flawed than the plans in this case. A review of cases where the Supreme Court or appeals courts considered the issue of what constitutes defectiveness is instructive.

As mentioned above, the Supreme Court first announced the implied warranty of specifications in ***Spearin*** and a review of the facts of that case are illuminating. In ***Spearin***, plaintiff contracted with the United States to build a dry dock at the Brooklyn Navy Yard. ***Spearin***, 248 U.S. at 133. The government prepared the plans and specifications and plaintiff commenced construction according to those plans. ***Id.*** at 133-34. Plaintiff complied with all the prescribed requirements but heavy rain resulted in flooding on the dry dock that severely damaged the sewer. ***Id***. at 134. The flooding was found to be a result of a blockage caused by a dam in the city's sewerage system that was not shown on the plans or blueprints which were submitted to plaintiff. ***Id***. The Court held that because "the articles prescribing the character, dimensions and location of the sewer" provided by the government were incorrect, the government breached an implied warranty that "if the specifications were complied with, the sewer would be adequate." ***Id***. at 137. Unlike the case at hand, the project in ***Spearin*** was only completed "under radically changed and enlarged plans." ***Id***. at 135. Therefore, the facts of ***Spearin*** are not analogous to the case at hand.

---

[33] While the project was ongoing, SSC did not know that Caddell had mishandled the RFIs. For example, plaintiff's witness Ernie Hopkins, the project manager, had not seen Caddell's RFI log until trial and testified that he did not know that Caddell had held the RFIs, nor that the RFIs were submitted to the VA in large bundles. ***Tr.*** at 515, 523.

[34] ***Tr.*** at 201, 204.

In ***J.L. Simmons Co. v. United States***, plaintiff contracted with the government to construct a hospital and related buildings. ***J.L. Simmons***, 412 F.2d at 1361. The contract included specific plans and designs for the foundation of the building, but when the foundation subcontractor's followed the government's design, the foundation did not meet the contract requirements. ***Id.*** at 1363. The government therefore made a number of revisions and redesigns to the plans and demanded that plaintiff restore a portion of the foundation that had already been completed. ***Id***. at 1363-65. The court found that the government was responsible for plaintiff's damages that resulted from the numerous changes defendant made to the plans. ***Id***. at 1383. The issues faced by plaintiff in the case at hand simply do not rise to the same level as those confronted by the ***J.L. Simmons*** plaintiff. In this case, the plans were achievable after a few minor modifications, in ***J.L. Simmons***, the building would have collapsed if plaintiff had used the original plans.

In ***White v. Edsall Const. Co., Inc.***, plaintiff brought an action against the government claiming it was given a defective design specification for the construction of canopy doors for a hangar. ***White***, 296 F.3d at 1083. Plaintiff argued that after being awarded the work, it realized the three-pick-point design would not work properly. ***Id***. at 1084. Plaintiff, therefore, submitted a structural drawing for a four-pick-point design, which was later approved by the contracting officer. ***Id***. The court found that because plaintiff incurred additional costs as a result of having to change the design, the government was liable for plaintiff's damages. ***Id***. Once again, the case at hand is much less severe than the precedential case. The ***White*** plaintiff had to literally go back to the drawing board, whereas SSC merely had gaps in the information that were easily filled in.

In ***Wunderlich v. United States***, plaintiff, a general contractor, brought an action against the United States to recover damages as a result of major delays it experienced in constructing a hospital for the VA. ***Wunderlich***, 351 F.2d at 959. The hospital was to be built "in accordance with detailed and highly technical plans, specification, and drawings." ***Id.*** at 959-60. Although a large number of errors existed in the design specifications and many changes to the plans had to be made before and during the construction, the court found that "the cumulative effect or extent of these errors was [n]either unreasonable [n]or abnormal for a project of such encompassing scope and complexity." ***Id***. at 964. Even though the plaintiff in ***Wunderlich*** experienced a total delay of 318 days as a result of the errors, omissions, and discrepancies, the court did not find that the specifications were defective. ***Id.*** Moreover, the court held that in committing to a schedule that every contractor bidding the contract knew could only be met under ideal conditions, plaintiff assumed the risk that it may not be able to meet the schedule and suffer delay costs. ***Id.***

Plaintiff in this case is similarly situated to the plaintiff in ***Wunderlich***. First, the plans in this case, like the plans in ***Wunderlich*** were very detailed and technical. Second, there were discrepancies in the plans in this case, but, like the plaintiff in ***Wunderlich***, SSC was unable to show that the errors were abnormal or unreasonable considering the complex nature of the project. Finally, like the ***Wunderlich*** plaintiff, SSC attempted to push a schedule that could only have been accomplished in perfect conditions and assumed the risk that this would not happen.[35] Therefore, the ***Wunderlich*** case provides substantial support that the specifications in this case were not defective.

What SSC faced in this case was a collection of small errors. A design specification, however, is defective when it contains some fundamental flaw or collection of flaws that requires a major revision that delays the project. All of this leads to the inexorable conclusion that the plans were not defective. The plans were not "unworkable" nor were they "substantially deficient." ***See Wunderlich***, 351 F.2d at 964. Furthermore, the plans were not "so faulty as to prevent or unreasonably delay completion of the contract performance." ***Id.*** Instead, the work stalled because of Caddell's mishandling of the RFIs. Finally, plaintiff provided nothing beyond the self-serving statements of its witnesses that demonstrated that "the cumulative effect or extent of the[] errors was either unreasonable or abnormal." ***Id.*** Therefore, defendant is not responsible for any of plaintiff's claimed damages that it may have suffered as a result of the alleged delay.

III. <u>Causation</u>

Even if plaintiff had been able to present evidence that the government breached the implied warranty of specifications, it would still have had to prove that the government caused SSC's alleged damages. "The government has a duty not to act in a way that will hinder or delay the contractor's performance." ***Southern Comfort Builders, Inc. v. United States***, 67 Fed. Cl. 124, 144 (2005) (citing ***Malone v. United States,*** 849 F.2d 1441, 1445 (Fed. Cir. 1988); ***SMS Data Prods. Group, Inc. v. United States,*** 17 Cl. Ct. 1, 6 (1989)). "In order for the government to be found liable for delay a plaintiff must demonstrate that the government caused the plaintiff a compensable injury." ***Id.*** (citing ***Servidone Constr. Corp. v. United States,*** 931 F.2d 860, 861 (Fed. Cir. 1991); ***Boyajian v. United States,*** 423 F.2d

---

[35] In fact, when SSC first put together its schedule for this project it mistakenly believed that the shop drawings would be returned by the VA in less time than was contractually required. ***Tr.*** at 639-40. Defendant's expert witness Patti Jones also testified that SSC's schedule was overly optimistic in a number of other aspects as well. ***Tr.*** at 3195-96. Therefore, it appears from the testimony that SSC's schedule may have been downright unrealistic and not just dependent on ideal conditions.

1231, 1235 (Ct. Cl. 1970)). Defendant, therefore, is not liable for breach of contract, or causes of action that rely upon a defective design claim, or government hindrance of performance, unless plaintiff proved that the alleged defects, changes, or hindrances negatively impacted costs and performance of the contract.

A. The First "Window"

Plaintiff maintains that, as a result of the defective design, it issued a large number of RFIs and that the government failed to promptly and fully answer these RFIs. Plaintiff attempted to show evidence at trial that it took more than thirty days to receive answers to nearly all of its RFIs. As a result, plaintiff claims it missed the "window" it had set aside for fabricating the steel on the Project.

Defendant contends that the RFI process was "seriously obstructed"[36] by both SSC and Caddell. First, defendant claims that the reason that the answers to many RFIs were delayed was that Caddell held many of SSC's RFIs for extended periods of time. Furthermore, defendant argues that when Caddell did forward the RFIs to the government, it did so in large batches, which made it difficult for the VA to respond quickly. Finally, defendant avers that plaintiff did not present any evidence at trial that demonstrated that the VA delayed responding to any RFIs or that the project was effected by the VA's allegedly slow response to any RFIs.

The court agrees with defendant that the VA did not cause SSC to miss its first "window." Under § 1.46 of the contract, "[i]n case of discrepancy in the figures, in the drawings or in the specifications, the matter shall be promptly submitted to the Contracting Officer, who shall promptly make a determination in writing."[37] Therefore, in order for plaintiff to prove that the government breached this clause, it had to present evidence at trial that the VA did not answer the RFIs "promptly." There is no definition of "promptly" in the contract, nor is one provided by the case law. Plaintiff's witness Ernie Hopkins, however, testified that he believed "promptly" means "[s]o as not to delay the work,"[38] which is the best definition available in this case.

Plaintiff, however, did not demonstrate at trial that the government did not answer RFIs promptly and ignored the effect of Caddell holding the RFIs. As mentioned above, it took Caddell anywhere from a week to a month to submit RFIs to the VA, which would obviously effect the RFI process and contribute to SSC's

---

36 ***Def.'s Post Trial Brief*** at 15.

37 ***PX 11*** at 01001-40.

38 ***Tr.*** at 202.

alleged delays.[39] Although plaintiff argued that it was the VA's fault that Caddell held the RFIs because the VA required Caddell to review SSC's RFIs, this position is untenable. First, the VA's insistence that Caddell research the RFIs before submitting them was made only after Caddell had sent over half of SSC's RFIs to the VA. Therefore, this alone does not explain away Caddell's culpability in this project's tortuous RFI process. In addition, despite plaintiff's witnesses' claims that requiring Caddell to review the RFIs was extra-contractual, this is simply not true. It is the contractor's duty to coordinate the various aspects of the project, which includes the submission of RFIs. It was not unreasonable for the government to ask Caddell, therefore, to ensure that the RFIs were actually necessary and that they were not repetitious. Defendant, therefore, was in no way responsible for the time it took Caddell to submit the RFIs.

The VA answered more than a third of SSC's RFIs in less than thirty days, and over ninety percent in less than forty-five days.[40] Plaintiff did not provide evidence at trial that connected its claimed damages to the time it specifically took the government to respond to the RFIs. Instead, plaintiff's witnesses only testified to the impact of the entire period it took to get answers to RFIs, including the time the RFIs were in Caddell's hands and out of the VA's control. Therefore, because plaintiff did not prove at trial what effect, if any, the government's alleged delay in answering RFIs had on SSC, it cannot recover damages associated with missing its first "window." ***See Southern Comfort***, 67 Fed. Cl. at 150 (denying compensation where plaintiff did not "trace or support specific derivative delays or negative impacts on the contractor's work" to the time it took the government to answer RFIs).

Finally, the contemporaneous documents do not bear out SSC's claim that it missed the first "window" because of the issues with the RFI process.[41] Instead, it is apparent that the delay was a direct result of Caddell's misunderstanding of the contract requirements and possible misrepresentation to SSC of the date steel would be required for erection. As plaintiff's witness Lawrence Cox, president of SSC, wrote in a letter to the president of Caddell dated July 15, 1996:

> [t]he RFI's are undoubtedly a problem which have delayed Steel Service and its detailers. However, again, this delay is also a *drop in*

---

39 ***DX 1001*** at 306-16 (Caddell's RFI log).

40 ***Id.***

41 The court also notes that SSC and Caddell did not have a signed contract in place during this first window. Therefore, there was no agreed timeline for fabrication and erection in place and SSC's expectations regarding when erection was to begin may not have a contractual basis.

> *the bucket compared to the delay caused by Caddell* – but a delay which could have and would have been avoided if Caddell had told Steel Service at the outset that steel was not needed until July 1997. Steel Service would have had a year to resolve the conflicts in the drawings. Instead, Steel Service, acting upon Caddell's schedule for steel, marshalled [*sic*] its forces and directed them to proceed full speed ahead.[42]

Therefore, because SSC admitted that the delay would have been avoided had Caddell informed SSC when steel was actually needed, the court cannot hold that the government caused the damages SSC allegedly suffered when it missed its first "window."

B. The Second "Window"

Plaintiff also claims that the defective specifications caused it to miss its second "window." Plaintiff maintains that the VA imposed an extra-contractual duty on SSC by not approving the incomplete shop drawings submissions, forcing SSC to postpone the steel fabrication. Furthermore, plaintiff argues that it experienced substantial delays because its detailer had to make revisions to the shop drawings based on the pre-cast subcontractor's shop drawings. Throughout the trial, plaintiff's witnesses testified that, but for the alleged defective specifications, SSC and the pre-cast subcontractor could have independently produced drawings that would have matched up perfectly. SSC avers, therefore, that the government caused its delays in the second "window."

Defendant maintains that plaintiff misinterpreted the contract and that the contract required complete shop drawings. Moreover, defendant argues that it was Caddell's duty under the contract to coordinate the various trades' drawings and that any revisions were a result of Caddell neglecting that duty. Finally, defendant claims that SSC did not lose any man-hours during the second window, and, therefore, cannot prove it suffered damages.

Under § 1340, part 1-3 of the contract, plaintiff was obligated to "[s]ubmit for approval, all of the items specifically mentioned under the separate sections of the specification, with information sufficient to evidence full compliance with contract requirements."[43] In addition, § 1340, part 1-9(E) requires "[s]ubmittal drawings (shop, erection or setting drawings) . . . [to] be checked before submission by technically qualified employees of Contractor for accuracy, completeness and

---

42 ***DX 1002*** at 1750 (emphasis added).

43 ***PX 11*** at 1340-1.

compliance with contract requirements."[44] Finally, § 1340, part 1-9(E)(7) states "[w]hen work is directly related and involves more than one trade, shop drawings shall be submitted to Architect-Engineer under one cover."[45]

By using the words "all" and "completeness" defendant clearly indicated that *complete* shop drawings were required for submissions, and the fact that the VA would not accept incomplete drawings was not extra-contractual. Furthermore, the court agrees with defendant's expert witness Patti Jones that the VA was not unreasonable in rejecting the drawings because the incomplete shop drawings "lacked information that the [Architect/Engineer] needed to do its review."[46] Therefore, any delay SSC may have experienced because the VA rejected its incomplete shop drawings is not compensable.

The court also finds that the revisions SSC's detailer made to the drawings as a result of coordinating with the pre-cast concrete subcontractor's drawings and the alleged delays this caused were not the fault of the VA. The contract required Caddell to coordinate the work of its subcontractors and ensure that the drawings of the pre-cast subcontract matched the other trades. In fact, this was critical to the success of the project because the pre-cast subcontractor was responsible for the design of the pre-cast panels,[47] unlike other aspects of the project which were dictated by the design drawings, such as the structural steel. Therefore, as Patti Jones wrote in her expert report,

> SSC and EEE were unrealistic to believe that its structural steel drawings could be developed in a vacuum without any coordination with the precast panel contractor . . .. Coordination of shop drawings between trade contractors, particularly when the work of one trade affixes to the work of another trade, is to be expected. . . . refusal to coordinate its drawings with the precast contractor is unjustified, and atypical of the interlocking nature that existed between the precast and steel work on this project.[48]

---

44 ***Id.*** at 1340-2.

45 ***Id.*** at 1340-3.

46 ***Tr***. at 3267; ***DX 1001*** at 49.

47 ***See DX 1001***, Exhibit V-18.

48 ***DX 1001*** at 52-53.

SSC's stance during the project and throughout this litigation that if the plans were not defective, coordination with pre-cast would not have been necessary is, therefore, totally incorrect. Furthermore, plaintiff's conspiracy theory that the VA's response to RFIs was "coordinate with GC" and shop drawings was "coordinate with precast" because the VA was covering up the defective designs is nonsensical. The VA was, in reality, simply looking at the contract and attempting to make sure Caddell did the job as per the contractual requirements. Therefore, because it was SSC itself that hindered the shop drawing process by refusing to coordinate with the pre-cast drawings before submitting its shop drawings, the VA cannot be held responsible for any of the delay damages associated with the shop drawings.

Although plaintiff's expert witness Ray Vinson attempted to show that SSC experienced downtime in its shop during the second "window," SSC's own records demonstrate otherwise. According to plaintiff's own exhibit, PX 180, its shop hours were at the same or nearly the same level as years previous. Mr. Vinson did attempt to discredit PX 180, by saying it was "meaningless data . . . playing with numbers,"[49] but this is totally unconvincing. First, Mr. Vinson used the chart in PX 180 in his own rebuttal report.[50] Second, the information in PX 180 is consistent with the shop hours listed in PX 157, the Claim for Equitable Adjustment prepared by Mr. Vinson.[51] Finally, there is nothing in the record that contradicts the information in PX 180. Therefore, it is apparent that SSC did not lose man-hours during the second "window."

IV. Superior Knowledge

In addition to its claim of breach of the implied warranty, plaintiff claims that defendant had "superior knowledge" that the plans were incomplete and defective. Plaintiff maintains that the government found the Architect/Engineers plans unacceptable, but included them in the bid anyway and then proceeded to cover up this fact by its evasive answers to RFIs and refusing to issue revised drawings. Defendant contends that plaintiff did not plead this claim in its complaint and, therefore, should not now be allowed to argue "superior knowledge."

A review of plaintiff's complaint reveals that there is no mention that the government knew that the plans were defective. Although plaintiff avers that it discovered documents that the government withheld information about the plans during discovery, plaintiff never moved to amend its complaint. Nor does plaintiff's

---

[49] ***Tr.*** at 2480.

[50] ***See PX 181***.

[51] ***See PX 157(2)*** at X-18.

argument that "superior knowledge" is implicit in its government hindrance claim hold water because a "superior knowledge" claim is more in the vein of misrepresentation than hindrance. ***Granite Const. Co. v. United States***, 24 Cl. Ct. 735, 748-50 (1991) (reviewing "superior knowledge" cases and stating that "[t]he element of misrepresentation, inadvertent or deliberate, is not directly relied upon, but may be implicit in the requirement that the Government know or have reason to know that the contractor is, in effect, stepping into a trap.") Plaintiff's complaint reads "the VA also breached its implied obligations to cooperate with Caddell and its subcontractors, including Steel Service, in good faith in the performance of the Contract and not to take any action which delayed, interfered with or otherwise hindered Steel Service's performance."[52] The court does not believe that this or any other portion of plaintiff's complaint can be read so as to put defendant on notice of a "superior knowledge" claim.

Even if it had properly pled "superior knowledge," plaintiff was unable to prove its allegations at trial. "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance." ***Giesler v. United States,*** 232 F.3d 864, 876 (Fed. Cir. 2000). Plaintiff did not present any evidence at trial that the VA knew the plans were in any way defective, nor that the knowledge of any defects in the plans was critical to plaintiff's performance of its contractual obligations.[53] Finally, SSC reviewed the plans before submitting its bid, therefore, the status of the plans was not hidden, but right before SSC's eyes. Thus, plaintiff cannot recover on the basis of "superior knowledge."

---

[52] ***Complaint*** ¶ 23.

[53] At the end of its case, plaintiff attempted to introduce letters and other documents that it alleged demonstrated that the VA knew the plans were deficient. Plaintiff, however, did not call any witnesses with personal knowledge of the documents or their contents. Therefore, the court granted defendant's objection, and the documents were not admitted. Although plaintiff explained that it was forced to offer the documents in this manner because defendant chose not to call anyone from the VA associated with the project to testify, this argument was unpersuasive. Plaintiff bears the burden of proof in this type of case and defendant is under no obligation to offer any evidence to establish its case. In our adversarial system, it is up to each party to present its best case.

Conclusion

For the above-stated reasons, the court finds that plaintiff did not prove that defendant breached the contract in this case. The Clerk of the Court is directed to enter judgment in favor of defendant. No costs.

IT IS SO ORDERED.

**s/Bohdan A. Futey**
**BOHDAN A. FUTEY**
**Judge**